JUDGE RAKOFF **14 CV 4456**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------x
ANGIE CRUZ and I.H.
on behalf of themselves and all others similarly
situated,

         Plaintiffs,

     -against-

HOWARD ZUCKER, as Commissioner of the
Department of Health,

        Defendant.
--------------------------------------------------------x

CLASS ACTION COMPLAINT



## PRELIMINARY STATEMENT

  1.  Gender Dysphoria ("GD"), formerly known as Gender Identity Disorder ("GID"),

is a serious medical condition recognized as such by physicians and other medical

professionals worldwide. GD/GID is characterized by an extreme sense of distress due to a

mismatch between birth sex and a person's internal sense of their gender. The condition

causes intense emotional pain and suffering and, if left untreated, can result in psychological

dysfunction, debilitating depression and, for people without access to appropriate health care

and treatment, suicidality and death. An established body of medical research demonstrates

that hormone therapy and sex reassignment surgery are effective and medically necessary

forms of therapeutic treatment for many people diagnosed with GD/GID.

  2.  For years, medical assistance coverage was available to Medicaid-eligible patients

in New York for the treatment of GD/GID, including hormone treatment and sex reassignment

surgery. In 1998, however, the New York State Department of Health (the "DOH") reversed

course, promulgating a regulation that precluded any payment whatsoever for "care, services,

drugs or supplies" rendered for the purposes of gender reassignment treatment or for "promoting" such treatment. Despite scientific evidence conclusively demonstrating otherwise, the DOH claimed then—and still does today, more than fifteen years later—that such treatment is "experimental" and not proven to be "safe and effective over the long term." As a result, Medicaid-eligible patients who have been diagnosed with GD/GID are forced to make the difficult choice between foregoing the medical treatment they desperately need, or giving up the basic necessities of life (such as food and shelter) in order to pay for that treatment themselves.

3.      The federal Department of Health and Human Services (the "HHS") recently recognized that denying Medicare coverage for all gender reassignment surgery based on the alleged "experimental" nature of gender reassignment surgery is unreasonable in light of evidence establishing that such surgery is safe and effective. The DOH's continuing coverage exclusion for gender reassignment surgery is not reasonable, based on the relevant medical and scientific evidence, and thus should be declared invalid.

4.      Plaintiffs therefore bring this action on behalf of themselves and all others similarly situated against Dr. Howard Zucker, acting in his official capacity as Commissioner of the New York State Department of Health ("Defendant"), in promulgating and enforcing 18 N.Y.C.R.R. § 505.2(l) (hereinafter referred to as "Section 505.2(l)") pursuant to 42 U.S.C. § 1983, the Supremacy Clause of the U.S. Constitution, art. VI, Article I, Section 11 of the New York State Constitution, and Section 1557 of the Patient Protection and Affordable Care Act (the "ACA"), 42 U.S.C. § 18116.

5.     As set forth below, Plaintiffs seek declaratory and injunctive relief to enjoin Defendant from continued enforcement of Section 505.2(l), and other appropriate relief on the grounds that it:  (i) conflicts with the Medicaid Act, 42 U.S.C. §§ 1396 et seq., and thus is preempted by the Supremacy Clause, U.S. Const. art. VI; (ii) unlawfully discriminates against a protected class of Medicaid-eligible persons and thus violates Article I, Section 11 of the New York State Constitution; and (iii) discriminates against Medicaid-eligible persons on the basis of sex and disability and thus violates Section 1557 of the ACA, 42 U.S.C. § 18116.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over the parties and the claims asserted herein pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), and 1367.

7.     Plaintiffs' claims for declaratory relief are brought pursuant to 28 U.S.C. §§ 2201 and 2202.

8.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Plaintiffs reside within this judicial district, the events giving rise to this action occurred in this judicial district, and Defendant is subject to personal jurisdiction in this judicial district.

## THE PARTIES

9.     Plaintiff I.H. resides in New York City and is a Medicaid recipient.

10.    Plaintiff Angie Cruz resides in New York City and is a Medicaid recipient.

11.    Defendant Howard Zucker is the interim Commissioner of the DOH. As such, he is responsible for the administration of the New York State Medicaid program and supervision

of the administration of the state's Medicaid program by the local social services districts. He

maintains an office at Corning Tower, Empire State Plaza, Albany, New York.

## CLASS ACTION ALLEGATIONS

12.    Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(2) on behalf

of themselves and a class of all others similarly situated, defined as:

> All Medicaid-eligible persons who have been diagnosed with
> Gender Identity Disorder or Gender Dysphoria, and whose
> expenses associated with medically necessary GID- or GD-related
> treatment are not reimbursable by Medicaid pursuant to Section
> 505.2(l).

13.    The class is so numerous that joinder of all members is impracticable.

Transgender people live in poverty at a rate approximately between twice and four times that

of the general population, according to the National Transgender Discrimination Survey.

14.    There are questions of law and fact common to the class, including, but not

limited to whether Section 505.2(l) conflicts with the Medicaid Act, and whether the

Defendant's actions in promulgating and enforcing Section 505.2(l) are preempted by the

Supremacy Clause of the United States Constitution, and/or violate Article I, Section 11 of the

New York State Constitution, and/or are otherwise not in accordance with law, and/or violate

Section 1557 of the ACA, 42 U.S.C. § 18116, and whether declaratory and injunctive relief is

therefore appropriate.

15.    The named Plaintiffs' claims are typical of the claims of the class. The named

Plaintiffs' and the class members' claims arise from the promulgation and enforcement of

Section 505.2(l).

16.   Declaratory and injunctive relief is appropriate with respect to the class as a whole because Defendant has acted on grounds applicable to the class.

17.   The named Plaintiffs and the proposed class members are represented by the Sylvia Rivera Law Project, The Legal Aid Society, and Willkie Farr & Gallagher LLP, whose attorneys are experienced in class action litigation and will fairly and adequately represent the class.

18.   A class action is superior to other available methods for a fair and efficient adjudication of this matter in that the litigation of separate actions by individual class members would unduly burden the Court and create the possibility of conflicting decisions.

## FEDERAL STATUTORY AND REGULATORY SCHEME

19.   Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 et seq., creates the federal Medicaid program, through which the federal government provides matching funds to states to provide medical assistance to residents who meet certain eligibility requirements. 42 U.S.C. § 1396b. The objective of the Medicaid program is to enable each state to furnish medical assistance to individuals whose incomes and resources are insufficient to meet the costs of necessary medical services. 42 U.S.C. § 1396.

20.   States are not required to participate in the Medicaid program, but if they choose to, they must comply with federal Medicaid statutes and their implementing regulations. 42 U.S.C. §§ 1396, 1396a, 1396c.

21.   The federal Medicaid program requires a participating state to establish or designate a single state agency that is responsible for administering or supervising the administration of that state's Medicaid program.  42 U.S.C. § 1396a(a)(5).

22.   Participating states also must submit a "state plan" to the Secretary of the United States Department of Health and Human Services ("HHS") for approval before that state may receive Medicaid funds.  42 U.S.C. §§ 1396a(a), (b).

23.   A state plan "must include reasonable standards for determining eligibility for and the extent of medical assistance under the plan."  42 U.S.C. § 1396a(a)(17).

24.   An individual is "categorically needy" and eligible for Medicaid if he or she falls into one of the seven eligibility categories set forth in 42 U.S.C. §§ 1396a(a)(10)(A)(i)(I) – (VII).  Persons who receive Supplemental Security Income ("SSI") are eligible and are considered "categorically needy" for Medicaid.  42 U.S.C. §§ 1396a(a)(10)(A)(i)(I); 42 C.F.R. § 435.120.

25.   The Medicaid Act mandates that a state plan provide for making medical assistance available to all categorically needy individuals by providing, at minimum, inpatient hospital services, outpatient hospital services, laboratory and X-ray services, and physicians' services furnished by a physician.  42 U.S.C. §§ 1396a(a)(10)(A), 1396d(a)(1), 1396d(a)(2), 1396d(a)(3), 1396d(a)(5).

26.   Pursuant to the Medicaid Act, medical assistance must be provided "in a manner consistent with . . . the best interests of the recipients."  42 U.S.C. § 1396a(a)(19).

27.    The Medicaid Act further requires that "the medical assistance made available to any [categorically needy] individual shall not be less in amount, duration or scope than the medical assistance made available to other such individuals." 42 U.S.C. § 1396a(a)(10)(B)(i).

28.    Federal regulations likewise require that medical assistance is provided in equal amount, duration, and scope to all categorically needy Medicaid recipients. 42 C.F.R. § 440.240(b).

29.    Federal regulations require that *all* services defined as required services in 42 C.F.R. §§ 440.10–440.50 and 42 C.F.R. § 440.70 be provided to *all* categorically needy Medicaid recipients. 42 C.F.R. § 440.210(a)(1).

30.    Inpatient hospital services, defined as services that "are ordinarily furnished in a hospital for the care and treatment of inpatients and are furnished under the direction of a physician," are required. 42 C.F.R. § 440.10(a)(1), (2).

31.    Outpatient hospital services, defined as "preventative, diagnostic, therapeutic, rehabilitative, or palliative services that are furnished to outpatients and are furnished by or under the direction of a physician," are a required service. 42 C.F.R. § 440.20(a)(1), (2).

32.    X-ray and other laboratory services "when ordered and provided by or under the direction of a physician or other licensed practitioner of the healing arts," are a required service. 42 C.F.R. § 440.30(a).

33.    Physicians' services, defined as "services furnished by a physician within the scope of practice of medicine or osteopathy as defined by State law and by or under the

personal supervision of an individual licensed under State law to practice medicine or

osteopathy," are a required service.  42 C.F.R § 440.50(a)(1), (2).

34.    "[E]ach service must be sufficient in amount, duration or scope to reasonably

achieve its purpose."  42 C.F.R. § 440.230(b).

35.    The "Medicaid agency may not arbitrarily deny or reduce the amount or scope of

a required service under sections 440.210 and 440.220 to an otherwise eligible recipient solely

because of the diagnosis, type of illness or condition."  42 C.F.R. § 440.230(c).

36.    Section 1557 of the ACA, 42 U.S.C. § 18116, provides, in relevant part that:

> [A]n individual shall not, on the ground prohibited under . . . title IX of the
> Education Amendments of 1972 (20 U.S.C. 1681 et seq.) . . . be excluded from
> participation in, be denied the benefits of, or be subjected to discrimination under
> any health program or activity, any part of which is receiving Federal financial
> assistance, including credits, subsidies, or contracts of insurance, or under any
> program or activity that is administered by an Executive Agency or any entity
> established under this title (or amendments).

ACA § 1557(a), 42 U.S.C. § 18116(a).  The ground prohibited under Title IX, Education

Amendments of 1972, is sex and states:  "No person in the United States shall, on the basis of

sex, be excluded from participation in, be denied the benefits of, or be subjected to

discrimination under any education program or activity receiving Federal financial assistance[.]"

20 U.S.C. § 1681(a).  Thus, the ACA prohibits health care programs receiving federal assistance

from discriminating on the basis of sex.  The Director of HHS's Office for Civil Rights (the

"OCR"), Leon Rodriguez, has confirmed that this protection includes gender, gender identity and

failure to conform to the sex and gender stereotypes associated with one's anatomical sex.  A

letter from Mr. Rodriguez to the National Center for Lesbian Rights dated July 12, 2012 states:

"We agree that Section 1557's sex discrimination prohibition extends to claims of discrimination

based on gender identity or failure to conform to stereotypical notions of masculinity or femininity[.]"

## NEW YORK STATE STATUTORY AND REGULATORY SCHEME

37.   New York State has opted to participate in the federal Medicaid program.  N.Y. Soc. Serv. Law § 363-a.

38.   The Medicaid program is administered in New York in accordance with Sections 363-369 of the New York Social Services Law, and the regulations promulgated thereunder. N.Y. Soc. Serv. Law §§ 363-369; 18 N.Y.C.R.R. §§ 358, 360, 505, et seq.

39.   Effective October 1, 1996, the DOH assumed responsibility, formerly held by the New York State Department of Social Services ("NYSDSS"), for administering New York's Medicaid Program.  All regulations of NYSDSS with respect to the Medicaid program continued, in full force and effect, as regulations of the DOH.  N.Y. Soc. Serv. Law § 363-a(1); 1996 N.Y. Session Law, c. 474, § 242.

40.   New York Social Services Law § 365-a establishes the coverage and adequacy of medical assistance under the New York State plan for Medicaid.  N.Y. Soc. Serv. Law § 365-a.

41.   New York Social Services Law §§ 363 and 364(2)(e) mandate a "comprehensive program of medical assistance for needy persons . . . to operate in a manner which will assure a uniform high standard of medical assistance throughout the state," in such a way "that the quality of medical care and services is in the best interests of the recipients."  N.Y. Soc. Serv. Law §§ 363, 364(2)(e).

42.   Pursuant to § 365-a(2) of the New York Social Services Law, "medical assistance" is defined as "payment of part or all of the cost of care, services and supplies which are necessary to prevent, diagnose, correct or cure conditions in the person that cause acute suffering, endanger life, result in illness or infirmity, interfere with his capacity for normal activity, or threaten some significant handicap. . . ." N.Y. Soc. Serv. Law § 365-a(2).

43.   Medical assistance is also defined to include "surgical benefits for certain surgical procedures which meet standards for surgical intervention, as established by the state commissioner of health on the basis of medically indicated risk factors, and medically necessary surgery where delay in surgical intervention would substantially increase the medical risk associated with such surgical intervention," N.Y. Soc. Serv. Law § 365-a(5)(b), and "surgical benefits for other deferrable surgical procedures specified by the state commissioner of health, based on the likelihood that deferral of such procedures for six months or more may jeopardize life or essential function, or cause severe pain; provided, however, such deferrable surgical procedures shall be included in the case of in-patient surgery only when a second written opinion is obtained from a physician, or as otherwise prescribed, in accordance with regulations established by the state commissioner of health, that such surgery should not be deferred," N.Y. Soc. Serv. Law § 365-a(5)(c).

44.   In New York State, medical assistance coverage includes:  (a) "[c]onstruction of artificial vagina (vaginal atresia or absence) with or without graft"; (b) "[o]rchiectomy, simple unilateral[,] bilateral"; (c) "[a]mputation of penis, partial[,] complete[,] radical"; (d) "[c]omplete (simple) mastectomy"; (e) "[r]adical mastectomy, including breast, pectoral muscles and axillary lymph nodes"; and (f) "[t]otal hysterectomy (corpus and cervix) with or without tubes, and/or ovaries, one or both." 18 N.Y.C.R.R. § 533.5.

45.    18 N.Y.C.R.R. § 505.2 sets forth eligibility for and the extent of physicians' services provided under the New York State Medicaid plan.

46.    On July 16, 1997, the DOH published a Notice of Proposed Rule Making which proposed amending 18 N.Y.C.R.R. § 505.2 to include Section 505.2(l) (the "Notice of Proposed Rulemaking"). Section 505.2(1) provides:

> Gender reassignment.  Payment is not available for care, services, drugs, or supplies rendered for the purpose of gender reassignment (also known as transsexual surgery) or any care, services, drugs, or supplies intended to promote such treatment.

47.    Despite acknowledging that promulgation of the proposed rule would only give rise to "minimal savings" because "the particular treatments and procedures involved in gender reassignment are also used to treat other medical conditions,"  the DOH adopted the regulation nevertheless, claiming that gender reassignment treatment "has not been shown to be a safe and effective treatment over the long-term."

48.    In response to the Notice of Proposed Rule Making, the DOH did not receive any submissions in support of the proposed rule.  However, the DOH did receive comments in opposition to the proposed rule from two physicians, Dr. Walter J. Meyer III and Dr. Heino F.L. Meyer-Bahlburg, each of whom were specialists with more than twenty years of experience in the treatment of persons with GD/GID.  The DOH acknowledged receipt of the comments it had received from Dr. Meyer and Dr. Meyer-Bahlburg in the Notice of Adoption, which was published on March 25, 1998.

49.    Dr. Meyer-Bahlburg noted that the contention that sex reassignment treatment "has not been shown to be a safe and effective treatment over the long-term" was "not in

- 11 -

agreement with the empirical data as documented in numerous follow-up studies of parties after sex reassignment in the U.S. and other countries." For Medicaid-dependent patients with GD/GID, Dr. Meyer-Bahlburg said, enactment of the rule would cause "unnecessary suffering." Dr. Meyer observed that the "appropriate, effective and safe treatment for [transgender] patients includes living in the role of the desired gender, hormonal treatment to match that gender, and surgical correction of the genitalia." Dr. Meyer urged the DOH to reject the proposed rule, noting that it would be "inhuman" to deny these patients appropriate treatment, and that enactment would be based on prejudice against the persons who would receive this care.

## CONSTITUTIONAL PROVISIONS

50.   Article Six, Clause 2 of the United States Constitution provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof, and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the contrary notwithstanding." U.S. Const. art. VI, Clause 2.

51.   Article 1, Section 11 of the New York State Constitution provides that "[n]o person shall be denied the equal protection of the laws of this state or any subdivision thereof." N.Y. Const. art. I, § 11.

## **FACTS**

52.    GD/GID is consistently recognized as "an identifiable, severe and incapacitating disease." D. Harish & B. Sharma, Medical Advances in Transsexualism and the Legal Implications, 24 Am. J. Forensic Med. & Pathology, 100, 101 (2003).

53.    GID is defined in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision ("DSM-IV-TR") as a condition characterized by "a strong and persistent cross-gender identification" with "persistent discomfort about one's assigned sex" unrelated to either a "perceived cultural advantage[] of being the other sex" or "a concurrent physical intersex condition," which results in "clinically significant distress or impairment in social, occupational or other important areas of functioning." DSM-IV-TR, §§ 302.06, 302.85.

54.    In May 2013, the American Psychiatric Association released the latest version of its Diagnostic and Statistical Manual of Mental Disorders ("DSM-V"). The diagnosis of GID was changed to GD, which is defined as follows:

A.    A marked incongruence between one's experienced/expressed gender and assigned gender, of at least 6 months' duration, as manifested by at least two of the following:
(i) A marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics (or in young adolescents, the anticipated secondary sex characteristics).
(ii) A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender (or in young adolescents, a desire to prevent the development of the anticipated secondary sex characteristics).
(iii) A strong desire for the primary and/or secondary sex characteristics of the other gender.
(iv) A strong desire to be of the other gender (or some alternative gender different from one's assigned gender).
(v) A strong desire to be treated as the other gender (or some alternative gender different from one's assigned gender).

(vi) A strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender different from one's assigned gender).

B.    The condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning.

DSM-V, §§ 302.06, 302.85.

55.    Sex reassignment has been endorsed by the country's leading medical organizations as safe and effective treatment for GD/GID.

56.    For example, the American Medical Association has recognized that "an established body of medical research demonstrates the effectiveness and medical necessity of mental health care, hormone therapy and sex reassignment surgery as forms of therapeutic treatment for many people diagnosed with GD and GID" and opposes "categorical exclusions," such as Section 505.2(1), "of coverage for treatment of gender identity disorder when prescribed by a physician."

57.    Similarly, the American Psychological Association "recognizes the efficacy, benefit and medical necessity of gender transition treatments," and has called upon "public and private insurers to cover these medically necessary treatments."

58.    The American Psychiatric Association likewise "recognizes that appropriately evaluated transgender and gender-variant individuals can benefit greatly from medical and surgical gender transition treatments," advocates for "removal of barriers to care and supports both public and private health insurance coverage for gender transition treatment," and "opposes categorical exclusions of coverage for such medically necessary treatment when prescribed by a physician."

- 14 -

59.    According to the World Professional Association for Transgender Health ("WPATH"), which is an international interdisciplinary professional association founded in 1979 and devoted to the understanding and treatment of individuals with gender identity disorders, "sex (gender) reassignment, properly indicated and performed . . . has proven to be beneficial and effective in the treatment of individuals with transsexualism, gender identity disorder and/or gender dysphoria."  In its Medical Necessity Statement, WPATH has noted that the "medical procedures attendant to sex reassignment are not 'cosmetic' or 'elective' or for the mere convenience of the patient.  These reconstructive procedures are not optional in any meaningful sense, but are understood to be medically necessary for the treatment of the diagnosed condition."  Nor are they "experimental:  decades of both clinical research and medical research show that they are essential to achieving well-being for the transsexual patient."

60.    The federal Medicare program allows for beneficiaries to apply for transition-related medical care. On May 30, 2014, the Appeals Board for HHS issued a decision declaring that Medicare's blanket exclusion on gender-confirming surgeries, which was narrower than that of its New York State counterpart, was not valid.  The Appeals Board ordered CMS to implement its decision within thirty days and "to apply any resulting policy changes to claims or service requests made by Medicare beneficiaries[.]" As a result, Medicare-eligible beneficiaries may seek coverage for transition-related care, while Medicaid beneficiaries who are otherwise similarly situated may not.

### Plaintiff I.H.

61.    I.H. is a categorically needy Medicaid recipient residing in Manhattan, New York. She is forty-six years old and has been a recipient of Medicaid benefits for most of the past twenty-five years.

62.    I.H. supports herself with Supplemental Security Income ("SSI"), benefits from New York City's HIV/AIDS Services Administration ("HASA") and public benefits and food stamps from New York City's Human Resources Administration ("HRA").

63.    I.H. was assigned male at birth, but has identified as a woman since she was about twelve years old.  I.H. was first assessed by a psychiatrist due to her gender non-conformity on or around 1974, when she was approximately six years old.  She was later diagnosed with GID.

64.    I.H. has been living full-time as a woman for over twenty-five years, including conforming her physical appearance with her female gender.  She began taking feminizing hormones in 1984 at the approximate age of fourteen.  I.H. was not supervised by a doctor when she started taking hormones.  She first received her hormones from her grandmother when she was young, and later purchased them from pharmacies or from other transgender women.  During this time, I.H. did not receive hormones from doctors as she was unsure how to obtain them and did not have appropriate personal documentation, such as a birth certificate, for her to access health care.

65.    I.H. developed serious health problems around the age of twenty-six as a result of her unsupervised hormone usage.  For example, she had a minor heart attack when she was eighteen, followed by a major stroke when she was twenty-six.  Her unsupervised hormone use also caused damage to her genitals.  I.H. stopped taking hormones when she was

approximately twenty-six years old because of these health complications.  I.H. ceased taking

hormones at that time based on doctors' recommendations at that time, as they told her she had

harmful levels of hormones in her system.

66.    I.H. tried to live without hormones so as not to do any further damage to her

health.  Around age forty, I.H. started to feel that with age, she was getting stiffer and losing

her femininity.  She started taking hormones again, this time under a doctor's care.  At first she

had to pay $100 for her hormones every month by herself, because Medicaid did not cover the

hormone therapy.

67.    Since 2010, I.H. has been taking feminizing hormones under the supervision of

her physicians at Callen-Lorde Community Health Center.  She takes an oral form of estradiol.

Medicaid repeatedly denied insurance coverage for I.H.'s hormone therapy.  Only after I.H.

changed her gender marker with HASA from male to female four years ago did Medicaid start

covering her hormone therapy.

68.    Hormone therapy has made it possible for I.H. to appear as a woman.  The

feminizing hormones have helped her to develop her breasts and other feminine characteristics.

69.    I.H. has suffered from severe pain in her genitals for more than fifteen years.  She

has been in constant treatment for her pain.  Three years ago I.H. had her testicles removed

through a bilateral orchiectomy, due to ascension (rising) of the testes into her abdominal

cavity from prolonged feminizing hormone use.  This surgery was covered by Medicaid

because it was not related to I.H.'s GID treatment.

70.    I.H. still suffers from pain in her genitals despite the surgical intervention and other treatments.  Due to complications from her orchiectomy, I.H. has developed a thrombosis in her penis and suffers from priapism.  Priapism is a condition where blood accumulation in the penis results in extended erections.  These are severe illnesses that limit I.H.'s ability to leave the house and have forced I.H. to go to the hospital or emergency room on numerous occasions.

71.    To resolve her priapism and thrombosis, I.H.'s doctor recommends full gender-confirming surgery, including a penectomy procedure, which involves removal of the penis.  Upon information and belief, the complete removal of I.H.'s penis through penectomy would be covered by Medicaid because it is not related to I.H.'s treatment for GD/GID.  However, if I.H.'s penis is completely removed through a penectomy, her penis tissue could not be used for a later vaginoplasty, the surgical construction of a vagina.

72.    I.H. requires a vaginoplasty with full penectomy in order to complete her treatment for gender dysphoria.  Upon information and belief, Medicaid will not cover a full vaginoplasty for I.H. because it would be prescribed as treatment for GD/GID.

73.    In a vaginoplasty with penectomy, only parts of the penis are removed and parts of the penis are used for the construction of the vagina.  Upon information and belief, if I.H. could directly obtain a vaginoplasty, she would be able to address the pain and inflammation in her genitals and complete sex reassignment at the same time.

74.    Medicaid's refusal to cover I.H. vaginoplasty puts I.H. in a devastating situation.  She has to endure the pain in her genitals until she can obtain a vaginoplasty.  A penectomy

without vaginoplasty would make it challenging or impossible for her to obtain vaginoplasty at a later point, because vaginoplasty typically requires the use of existing tissue.

75.   I.H. also needs breast reconstruction to affirm her female gender identity and repair damage from previous breast augmentation.

76.   At the age of seventeen, I.H. had surgery, performed by a surgeon in private practice, to place silicone implants in her chest.  She paid for the surgery herself.  She was not on Medicaid at that time.  The surgeon used cheap material, and the silicone implants ruptured three years later due to heat exposure.  I.H. was twenty years old when the implants ruptured. Now, twenty-five years later, she still has many toxic silicone particles in her chest from the rupture.  Loose silicone is linked to infections, disfigurement, respiratory distress, chronic pain, fatigue, cramping, stroke, pulmonary embolism, toxic shock, neuropathy, and heart failure, among other severe health conditions, and may cause death if untreated.

77.   I.H. obtained two surgeries in which silicone particles were removed.  The doctors have not been able to remove all silicone particles.  I.H. herself paid for two previous surgeries in which silicone particles were removed from her body.  She obtained the first surgery at age twenty-four.  She was not on Medicaid at that time and paid $10,000.  At age thirty-two she had a second surgery which cost $13,000.  Medicaid did not cover the surgery. I.H. needs further surgeries to remove the silicone particles and to reconstruct her breasts.

78.   Upon information and belief, Medicaid will not cover the costs for breast reconstruction surgery because it is related to GD/GID.  I.H. is currently low-income and is not able to cover the costs for the breast surgery necessary to clean her chest of silicone particles and reconstruct her breasts.

79. The denial of coverage for vaginoplasty and breast reconstruction deprives I.H. of surgeries that are essential for her mental and physical health.

80. I.H.'s self confidence, mental stability and physical comfort suffer due to the mismatch of her genitals with her gender identity. She carries the mental diagnoses of severe bipolar disorder, post-traumatic stress disorder, anxiety with panic, and insomnia. I.H.'s doctor has concluded that these diagnoses are directly related to her GD. Because I.H. cannot obtain sex reassignment surgery and live as a woman with female genitals, her depression becomes so severe that she can be bed-bound for extended periods of time.

81. At the age of seventeen, I.H. was attacked badly by seven people when they found out she was transgender. This traumatic experience contributes to I.H.'s post-traumatic stress disorder. I.H. continues to be afraid that she will be attacked in public if she is perceived as transgender. Therefore it is crucial for her safety to outwardly appear as a non-transgender woman. This is only possible through hormone therapy and surgeries.

82. Without the surgeries, I.H. will remain in a status that is extremely dangerous for her physical and mental health. The thrombosis in her penis and priapism are serious illnesses that require urgent surgery. Two urologists have urged I.H. to obtain surgery as soon as possible.

83. The silicone particles that indurated after I.H.'s silicone implants burst cause constant pain in I.H.'s breasts, and she remains at risk of toxic shock and other side effects.

84. I.H. and individuals similarly situated need gender reassignment treatment, including surgery, in order to achieve the capacity to live a life without terrible suffering. I.H.

experiences acute interference with her capacity for normal activity as result of Defendant's refusal to provide medical assistance coverage of her gender reassignment treatment.

85.   Vaginoplasty with full penectomy and breast reconstruction with removal of silicone are medically necessary for I.H.'s treatment of GD and other health conditions, which are directly related to her being denied care.  I.H.'s significant depression often manifests in her disengaging in treatment for her HIV, a behavior referred to as passive suicidality.

86.   Defendant provides medical assistance coverage for the same surgical procedures and other treatments indicated by I.H.'s physicians as medically necessary to treat her GD/GID to Medicaid recipients, who are similarly situated to I.H. and suffering from medical conditions other than GD/GID.  See, e.g., 18 N.Y.C.R.R. § 533.5 (construction of an artificial vagina, orchiectomy, amputation of penis, mastectomy and hysterectomy).

87.   Defendant's promulgation and enforcement of the blanket coverage exclusion set forth in Section 505.2(l) does not serve any compelling, important or legitimate State interest. To the contrary, as set forth above, there is no scientific support for the notion that gender reassignment treatment is experimental, unsafe or ineffective, which were the stated reasons for the enactment of Section 505.2(l) and for Defendant's refusal, upon statutorily-mandated review, to repeal, alter or modify Section 505.2(l) thereafter.

**Plaintiff Cruz**

88.   Angie Cruz is a categorically needy Medicaid recipient residing in Bronx County, New York. Ms. Cruz is fifty years old and has been in almost continuous receipt of Medicaid benefits since she was a child.

89.   Ms. Cruz supports herself with Supplemental Security Income ("SSI") and public benefits and food stamps from New York City's Human Resources Administration ("HRA").

90.   Ms. Cruz was assigned male at birth, but has identified as a woman since she was ten years old.  Most of Ms. Cruz's family has recognized that she was a woman since she was young.  Her father was very accepting of her self-identification as female, although it took her mother considerably longer.  Her two brothers and sister consider her a second sister and are very supportive.  Since Ms. Cruz was young, most of her family members have addressed her as a woman and have used the pronoun "she" to describe her.

91.   Ms. Cruz started taking hormones as a teenager in order to help align her physical appearance with her female gender identity.  She started taking prescribed hormones in pill form on and off from the age of seventeen, after being evaluated by a psychiatrist to make sure she understood the risks and consequences of hormone therapy.  Since then she has gotten her hormones either from doctors and pharmacies or from the street.

92.   Ms. Cruz has lived openly as a woman since she was in her early twenties.  She was first officially diagnosed with GID in 2004.  Since 2005, Ms. Cruz's prescribed hormone therapy requires her to take estrogen injections every other week.

93.   Angie Cruz's hormone therapy has created positive physical bodily change, resulting in a more feminine body.  Her skin got softer, facial and body hair growth stopped and her facial features became more feminine.  She has felt much more comfortable and confident because of the positive body changes.

94.   Ms. Cruz stopped receiving hormone therapy in 2004 due to health problems. She developed severe pneumonia, resulting in the collapse of her lungs. She started taking a blood thinner, and was forced to go off hormones. She remained off hormones for eighteen months before going back on hormones in 2005. Since then, Ms. Cruz went off Medicaid and hormones for short periods of time on several other occasions.

95.   In 2012, Ms. Cruz legally changed her name, and was able to obtain identification documents bearing the name Angie Milan Cruz. However, some of Ms. Cruz's documents, such as her New York State identification card and Medicaid card, still bear a "male" gender marker because she was unable to change the designation.

96.   Although supported by much of her family, Ms. Cruz struggles as a result of having a physical body that does not match her gender identity. Although most people she meets address Ms. Cruz as a woman, she describes herself as having lived for a long time in secrecy.

97.   Ms. Cruz needs breast augmentation surgery and vaginoplasty in order to complete her gender transition. She sees the next phase of her transition as a step-by-step process, and would like to begin with breast augmentation.

98.   Ms. Cruz feels that without breast augmentation and vaginoplasty, her gender transition will not be complete. She feels that having breast augmentation and vaginoplasty will reduce the social isolation and stress she experiences as a result of her gender dysphoria.

99.   Breast augmentation and vaginoplasty are medically necessary treatments for Ms. Cruz's gender dysphoria.

100.  Upon information and belief, Medicaid will not pay for breast augmentation and sex reassignment surgery because it is related to Ms. Cruz's GID diagnosis and gender dysphoria.

101.  Ms. Cruz feels great emotional pain because Medicaid will not cover her breast implants and vaginoplasty.  It is devastating for Ms. Cruz to know she will not have any access to the desired surgeries. Ms. Cruz's self-confidence, mental stability and physical comfort suffer due to the mismatch of her body with her gender identity.

102.  Ms. Cruz and individuals similarly situated need gender reassignment treatment, including surgery, in order to achieve the capacity to live a life without terrible suffering.  Ms. Cruz experiences acute interference with her capacity for normal activity and a normal social life as result of Defendant's refusal to provide medical assistance coverage of her gender reassignment treatment.

103.  Ms. Cruz describes it as impossible to find and maintain a relationship. Whenever she meets a potential male partner she has to come out as transgender.  Ms. Cruz has experienced many relationship problems and loss of relationships because of the mismatch of her physical body and her female gender.

104.  Defendant provides medical assistance coverage for the same surgical procedures and other treatments indicated by Ms. Cruz's physicians as medically necessary to treat her GD/GID to Medicaid recipients, who are similarly situated to Ms. Cruz, suffering from medical conditions other than GD/GID.  See, e.g., 18 N.Y.C.R.R. § 533.5.

105.  Defendant's promulgation and enforcement of the blanket coverage exclusion set forth in Section 505.2(l) does not serve any compelling, important or legitimate State interest. To the contrary, as set forth above, there is no scientific support for the notion that gender reassignment treatment is experimental, unsafe or ineffective, which were the stated reasons for the enactment of Section 505.2(l) and for Defendant's refusal, upon statutorily mandated review, to repeal, alter or modify Section 505.2(l) thereafter.

### FIRST CLAIM FOR RELIEF

106.  Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 105 above.

107.  Section 505.2(l) and Defendant's written policies eliminating coverage for transition-related services for individuals diagnosed with GD/GID without an opportunity to obtain an individualized determination of medical necessity are in conflict with 42 U.S.C. § 1396a(a)(10)(A) and its implementing regulation 42 C.F.R. § 440.210, and are thus preempted by the Supremacy Clause of the U.S. Constitution, art. VI.

### SECOND CLAIM FOR RELIEF

108.  Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 107 above.

109.  Section 505.2(l) and Defendant's written policies eliminating coverage for transition-related services for individuals diagnosed with GD/GID conflict with Medicaid's comparability requirement, 42 U.S.C. § 1396a(a)(10)(B) and its implementing regulation 42 C.F.R. § 440.240(b), and are thus preempted by the Supremacy Clause of the U.S. Constitution, art. VI.

## THIRD CLAIM FOR RELIEF

110.  Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 109 above.

111.  Section 505.2(l) and Defendant's written policies eliminating coverage for transition-related services for individuals diagnosed with GD/GID for all categorically needy Medicaid recipients arbitrarily denies and reduces the amount, duration, or scope of a required service solely on account of diagnosis, which conflicts with 42 U.S.C. § 1396a(a)(17), 42 U.S.C. § 1396a(a)(10)(B)(i) and their implementing regulation 42 C.F.R. § 440.230(c), and are thus preempted by the Supremacy Clause of the U.S. Constitution, art. VI.

## FOURTH CLAIM FOR RELIEF

112.  Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 111 above.

113.  Defendant has violated and is violating Plaintiffs' rights under Section 11 of Article I of the Equal Protection Clause of the New York State Constitution by denying care, services, drugs and/or supplies to Plaintiffs to treat their GD/GID while providing the same care, services, drugs and/or supplies to categorically needy Medicaid recipients suffering from illnesses other than GD/GID without justification.  N.Y. Const. art. I, § 11.

114.  As a result of the promulgation and enforcement of Section 505.2(l), Medicaid provides coverage for non-experimental, medically necessary care, services, drugs and/or supplies to Medicaid-eligible people in New York except transgendered people.  Section 505.2(l) therefore unlawfully discriminates on the basis of sex (including gender, gender identity and failure to conform to the sex and gender stereotypes associated with one's

anatomical sex), identity as a transgender person, sexual orientation, and/or disability, and its enforcement denies Plaintiffs the equal protection of the laws.

115.  Defendant's actions in promulgating and enforcing Section 505.2(l) were undertaken purposefully and intentionally, and bear no substantial or rational relationship to any compelling, important or legitimate government interest.

**FIFTH CLAIM FOR RELIEF**

116.  Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 115 above.

117.  Section 505.2(l) and Defendant's written policies eliminating coverage for transition-related services for individuals diagnosed with GD/GID exclude Plaintiffs from participation in, deny Plaintiffs the benefits of, and/or subject Plaintiffs to discrimination under the New York State Medicaid Program, a health program receiving federal financial assistance, on the basis of sex (including gender, gender identity, and failure to conform to the sex and gender stereotypes associated with anatomical sex) and disability.  Section 505.2(l) therefore violates Section 1557 of the ACA, 42 U.S.C. § 18116, which is enforceable under 42 U.S.C. § 1983.

**PRAYER FOR RELIEF**

118.  WHEREFORE, Plaintiffs respectfully request that this Court:

(a)     Certify this action as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(2) with a plaintiff class defined as "All Medicaid-eligible persons who have been diagnosed with GID or GD and whose expenses associated with medically necessary GID- or GD-related treatment are not reimbursable by Medicaid pursuant to Section 505.2(l)";

(b)    Issue a permanent injunction pursuant to 42 U.S.C. § 1983 and otherwise, including but not limited to the Court's inherent power:

    i.    ordering Defendant Zucker to provide Plaintiffs with medical assistance coverage for all care, services, drugs and supplies prescribed by Plaintiffs' physicians as medically necessary for the purpose of gender reassignment to treat Plaintiffs' GD/GID;

    ii.    enjoining Defendant Zucker from denying medical assistance coverage to Medicaid-eligible recipients who have been diagnosed with GD/GID for expenses associated with medically necessary treatment of their GD/GID (including physician-prescribed care, services, drugs and supplies).

    iii.    ordering Defendant Zucker to repeal 18 N.Y.C.R.R. § 505.2(l); and

    iv.    ordering Defendant Zucker to issue an Informational Letter ("INF") informing local social services districts that 18 N.Y.C.R.R. § 505.2(l) is no longer in effect.

(c)    Enter a declaratory judgment declaring that:

    i.    18 N.Y.C.R.R. § 505.2(l) is preempted by the Supremacy Clause of the United States Constitution, art. VI. because it is inconsistent with the Medicaid Act;

    ii.    18 N.Y.C.R.R. § 505.2(l) violates Article 1, Section 11 of the New York State Constitution by denying care, services, drugs and/or supplies necessary to treat Medicaid-eligible patients diagnosed with GD/GID;

    iii.    18 N.Y.C.R.R. § 505.2(l) violates Section 1557 of the Patient Protection and Affordable Care Act, 42 U.S.C. § 18116, by denying care, services, drugs and/or supplies necessary to treat Medicaid-eligible patients diagnosed with GD/GID;

(d)    Award Plaintiffs costs and disbursements, including reasonable attorneys' fees, pursuant to 42 U.S.C. § 1988; and

(e)    Award Plaintiffs such other and further relief as the Court may deem just and proper.

Dated: June 19 , 2014
New York, New York

Respectfully submitted,

SYLVIA RIVERA LAW PROJECT

Elana Redfield, Esq.
Pooja Gehi, Esq.
147 West 24th Street, 5th Floor
New York, N.Y. 10001
Tel. (212) 337-8550
Fax (212) 337-1972

THE LEGAL AID SOCIETY

Scott Rosenberg, Esq.
Adriene Holder, Esq.
Judith Goldiner, Esq.
Kimberly Forte, Esq.
Rebecca Novick, Esq.
Belkys Garcia, Esq.
199 Water Street
New York, N.Y. 10038
Tel: 212-577-3300
Fax: 212-509-8761

WILLKIE FARR & GALLAGHER LLP

By: _M. Eaton._____

Mary Eaton, Esq.
Megan Y. Hogan, Esq.
L. Lars Hulsebus, Esq.
787 Seventh Avenue
New York, N.Y. 10019-6099
Tel: 212-728-8000
Fax: 212-728-8111

*Attorneys for Plaintiffs*