UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ x
ANGIE CRUZ, I.H., AR'ES KPAKA, and    :
KIYA CHRISTIE, on behalf of           .
themselves and all others similarly   :
situated,                             :
                                      :
                 Plaintiffs,          :
                                      :          14-cv-4456 (JSR)
              -v-                      :
                                      :              OPINION
HOWARD ZUCKER, as Commissioner of the :
Department of Health [of the State of :
New York],                            :
                                      :
                 Defendant.           :
------------------------------------ x

JED S. RAKOFF, U.S.D.J.

The intersection of our cognition with our emotions is both the essence of our humanity and the source of our anxiety. According to the plaintiffs in this class action, someone who is born with the physical equipment of one sex but emotionally identifies as someone of the opposite sex suffers severe anxiety and emotional distress that may, however, be materially alleviated by available medical procedures. Plaintiffs further contend that New York wrongly denies Medicaid coverage for many such procedures, regarding them as merely "cosmetic" or the like. The immediate question before the Court is whether the plaintiffs here can sue for redress of this alleged wrong. The Court concludes that they can.

Plaintiff Angie Cruz, now fifty years old, alleges that she was assigned male at birth but has identified as female since she was ten years old. See Amended Class Action Complaint dated March 27, 2015, ECF No. 27 ("Am. Compl.") ¶¶ 91, 93. She began taking hormones as a teenager in an effort to bring her physical appearance into alignment

with her gender identity and has undergone hormone therapy for much of her adult life, purchasing her hormones sometimes from doctors and pharmacies and sometimes on the street. Id. ¶¶ 94-95. Although this therapy has given her body a more feminine appearance, she still experiences intense distress and interference with her capacity for normal activity as a result of the mismatch between her body and her identity. Id. ¶¶ 96, 99, 104-05. Cruz is a "categorically needy" Medicaid recipient, meaning that she meets one of nine eligibility categories set forth in the federal Medicaid Act, 42 U.S.C. § 1396a(a)(10)(A)(i). Id. ¶¶ 29, 91.

Plaintiff Ar'es Kpaka, also a categorically needy Medicaid recipient, alleges that, although born with a male body, she has identified as female since she was three years old. Id. ¶ 136. As an adolescent, she hid her gender identity from her mother and brothers until, at age twenty-one, she was forced to move out of her mother's home and became homeless for several months. Id. ¶ 137. Now twenty-three, she is undergoing hormone therapy but still struggles with depression relating to her gender identity. Id. ¶¶ 136, 138, 140.

Plaintiff Riya Christie alleges that, growing up in Jamaica, she faced violence because of her gender expression and suffered from severe depression and suicidal thoughts. Id. ¶¶ 149-50. At the age of twenty-one, she moved to the United States and was granted asylum on the ground that her gender identity made it unsafe for her to return home. Id. ¶ 152. Now twenty-three, she continues to experience pain and anxiety as a result of the incongruence between her body and her

gender identity. Id. ¶ 159. She, like Cruz and Kpaka, is a categorically needy Medicaid recipient. Id. ¶ 136.

Each of the three named plaintiffs in this class action has been diagnosed with Gender Dysphoria ("GD") (formerly known as Gender Identity Disorder).[1] Id. ¶¶ 95, 138, 155. They allege that GD is recognized by the medical community as "'an identifiable, severe and incapacitating disease.'" Id. ¶ 80 (quoting D. Harish & B. Sharma, Medical Advances in Transsexualism and the Legal Implications, 24 Am. J. Forensic Med. & Pathology 100, 101 (2003)). It is defined in the latest edition of the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders ("DSM-V") as a "marked incongruence between one's experienced/expressed gender and assigned gender," as manifested by at least two of the following: (i) a "marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics…"; (ii) a "strong desire to be rid of one's primary and/or secondary sex characteristics…"; (iii) "a strong desire for the primary and/or secondary sex characteristics of the other gender"; (iv) a "strong desire to be of the other gender…"; (v) a "strong desire to be treated as the other gender…"; and (vi) a "strong conviction that one has the typical feelings and reactions of the other gender…" Id. ¶ 82 (quoting DSM-V §§ 302.06, 302.85). The DSM-V further specifies that GD is "associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning." Id.

---

[1] One of the original named plaintiffs, I.H., subsequently withdrew as

Plaintiffs allege that, in order to alleviate the profound psychological suffering and social and occupational impairment that they experience as a result of their GD, they need certain treatments to facilitate their transitions to the gender with which they identify. The treatments they seek include breast augmentation, facial feminizing surgery, chondrolarngoplasty (commonly referred to as "tracheal shave"), body sculpting procedures, and electrolysis. Id. ¶¶ 101, 141, 157. Plaintiffs allege that these treatments are safe, effective, and medically necessary. Id. ¶¶ 83-88. However, plaintiffs allege, they have been denied access to the needed treatments because such treatments are excluded from coverage under New York State's Medicaid program. Id. ¶¶ 103, 143, 158.

Prior to 1998, medical coverage was available under New York's Medicaid program for the treatment of GD, including hormone treatment and sex reassignment surgery. Id. ¶ 2. However, in 1998, the New York State Department of Health ("DOH"), which is responsible for administering the state's Medicaid program, promulgated 18 N.Y.C.R.R. § 505.2(l), which barred payment for all "care, services, drugs or supplies rendered for the purposes of gender reassignment" treatment or for "promoting" such treatment ("Section 505.2(l)"). Id.

On June 19, 2014, plaintiffs filed a class action complaint on behalf of themselves and all similarly situated individuals against Dr. Howard Zucker, acting in his official capacity as Commissioner of DOH, alleging that Section 505.2(l) violates various provisions of

---

class representative. ECF No. 28.

state and federal law. ECF No. 1. On August 21, 2014, the parties

agreed to a Provisional Stipulation and Order of Class Certification,

pursuant to which the Court certified a class consisting of:

> All New York State Medicaid recipients who have been
> diagnosed with Gender Identity Disorder or Gender Dysphoria,
> and whose expenses associated with medically necessary
> Gender Identity Disorder- or Gender Dysphoria-related
> treatment are not reimbursable by Medicaid pursuant to 18
> N.Y.C.R.R. § 505.2(l).

ECF No. 23. Subsequently, on December 17, 2014, DOH published a Notice

of Proposed Rule Making that proposed amendments to Section 505.2(l)

("Amended Section 505.2(l)").

The proposed Amended Section 505.2(l) lifted the blanket ban on

coverage for treatment of GD, making hormone therapy and gender

reassignment surgery available to certain Medicaid recipients. Am.

Compl. ¶ 5; Declaration of John Gasior dated April 17, 2015, ECF No.

31 ("Gasior Decl.") Ex. 1. However, it preserved two important

coverage exclusions. First, it excluded coverage for "cosmetic

surgery, services, and procedures," which it defined as "anything

solely directed at improving an individual's appearance," including

but not limited to certain enumerated procedures such as breast

augmentation, electrolysis, thyroid chondroplasty, and facial bone

reconstruction, reduction, or sculpturing (the "Cosmetic Procedures

Exclusion"). Gasior Decl. Ex. 1. Second, it did not provide coverage

for hormone therapy or gender reassignment surgery for individuals

under the age of eighteen, or for gender reassignment surgery for

individuals under the age of twenty-one where such surgery would

result in sterilization (the "Youth Exclusion"). Id.

The Amended Section 505.2(l) came into effect on March 11, 2015. On March 27, 2015, plaintiffs filed their Amended Complaint. In it, plaintiffs allege that the Amended Section 505.2(l) violates various provisions of Title XIX of the Social Security Act (the "Medicaid Act"), the Patient Protection and Affordable Care Act ("ACA"), and the New York State Constitution. Specifically, plaintiffs assert six causes of action: (I) violation of 42 U.S.C. § 1396a(a)(10)(A) and its implementing regulation, 42 C.F.R. § 440.210 (the "Availability Requirement" of the Medicaid Act); (II) violation of 42 U.S.C. § 1396a(a)(10)(B) and its implementing regulation, 42 C.F.R. § 440.240(b) (the "Comparability Requirement" of the Medicaid Act); (III) violation of 42 U.S.C. §§ 1396a(a)(17), 1396a(a)(10)(B)(i) and their implementing regulation, 42 C.F.R. § 440.230(c) (the "Reasonable Standards Requirement" of the Medicaid Act); (IV) violation of Article I, Section 11 of the New York State Constitution, which guarantees equal protection of the laws; (V) Section 1557 of the ACA, 42 U.S.C. § 18116, which prohibits sex discrimination in the provision of healthcare; and (VI) violation of 42 U.S.C. § 1396a(a)(43), which requires states to provide "early and periodic screening, diagnostic, and treatment services" for eligible persons under the age of twenty-one (the "EPSDT Requirement" of the Medicaid Act).[2]

---

[2] Plaintiffs' sixth cause of action cites the Availability and Comparability Requirements, 42 U.S.C. § 1396a(a)(10). See Am. Compl. ¶ 177. However, plaintiffs represented in their opposition to defendant's motion that they intended to cite the EPSDT Requirement, 42 U.S.C. § 1396a(a)(43), which is referenced in other paragraphs of

Defendant moved to dismiss the Amended Complaint. By "bottom line" Order dated June 26, 2015, the Court granted in part and denied in part defendant's motion. ECF No. 46. This opinion explains the reasons for those rulings.

As discussed above, in their Amended Complaint, plaintiffs allege violations of various provisions of the federal Medicaid Act. Medicaid is a cooperative state and federal benefit program designed to provide necessary medical services to "needy persons of modest income." Cmty. Health Ctr. v. Wilson-Coker, 311 F.3d 132, 134 (2d Cir. 2002). "'States need not participate in the program, but if they choose to do so, they must implement and operate Medicaid programs that comply with detailed federally mandated standards.'" Cmty. Health Care Ass'n of N.Y. v. Shah, 770 F.3d 129, 135 (2d Cir. 2014) (quoting Three Lower Cnties. Cmty. Health Servs., Inc. v. Maryland, 498 F.3d 294, 297 (4th Cir. 2007) (internal quotation marks omitted)). States that elect to receive federal Medicaid funds must submit a plan detailing how they will spend such funds to the Centers for Medicare and Medicaid Services, a federal agency within the Department of Health and Human Services. Wilson-Coker, 311 F.3d at 134 (citing 42 U.S.C. §§ 1396, 1396a). State Medicaid plans are subject to extensive requirements, four of which are relevant here.

---

the Amended Complaint. Reading the Amended Complaint as a whole and drawing all inferences in plaintiffs' favor, it is clear that the citation to Section 1396a(a)(10) was merely a scrivener's error, and the Court will treat it as such. Because of this error, defendant does not make any argument with respect to the EPSDT Requirement. Defendant has not been prejudiced by plaintiffs' error, however, as the Court finds that the EPSDT Requirement gives rise to a private right of

Availability. The Availability Requirement provides that a state plan for medical assistance "must provide … for making medical assistance available [to all categorically needy individuals], including at least" certain enumerated types of care and services, including inpatient and outpatient hospital services, laboratory and x-ray services, nursing facility services, and physicians' services. 42 U.S.C. § 1396a(a)(10)(A), 42 U.S.C. § 1396d(a). Categorically needy individuals are those meeting one of nine eligibility criteria, which include, for example, receipt of supplemental security income benefits and having an income that does not exceed 133 percent of the poverty line. 42 U.S.C. § 1396a(a)(10)(A)(i)(I)-(IX).

The implementing regulation, 42 C.F.R. § 440.210, requires the State plan to provide categorically needy individuals with the "services defined in § 440.10 through 440.50 [and] 440.70." Those provisions, in turn, further define the types of services that must be provided. For example, "inpatient hospital services" are defined as services that "(1) are ordinarily furnished in a hospital for the care and treatment of inpatients; (2) are furnished under the direction of a physician or dentist; and (3) are furnished in an [appropriate and approved] institution…" 42 C.F.R. § 440.10(a). Similarly, "physicians' services" are defined as "services furnished by a physician … [w]ithin the scope of practice of medicine or osteopathy as defined by State law; and … [b]y or under the personal supervision of an individual

_____

action. See infra.

8

licensed under State law to practice medicine or osteopathy." 42

C.F.R. § 440.50(a).

> The implementing regulations further provide, in relevant part:

> (b) Each service must be sufficient in amount, duration, and scope to reasonably achieve its purpose.

> (c) The Medicaid agency may not arbitrarily deny or reduce the amount, duration, or scope of a required service under §§ 440.210 and 440.220 to an otherwise eligible beneficiary solely because of the diagnosis, type of illness, or condition.

> (d) The agency may place appropriate limits on a service based on such criteria as medical necessity or on utilization control procedures.

42 C.F.R. § 440.230.

Comparability. The Medicaid Act's Comparability Requirement

provides that "the medical assistance made available to any

[categorically needy individual] … shall not be less in amount,

duration, or scope than the medical assistance made available to any

other such individual." 42 U.S.C. § 1396a(a)(1)(B)(i). Its

implementing regulation provides that the state's "plan must provide

that the services available to any [categorically needy] individual …

are equal in amount, duration, and scope for all beneficiaries within

the [categorically needy] group." 42 C.F.R. § 440.240(b). The purpose

of the Comparability Requirement is to make clear that "states may not

provide benefits to some categorically needy individuals but not to

others." Rodriguez v. City of New York, 197 F.3d 611, 615 (2d Cir.

1999).

EPSDT. The Medicaid Act further requires a state plan for medical assistance to provide "early and periodic screening, diagnostic, and treatment services," including regular screening for physical and mental illnesses and conditions, to eligible individuals under the age of twenty-one. 42 U.S.C. §§ 1396a(a)(43), 1396d(r). In addition, the state plan must provide "[s]uch other necessary health care, diagnostic services, treatment, and other measures … to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services, whether or not such services are covered under the State plan." 42 U.S.C. § 1396d(r)(5).

Reasonable Standards. Finally, the Medicaid Act requires that the state plan must "include reasonable standards … for determining eligibility for and the extent of medical assistance under the plan which [] are consistent with the objectives of [the Medicaid Act]." 42 U.S.C. § 1396a(a)(17). This subsection further sets forth certain requirements for the "reasonable standards" that the state must adopt, such as the types of income and resources that the state may take into account in determining eligibility. Id.

Plaintiffs' claims alleging violations of the Availability Requirement (Count I), the Comparability Requirement (Count II), and the EPSDT Requirement (Count VI) of the federal Medicaid Act are brought pursuant to 42 U.S.C. § 1983 ("Section 1983"), which provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the

> Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress…

42 U.S.C. § 1983. In his motion to dismiss, defendant argued that Section 1983 does not create a private right of action to enforce these provisions, and therefore that plaintiffs' Counts I, II, and VI must be dismissed for failure to state a claim.

In Maine v. Thiboutot, the Supreme Court held that the Section 1983 remedy encompasses rights conferred by federal statutes. 448 U.S. 1, 4 (1980). Nonetheless, "[i]n order to seek redress through § 1983, … a plaintiff must assert the violation of a federal right, not merely a violation of federal law." Blessing v. Freestone, 520 U.S. 329, 340 (1997). In determining whether a particular statutory provision gives rise to a federal right, courts apply a three-pronged test: (1) "Congress must have intended that the provision in question benefit the plaintiff"; (2) "the plaintiff must demonstrate that the right assertedly protected by the statute is not so 'vague and amorphous' that its enforcement would strain judicial competence"; and (3) "the statute must unambiguously impose a binding obligation on the States," meaning it "must be couched in mandatory, rather than precatory, terms." Id. at 340-41. If the plaintiff demonstrates that the federal statute creates an individual right, the defendant many nonetheless rebut the presumption that such right is enforceable via a Section 1983 action by showing that Congress "specifically foreclosed a remedy under § 1983," either expressly or "impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual

11

enforcement under § 1983." Id. at 341 (internal quotation marks and citations omitted). This test is known as the "Blessing" test.

In Gonzaga University v. Doe, the Supreme Court clarified that, with respect to the first prong of the Blessing test, it "reject[ed] the notion that our cases permit anything short of an unambiguously conferred right to support a cause of action brought under § 1983." 536 U.S. 273, 283 (2002). It was insufficient, the Court held, that the "plaintiff falls within the general zone of interest that the statute is intended to protect." Id. at 283. The Court reaffirmed that "unless Congress 'speak[s] with a clear voice,' and manifests an 'unambiguous' intent to confer individual rights, federal funding provisions provide no basis for private enforcement by § 1983." Id. at 280 (quoting Pennhurst State School and Hospital v. Halderman, 451 U.S. 1, 17, 28 and n.21 (1981)).

In arguing that provisions of the Medicaid Act cited by plaintiffs do not create private rights of action under Section 1983, defendant relies heavily on Casillas v. Daines, 580 F. Supp. 2d 235, 242 (S.D.N.Y. 2008). The plaintiff in that case, Terri Casillas, was a New York State Medicaid recipient who had been diagnosed with GD, and whose physicians had recommended that she undergo hormone therapy, orchiectomy (removal of the testes), and vaginoplasty (removal of the penis and creation of a vagina). Id. at 237-38. She brought an action under Section 1983 challenging the original Section 505.2(l) under the Availability and Comparability Requirements of the Medicaid Act.[3] Id.

---

[3]  Casillas also brought a Section 1983 claim alleging that Section

12

at 241-44. The court granted defendant's motion for judgment on the pleadings, holding that neither provision created a right enforceable under Section 1983.

With respect to the Availability Requirement, Casillas held that neither the first nor the second prong of the Blessing test was met. As to the first prong, it held that, although the Availability Requirement may confer certain rights on certain classes of persons, it did not unambiguously confer the right that plaintiff asserted, namely the right to receive the specific treatments for GD that had been deemed medically necessary by her physicians. Id. at 241-43. The court reasoned that the Availability Requirement requires states to provide coverage for certain broad categories of medical services, but does not "mandate that a particular level or type of care must be provided." Id. at 242. In so finding, it relied on Supreme Court's decision in Beal v. Doe, 432 U.S. 438 (1977), for the proposition that "nothing in the statute suggests that participating states are required to fund every medical procedure that falls within the delineated categories of medical care." Id. (quoting Beal, 432 U.S. at 444) (alteration omitted).

The Casillas court further reasoned that the right that plaintiff asserted was inconsistent with the Availability Requirement's implementing regulation, which allows states to "'place appropriate

505.2(1) violated the Reasonable Standards Requirement. Casillas, 580 F. Supp. 2d at 245-46. Because plaintiffs in this case bring their claim relating to the Reasonable Standards Requirement under the Supremacy Clause rather than Section 1983, this portion of the Casillas decision is not directly relevant.

limits on a service based on such criteria as medical necessity or on utilization control procedures.'" Id. (quoting 42 C.F.R. § 440.230(d)). These criteria, the court held, particularly the reference to "utilization control procedures," "capture[] concepts that do not relate to the care of any one particular patient but looks to actual or expected utilization over a broader population," and thus indicate that the Availability Requirement is intended to prescribe standards with which the state plan must comply rather than to create individual rights. Id.

As to the second prong of the Blessing test, Casillas further held that the phrase "utilization control procedures" was "so 'vague and amorphous' that its enforcement would strain judicial competence." Id. at 243 (quoting Blessing, 520 U.S. at 340-41). This term, the court noted, is "susceptible to multiple plausible interpretations and lacks a fixed meaning." Id. Moreover, it noted, the regulation permits a state to rely on other unspecified criteria in crafting "appropriate limits" on medical services, thereby compounding the vagueness problem. Id.

Although in no way binding on this Court, Casillas is entitled to this Court's respectful attention. But in the end, the Court finds itself in disagreement with that decision's reasoning and conclusions. In particular, the Court concludes that the Availability Requirement unambiguously confers on categorically needy individuals an individual

right to the medical services described in the statute and its implementing regulations. Gonzaga, 536 U.S. at 280.

As an initial matter, Casillas's reliance on Beal is misplaced. That case concerned a Pennsylvania regulation that limited Medicaid coverage for abortions to those that had been certified by the recipient's physicians as medically necessary. Beal, 432 U.S. at 441-42. In holding that the challenged regulation did not violate the Medicaid Act, the Supreme Court focused on the fact that the excluded procedures were not medically necessary. Id. at 440 (describing the question presented as whether the Medicaid Act requires states to "fund the cost of nontherapeutic abortions" (emphasis added)). It expressly noted that denial of medically necessary treatment would pose a very different question: "Although serious statutory questions might be presented if a state Medicaid plan excluded necessary medical treatment from its coverage, it is hardly inconsistent with the objectives of the Act for a State to refuse to fund unnecessary though perhaps desirable medical services." Id. at 444-45 (emphasis added).[4] Here, by contrast, plaintiffs allege that the treatments they seek are medically necessary, and on a motion to dismiss, the Court must accept that allegation as true.

---

[4] Justice Brennan, joined by Justice Marshall and Justice Blackmun in dissent, interpreted the Medicaid Act to require coverage even for elective abortions. Id. at 449 (Brennan, J., dissenting). As relevant here, Justice Brennan interpreted the Medicaid Act to leave decisions regarding medical treatment to the doctor and patient, not the state: "the very heart of the congressional scheme is that the physician and patient should have complete freedom to choose those medical procedures for a given condition which are best suited to the needs of the patient." Id. at 450 (Brennan, J., dissenting).

Regarding the first prong of the Blessing test, the language of
the Availability Requirement is expressly addressed to the needs of
individual Medicaid beneficiaries: "[a] state plan … must provide for
making medical assistance available … to all individuals" who meet
certain eligibility requirements. 42 U.S.C. § 1396a(a)(10)(A). This is
precisely the "unmistakable focus on the benefited class" that the
Supreme Court, in Gonzaga, held would evince Congress's intent to
create an individual right. 536 U.S. at 284 (citation and internal
quotation marks omitted). Indeed, the Third Circuit has found that
"the 'individual focus' of [the Availability Requirement] is
unmistakable." Sabree ex rel. Sabree v. Richman, 367 F.3d 180, 190 (3d
Cir. 2004).

Although the Second Circuit has not had occasion to consider this
question, it has held that a similarly worded provision of the
Medicaid Act created a privately enforceable right. See Rabin v.
Wilson-Coker, 362 F.3d 190 (2004). The provision at issue in Rabin
granted a six-month extension of eligibility for medical assistance,
provided the recipient complied with certain reporting requirements:

> "[E]ach State plan approved under this subchapter must
> provide that each family which was receiving aid pursuant to
> a plan of the State … in at least 3 of the 6 months
> immediately preceding the month in which such family becomes
> ineligible for such aid … shall … remain eligible for
> assistance under the plan … during the immediately
> succeeding 6-month period."

Id. at 194 (quoting 42 U.S.C. § 1396r-6(b)). The Second Circuit found
that, by focusing on individual (or family) entitlements rather than
high-level programmatic requirements, Congress intended to create an

16

enforceable right. Id. at 201-02. Given the grammatical similarity between this provision and the Availability Requirement, it follows that the Availability Requirement also evinces congressional intent to create an enforceable right.

Contrary to Casillas, nothing about the existence of this right is inconsistent with the "appropriate limits" clause of the implementing regulations. 42 C.F.R. § 440.230(d). That clause simply provides that, like most rights, the right to the medical services described in the Availability Requirement is not absolute. Rather, it is subject to limits that the state may enact, consistent with the discretion vested in the state by the statute. That discretion is not boundless. The state may enact only "appropriate" limits, must provide services that are "sufficient in amount, duration, and scope to reasonably achieve [their] purpose," and "may not arbitrarily deny or reduce the amount, duration, or scope of a required service … to an otherwise eligible beneficiary solely because of the diagnosis, type of illness, or condition." 42 C.F.R. § 440.230(b)-(d). These provisions define the contours of the right; they do not negate its existence.

Nor is this right so "vague and amorphous" as to be judicially unmanageable under the second prong of the Blessing test. The Availability Requirement and its implementing regulations set forth in detail the services that states must provide to their needy residents, and states' compliance with these requirements is objectively measureable. See Watson v. Weeks, 436 F.3d 1152, 1161 (9th Cir. 2006)

17

("[Sections 1396a(a)(10) and 1396d(a) supply concrete and objective standards for enforcement; they are hardly vague and amorphous.").

Casillas found that the term "utilization control procedures," as used in the implementing regulations, was not judicially manageable. Casillas, 580 F. Supp. 2d at 243. But courts have had no trouble adjudicating whether a particular regulation is a valid utilization control procedure. For example, in DeLuca v. Hammons, 927 F. Supp. 132 (S.D.N.Y. 1996), plaintiffs challenged a regulation, which the state defended as a utilization control procedure, that limited home-care services for new Medicaid recipients to twenty-eight hours per week. Id. at 134. The court found that this arbitrary cap was "not appropriate in that it discriminates among applicants and intentionally fails to take into account the amount of services that have been determined … to be necessary for the health and safety of the patient." Id. at 136. See also, e.g., Davis v. Shah, No. 12-CV-6134 CJS, 2013 WL 6451176, at *12 (W.D.N.Y. Dec. 9, 2013) (holding that regulation limiting access to medically necessary orthopedic shoes and compression stockings based on diagnosis was not valid utilization control procedure); Ladd v. Thomas, 962 F. Supp. 284, 294 (D. Conn. 1997) (holding that requirement that Medicaid recipients submit requests for prior authorization of durable medical equipment to vendor was a valid utilization control procedure).

Casillas further expressed concern that the implementing regulation permits a state agency to place "appropriate limits" on services based on unspecified other criteria. To be sure, this

provision grants the state a considerable measure of discretion. It does not, however, render the asserted right entirely standardless. For example, a limitation based on genuine health and safety concerns would most likely be an "appropriate limit," whereas one based solely on animus towards a disfavored class most certainly would not. Nothing about this determination stretches the bounds of judicial competence.

Finally, regarding the third prong of the <u>Blessing</u> test, the Availability Requirement is framed in mandatory terms. It provides that state plans "must" make available the services described. Provision of these services is not optional. Accordingly, the Court finds that all three <u>Blessing</u> factors are met and the Availability Requirement creates an individual right enforceable under Section 1983.[5]

---

[5] In so holding, the Court joins the overwhelming majority of courts, both before and after <u>Gonzaga</u>, that have considered this question. <u>See</u> <u>Watson v. Weeks</u>, 436 F.3d 1152, 1159-60 (9th Cir. 2006) ("No circuit court has held that section 1396a(a)(10) does not create a section 1983 right."); <u>Sabree ex rel. Sabree v. Richman</u>, 367 F.3d 180 (3d Cir. 2004); <u>S.D. ex rel. Dickson v. Hood</u>, 391 F.3d 581, 603 (5th Cir. 2004); <u>Pediatric Specialty Care, Inc. v. Arkansas Dep't of Human Servs.</u>, 293 F.3d 472, 478-79 (8th Cir. 2002); <u>Westside Mothers v. Haveman</u>, 289 F.3d 852, 862-63 (6th Cir. 2002); <u>Miller by Miller v. Whitburn</u>, 10 F.3d 1315, 1319 (7th Cir. 1993); <u>Crawley v. Ahmed</u>, No. 08-14040, 2009 WL 1384147, at *19 (E.D. Mich. May 14, 2009); <u>Michelle P. ex rel. Deisenroth v. Holsinger</u>, 356 F. Supp. 2d 763, 767 (E.D. Ky. 2005); <u>Health Care For All, Inc. v. Romney</u>, No. CIV.A.00-10833-RWZ, 2004 WL 3088654, at *2 (D. Mass. Oct. 1, 2004); <u>Memisovski ex rel. Memisovski v. Maram</u>, No. 92 C 1982, 2004 WL 1878332, at *11 (N.D. Ill. Aug. 23, 2004); <u>Kenny A. ex rel. Winn v. Perdue</u>, 218 F.R.D. 277, 294 (N.D. Ga. 2003); <u>Dajour B. v. City of New York</u>, No. 00 CIV. 2044, 2001 WL 830674, at *8 (S.D.N.Y. July 23, 2001); <u>cf.</u> <u>Bryson v. Shumway</u>, 308 F.3d 79, 88-89 (1st Cir. 2002) (holding that similarly worded provision of Medicaid Act creates privately enforceable right); <u>Doe 1-13 By & Through Doe, Sr. 1-13 v. Chiles</u>, 136 F.3d 709, 719 (11th Cir. 1998) (same).

19

With respect to the Comparability Requirement, the Court also finds that all three Blessing factors are met. First, the statutory language is squarely directed toward individual rights: "the medical assistance made available to any [categorically needy individual] … shall not be less in amount, duration, or scope than the medical assistance made available to any other such individual." 42 U.S.C. § 1396a(a)(1)(B)(i). The implementing regulations further provide that a state Medicaid "plan must provide that the services available to any individual in the following groups are equal in amount, duration, and scope for all beneficiaries within the group: (1) The categorically needy. (2) A covered medically needy group." 42 C.F.R. § 440.240(b). These provisions, like those of the Availability Requirement, focus on the particular services that individual beneficiaries are entitled to receive, not on the broader structure of the Medicaid program as a whole, and thus evince congressional intent to create individual rights.

In holding otherwise, the Casillas court relied on Rodriguez v. City of New York, 197 F.3d 611 (2d Cir. 1999). In Rodriguez, New York had elected to provide certain types of personal care services to individuals with disabilities, which were not among the services it was required to provide under the Availability Requirement. Id. at 613. Plaintiffs contended that, under the Comparability Requirement, the state was required to provide "safety monitoring," a different service that plaintiffs alleged was comparable to the personal care services that the state had chosen to cover. Id. at 616. The Second

20

Circuit rejected plaintiffs' argument, noting that "[a] holding to the contrary would … create a disincentive for states to provide services optional under federal law lest a court deem other services 'comparable' to those provided … thereby increasing the costs of the optional services." Id.

The right asserted in Rodriguez is very different from the right asserted here. The Rodriguez plaintiffs sought access to a specific service that the state was not required to provide and that it had not chosen to provide to anyone. Here, by contrast, plaintiffs allege that the specific treatments they seek are already provided to other Medicaid recipients but have been denied to them on the basis of their GD diagnoses alone. This, they allege, demonstrates that the services they receive under New York's Medicaid program are not "equal in amount, duration, and scope" to those received by other categorically needy individuals. 42 C.F.R. § 440.240(b).

In Casillas, the court found that the right asserted by plaintiff would, as in Rodriguez, create a disincentive for states to provide specific treatments: "the state would have to consider other possible diagnoses for which the treatment might be prescribed before deciding whether to make it available for any single condition." Id. at 244. While that may be the case, requiring the state to undertake such considerations is entirely consistent with the purpose of an anti-discrimination provision. In enacting the Comparability Requirement, Congress made clear that the states may not blithely provide services to some of their needy residents while denying the same services to

21

others who are equally needy. Thus, this is not a reason to find that the Comparability Requirement does not give rise to an individual right.

The Comparability Requirement also satisfies the second and third prongs of the Blessing test. The standard set forth in the statute — that services provided to some categorically needy individuals may not be "less in amount, duration, or scope" than those provided to others — is neither vague nor amorphous. 42 U.S.C. § 1396a(a)(1)(B)(i). And by directing that services "shall" be comparable, Congress made clear that this requirement was mandatory and binding on the states. Accordingly, the Court finds that the Comparability Requirement creates an enforceable individual right.[6]

Finally, although defendant makes no argument regarding the EPSDT Requirement, see supra note 2, the Court finds that the EPSDT Requirement is also privately enforceable under Section 1983. As numerous courts have held, the EPSDT Requirement (1) is unmistakably focused on the rights of Medicaid-eligible youth to receive the enumerated services, (2) provides detailed, objective, and manageable standards, including specific services that must be provided, and (3) is binding on states. See, e.g., Dajour B. v. City of New York, No. 00 Civ. 2044, 2001 WL 830674, at *8-*10 (S.D.N.Y. July 23, 2001); see

---

[6] Numerous other courts have so held. See, e.g., Davis v. Shah, No. 12-CV-6134 CJS, 2013 WL 6451176, at *12 (W.D.N.Y. Dec. 9, 2013); Michelle P. ex rel. Deisenroth v. Holsinger, 356 F. Supp. 2d 763, 767 (E.D. Ky. 2005); Health Care For All, Inc. v. Romney, No. CIV.A.00-10833-RWZ, 2004 WL 3088654, at *2 (D. Mass. Oct. 1, 2004); Antrican v. Buell, 158 F. Supp. 2d 663, 672 (E.D.N.C. 2001) aff'd sub nom. Antrican v. Odom, 290 F.3d 178 (4th Cir. 2002).

also Salazar v. District of Columbia, 729 F. Supp. 2d 257, 269 (D.D.C. 2010).

Because the Court found that the Availability, Comparability, and EPSDT Requirements create private rights enforceable via Section 1983, the Court denied the portion of defendant's motion seeking to dismiss Counts I, II, and VI.

With respect to certain of plaintiffs' other claims, however, the Court found that defendant's motion had merit, at least in part. Regarding plaintiffs' claim that Amended Section 505.2(l) violates the Reasonable Standards Requirement (Count III), this claim is brought pursuant to the Supremacy Clause of the United States Constitution. See U.S. Const. art. VI.[7] In his motion, defendant argued that the Supreme Court's recent opinion in Armstrong v. Exceptional Child Center, Inc., 135 S. Ct. 1378 (2015), establishes that plaintiffs have no cause of action under the Supremacy Clause to enforce the Reasonable Standards Requirement.

In Armstrong, the Court held that the Supremacy Clause does not confer a private right of action. Id. at 1384. Furthermore, although federal courts have inherent authority to enjoin unconstitutional actions by state and federal officials, that authority "is subject to express and implied statutory limitations." Id. at 1385. Specifically,

---

[7] Plaintiffs also allege that the Availability and Comparability Requirements (Counts I and II) are preempted by the Supremacy Clause. Because the Court finds that plaintiffs have a private right of action to enforce these provisions under Section 1983, it does not address whether they may also bring their claims pursuant to the Supremacy Clause.

where a statute "implicitly precludes private enforcement," a
plaintiff "cannot, by invoking our equitable powers, circumvent
Congress's exclusion of private enforcement." Id.

At issue in that case was Section 30(A) of the Medicaid Act,
which requires state plans to:

> provide such methods and procedures relating to the
> utilization of, and the payment for, care and services
> available under the plan … as may be necessary to safeguard
> against unnecessary utilization of such care and services
> and to assure that payments are consistent with efficiency,
> economy, and quality of care and are sufficient to enlist
> enough providers so that care and services are available
> under the plan at least to the extent that such care and
> services are available to the general population in the
> geographic area …

42 U.S.C. § 1396a(a)(30)(A). The Court held that Section 30(A) is not
privately enforceable because, first, the statute provides an express
method of enforcement, namely withholding of Medicaid funds by the
Secretary of Health and Human Services. Id. at 1385 (citing 42 U.S.C.
§ 1396c). The creation of an administrative remedy, the Court held,
evinced Congress's intent to preclude private enforcement. Second, the
Court found that Section 30(A) was not amenable to private enforcement
because its mandate was so "judgment-laden," "broad[]," and
"complex[]" as to be "judicially unadministrable." Id.

Like Section 30(A), the Reasonable Standards Requirement is
subject to an express administrative enforcement mechanism, viz.,
defunding by the Secretary of Health and Human Services. 42 U.S.C. §
1396c. Furthermore, this provision consists of a broad grant of
discretion to the states to implement "reasonable standards … for

determining eligibility for and the extent of medical assistance under the plan" that are "consistent with the objectives of [the Medicaid Act]." 42 U.S.C. § 1396a(a)(17). Cf. Watson, 436 F.3d at 1162 ("Section 1396a(a)(17) is a general discretion-granting requirement that a state adopt reasonable standards."). Like Section 30(A), it focuses on programmatic aspects of the state plan as a whole, rather than on the specific benefits that must be accorded to individuals. Therefore, the Court concluded that the Reasonable Standards Requirement is not privately enforceable under Armstrong. Accordingly, the Court granted defendant's motion to dismiss Count III.

Turning to Count V, defendant argued in his motion that plaintiffs failed to state a claim for violation of Section 1557 of the ACA with respect to the Youth Exclusion. Section 1557 provides that "an individual shall not … be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity" that receives federal funding on the basis of certain criteria, including sex. 42 U.S.C. § 18116. On a motion to dismiss under Rule 12(b)(6), a court must assess whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Defendant argues that the Youth Exclusion draws distinctions on the basis of age, not sex, and therefore does not violate this provision.

25

Plaintiffs respond that the Youth Exclusion discriminates on the basis of sex in two ways: "(1) that certain services are available to non-transgender people but denied to transgender people where medically necessary; or (2) that regardless of the availability of these treatments to people generally, these coverage exclusions have a disparate impact on transgender people for whom these services are medically necessary." Plaintiffs' Opposition to Defendant's Motion to Dismiss dated May 8, 2015, ECF No. 34, at 19.[8]

However, plaintiffs fail to allege any facts in support of either theory.[9] Most notably, plaintiffs fail to allege that the treatments barred by the Youth Exclusion are available to non-transgender youth. In the absence of such an allegation, defendant's failure to make such services available to transgender youth cannot constitute sex discrimination. Thus, although the Court is cognizant of the principle that "[c]omplaints alleging civil rights violations must be construed especially liberally," United States v. City of New York, 359 F.3d 83, 91 (2d Cir. 2004), here there is nothing to construe. Accordingly, the Court granted defendant's motion to dismiss Claim V of the Amended

---

[8] It is not settled whether a disparate impact claim is cognizable under Section 1557 of the ACA. See Rumble v. Fairview Health Servs., No. 14-CV-2037 SRN/FLN, 2015 WL 1197415, at *12 (D. Minn. Mar. 16, 2015).

[9] The only factual allegation in the Amended Complaint relating to treatment of transgender youth is that "numerous respected clinics around the United States provide medical services for people diagnosed with GD/GID who are under the age of eighteen." Am. Compl. ¶ 89. This allegation cannot support plaintiffs' claim of discrimination.

Complaint with respect to the Youth Exclusion for failure to state a claim.

Defendant also argued in his motion that plaintiffs failed to state a claim for violation of the Comparability Requirement because they failed to plead sufficient factual support for their contention that they have not received comparable services. However, plaintiffs clearly allege that defendant provides medical coverage to similarly situated Medicaid recipients suffering from conditions other than GD for the surgical procedures and other treatments that are denied to them under Amended Section 505.2(1), and cite a provision of the DOH regulations supporting that contention. Am. Compl. ¶¶ 107, 146, 160 (citing 18 N.Y.C.R.R. § 533.5). These paragraphs adequately plead violations of the Comparability Requirement, as they allege that defendant has provided medically necessary procedures to some individuals but not to others. See Providence Pediatric Med. Daycare, Inc. v. Alaigh, 799 F. Supp. 2d 364, 374 (D.N.J. 2011) (denying motion to dismiss where plaintiffs alleged that certain "children are not receiving those services that their physicians have designated as medically necessary").

Defendant further argued that plaintiffs' claims with respect to the Cosmetic Procedures Exclusion are not yet ripe for adjudication because plaintiffs failed to plead that they have requested and been denied any of the procedures barred by Amended Section 505.2(1). "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at

all." Texas v. United States, 523 U.S. 296, 300 (1998) (internal quotation marks omitted). However, courts within this circuit do not require "a futile gesture as a prerequisite for adjudication in federal court." Desiderio v. Nat'l Ass'n of Sec. Dealers, Inc., 191 F.3d 198, 202 (2d Cir. 1999) (quoting Williams v. Lambert, 46 F.3d 1275, 1280 (2d Cir. 1995)). Amended Section 505.2(1), by its plain terms, excludes coverage for the procedures deemed "cosmetic." See Amended Section 505.2(1)(4) (stating that "[p]ayment will not be made" for "cosmetic surgery, services, and procedures including but not limited to" the enumerated procedures). Furthermore, the Department of Health's Medicaid Update makes clear that "payment will not be made for" the services deemed "cosmetic." Declaration of Arthur Biller dated May 8, 2015, Ex. 2, at 16. Therefore, the Court finds that any attempt to seek coverage for the so-called "cosmetic" services would have been a "futile gesture" and was not required to render plaintiffs' claims ripe for adjudication.

Accordingly, the Court denied defendant's motion to dismiss plaintiffs' claims regarding the Cosmetic Procedures Exclusion as unripe.

Finally, defendant argued in his motion that plaintiffs' Claim IV, for violation of the equal protection provisions of the New York State Constitution, is barred by the Eleventh Amendment to the United States Constitution because it asserts a purely state law claim against a state official. See Concourse Rehab. & Nursing Ctr., Inc. v. DeBuono, 179 F.3d 38, 44 (2d Cir. 1999); Morningside Supermarket Corp.

v. New York State Dep't of Health, 432 F. Supp. 2d 334, 339 (S.D.N.Y. 2006) (dismissing state law claims against DOH official as barred by the Eleventh Amendment). Plaintiffs conceded this point at oral argument. See Transcript dated May 22, 2015, ECF No. 41, at 6:18. Accordingly, the Court granted defendant's motion to dismiss Count IV of the Amended Complaint.[10]

For the foregoing reasons, the Court, by Order dated June 26, 2015, dismissed Claims III and IV, and also dismissed Claim V with respect to the Youth Exclusion, but otherwise denied defendant's motion to dismiss the Amended Complaint.

Dated: New York, New York
       July 29, 2015

_____
JED S. RAKOFF, U.S.D.J.

---

[10] Defendant raised several other arguments for the first time in his reply papers. Because these arguments were not raised in his opening brief, they were waived, and the Court does not address them. See Knipe v. Skinner, 999 F.2d 708, 711 (2d Cir. 1993) ("Arguments may not be made for the first time in a reply brief.").