**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------x
ANGIE CRUZ, I.H., AR'ES KPAKA
RIYA CHRISTIE, A.B., as Parent and Natural
Guardian of M.B., a minor, N.V., as Legal
Guardian of S.V., a minor, on behalf of
themselves and all others similarly situated,

                               Plaintiffs,

              -against-

HOWARD ZUCKER, as Commissioner of the
Department of Health,

                               Defendant.
--------------------------------------------------------x

**SECOND AMENDED**
**CLASS ACTION COMPLAINT**

14 Civ. 4456

## PRELIMINARY STATEMENT

1.     Gender Dysphoria ("GD"), formerly known as Gender Identity Disorder ("GID"),

is a serious medical condition recognized as such by physicians and other medical

professionals worldwide.  GD/GID is characterized by an extreme sense of distress due to a

mismatch between birth sex and a person's internal sense of their gender.  The condition

causes intense emotional pain and suffering and, if left untreated, can result in psychological

dysfunction, debilitating depression and, for people without access to appropriate health care

and treatment, suicidality and death.  An established body of medical research demonstrates

that hormone therapy and sex reassignment surgery are effective and medically necessary

forms of therapeutic treatment for many people diagnosed with GD/GID.

2.     For years, medical assistance coverage was available to Medicaid-eligible patients

in New York for the treatment of GD/GID, including hormone treatment and sex reassignment

surgery.  In 1998, however, the New York State Department of Health (the "DOH") reversed

course, promulgating a regulation that precluded any payment whatsoever for "care, services, drugs or supplies" rendered for the purposes of gender reassignment treatment or for "promoting" such treatment.  Despite scientific evidence conclusively demonstrating otherwise, the DOH claimed that such treatment was "experimental" and not proven to be "safe and effective over the long term."   As a result, Medicaid-eligible patients who have been diagnosed with GD/GID have long been forced to make the difficult choice between foregoing the medical treatment they desperately need, or giving up the basic necessities of life (such as food and shelter) in order to pay for that treatment themselves.

3.      The federal Department of Health and Human Services (the "HHS") recently recognized that denying Medicare coverage for all gender reassignment surgery based on the alleged "experimental" nature of gender reassignment surgery is unreasonable in light of evidence establishing that such surgery is safe and effective.

4.      Plaintiffs therefore brought this action on behalf of themselves and all others similarly situated against Dr. Howard Zucker, acting in his official capacity as Commissioner of the New York State Department of Health ("Defendant"), in promulgating and enforcing 18 N.Y.C.R.R. § 505.2(*l*) (hereinafter referred to as "Section 505.2(*l*)") pursuant to 42 U.S.C. § 1983, the Supremacy Clause of the U.S. Constitution, art. VI, Article I, Section 11 of the New York State Constitution, and Section 1557 of the Patient Protection and Affordable Care Act (the "ACA"), 42 U.S.C. § 18116.

5.      In February 2015, Defendant adopted an amendment to Section 505.2(*l*). Although the amendment lifted the blanket ban on reimbursement for all forms of treatment for GD/GID, Section 505.2(*l*) now excludes payments for procedures that it deems "cosmetic,"

even though some or all of these procedures may be medically necessary for individuals diagnosed with GD/GID.  Further, the definition of "cosmetic" found in Section 505.2(*l*) as amended fundamentally misunderstands and misstates relevant medical and scientific opinion regarding the treatment of GD/GID.  These exclusions are not reasonable, based on the relevant medical and scientific evidence, and thus should be declared invalid.

6.     Further, Section 505.2(*l*), as amended, excludes coverage for hormone therapy for individuals under the age of eighteen; excludes gender reassignment surgery for individuals under twenty-one if such surgery will result in sterilization; and excludes coverage completely for gender reassignment surgery for individuals under eighteen.  These exclusions are not reasonable, based on the relevant medical and scientific evidence, and thus should be declared invalid.

7.     As set forth below, Plaintiffs seek declaratory and injunctive relief to enjoin Defendant from continued enforcement of Section 505.2(*l*), and other appropriate relief on the grounds that it: (i) conflicts with the Medicaid Act, 42 U.S.C. §§ 1396 et seq., and thus is preempted by the Supremacy Clause, U.S. Const. art. VI; (ii) violates the Medicaid Act, 42 U.S.C. §§ 1396 et seq., which is enforceable pursuant to 42 U.S.C. § 1983; (iii) unlawfully discriminates against a protected class of Medicaid-eligible persons and thus violates Article I, Section 11 of the New York State Constitution; and (iv) discriminates against Medicaid-eligible persons on the basis of sex and disability and thus violates Section 1557 of the ACA, 42 U.S.C. § 18116.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over the parties and the claims asserted herein

pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), and 1367.

9.      Plaintiffs' claims for declaratory relief are brought pursuant to 28 U.S.C. §§ 2201

and 2202.

10.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because plaintiffs

Angie Cruz, I.H., and Ar'es Kpaka reside within this judicial district, the events giving rise to

this action occurred in this judicial district, and Defendant is subject to personal jurisdiction in

this judicial district.

## THE PARTIES

11.      Plaintiff Angie Cruz resides in New York City and is a Medicaid recipient.

12.      Plaintiff I.H. resides in New York City and is a Medicaid recipient.

13.      Plaintiff Ar'es Kpaka resides in New York City and is a Medicaid recipient.

14.      Plaintiff Riya Christie resides in New York City and is a Medicaid recipient.

15.      Plaintiff M.B. is a minor, having been born in 2001.  M.B. resides in Norwich,

New York, with her mother, A.B., and is a Medicaid recipient.

16.      Plaintiff S.V. is a minor, having been born in 2002.  S.V. resides in Tillson, New

York, with her grandmother and legal guardian, N.V., and is a Medicaid recipient.

17.    Defendant Howard Zucker is the Acting Commissioner of the DOH.  As such, he is responsible for the administration of the New York State Medicaid program and supervision of the administration of the state's Medicaid program by the local social services districts.  He maintains an office at Corning Tower, Empire State Plaza, Albany, New York.

## CLASS ACTION ALLEGATIONS

18.    Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(2) on behalf of themselves and a class of all others similarly situated, defined as:

> All New York State Medicaid recipients who have been diagnosed with Gender Identity Disorder or Gender Dysphoria, and whose expenses associated with medically necessary Gender Identity Disorder- or Gender Dysphoria-related treatment are not reimbursable by Medicaid pursuant to Section 505.2(*l*).

19.    The class is so numerous that joinder of all members is impracticable. Transgender people live in poverty at a rate approximately between two and four times that of the general population, according to the National Transgender Discrimination Survey.

20.    There are questions of law and fact common to the class, including, but not limited to whether Section 505.2(*l*) conflicts with the Medicaid Act, and whether the Defendant's actions in promulgating and enforcing Section 505.2(*l*) are preempted by the Supremacy Clause of the United States Constitution, and/or violate Article I, Section 11 of the New York State Constitution, and/or are otherwise not in accordance with law, and/or violate Section 1557 of the ACA, 42 U.S.C. § 18116, and whether declaratory and injunctive relief is therefore appropriate.

21.   The named Plaintiffs' claims are typical of the claims of the class.  The named Plaintiffs' and the class members' claims arise from the promulgation and enforcement of Section 505.2(*l*).

22.   Declaratory and injunctive relief is appropriate with respect to the class as a whole because Defendant has acted on grounds applicable to the class.

23.   The named Plaintiffs and the proposed class members are represented by the Sylvia Rivera Law Project, The Legal Aid Society, and Willkie Farr & Gallagher LLP, whose attorneys are experienced in class action litigation and will fairly and adequately represent the class.

24.   A class action is superior to other available methods for a fair and efficient adjudication of this matter in that the litigation of separate actions by individual class members would unduly burden the Court and create the possibility of conflicting decisions.

25.   The proposed class was certified by this Court on August 22, 2014.

## FEDERAL STATUTORY AND REGULATORY SCHEME

26.   Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 et seq., creates the federal Medicaid program, through which the federal government provides matching funds to states to provide medical assistance to residents who meet certain eligibility requirements.  42 U.S.C. § 1396b.  The objective of the Medicaid program is to enable each state to furnish medical assistance to individuals whose incomes and resources are insufficient to meet the costs of necessary medical services.  42 U.S.C. § 1396.

27.     States are not required to participate in the Medicaid program, but if they choose to, they must comply with federal Medicaid statutes and their implementing regulations.  42 U.S.C. §§ 1396, 1396a, 1396c.

28.     The federal Medicaid program requires a participating state to establish or designate a single state agency that is responsible for administering or supervising the administration of that state's Medicaid program.  42 U.S.C. § 1396a(a)(5).

29.     Participating states also must submit a "state plan" to the Secretary of the United States Department of Health and Human Services ("HHS") for approval before that state may receive Medicaid funds.  42 U.S.C. §§ 1396a(a), (b).

30.     A state plan "must include reasonable standards for determining eligibility for and the extent of medical assistance under the plan."  42 U.S.C. § 1396a(a)(17).

31.     An individual is "categorically needy" and eligible for Medicaid if he or she falls into one of the nine eligibility categories set forth in 42 U.S.C. §§ 1396a(a)(10)(A)(i)(I) – (IX); see also 42 C.F.R. § 435.100 ("This subpart prescribes requirements for coverage of categorically needy individuals.").  Persons who receive Supplemental Security Income ("SSI") are eligible and are considered "categorically needy" for Medicaid.  42 U.S.C. § 1396a(a)(10)(A)(i)(I); 42 C.F.R. § 435.120.  Certain individuals whose income is below 133 percent of the federal poverty level are considered "categorically needy" for Medicaid.  42 U.S.C. § 1396a(a)(10)A)(i)(VII); 42 C.F.R. § 435.119.

32.     The Medicaid Act mandates that a state plan provide for making medical assistance available to all categorically needy individuals by providing, at minimum, inpatient

hospital services, outpatient hospital services, laboratory and X-ray services, and physicians' services furnished by a physician.  42 U.S.C. §§ 1396a(a)(10)(A), 1396d(a)(1), 1396d(a)(2), 1396d(a)(3), 1396d(a)(5).

33.    Pursuant to the Medicaid Act, medical assistance must be provided "in a manner consistent with . . . the best interests of the recipients."  42 U.S.C. § 1396a(a)(19).

34.    The Medicaid Act further requires that "the medical assistance made available to any [categorically needy] individual shall not be less in amount, duration or scope than the medical assistance made available to other such individuals."  42 U.S.C. § 1396a(a)(10)(B)(i).

35.    Federal regulations likewise require that medical assistance is provided in equal amount, duration, and scope to all categorically needy Medicaid recipients.  42 C.F.R. § 440.240(b).

36.    Federal regulations require that *all* services defined as required services in 42 C.F.R. §§ 440.10–440.50 and 42 C.F.R. § 440.70 be provided to *all* categorically needy Medicaid recipients.  42 C.F.R. § 440.210(a)(1).

37.    Inpatient hospital services, defined as services that "are ordinarily furnished in a hospital for the care and treatment of inpatients and are furnished under the direction of a physician," are required services.  42 C.F.R. § 440.10(a)(1), (2).

38.    Outpatient hospital services, defined as "preventative, diagnostic, therapeutic, rehabilitative, or palliative services that are furnished to outpatients and are furnished by or under the direction of a physician," are required services.  42 C.F.R. § 440.20(a)(1), (2).

39.    X-ray and other laboratory services "when ordered and provided by or under the direction of a physician or other licensed practitioner of the healing arts," are a required service.  42 C.F.R. § 440.30(a).

40.    Physicians' services, defined as "services furnished by a physician within the scope of practice of medicine or osteopathy as defined by State law and by or under the personal supervision of an individual licensed under State law to practice medicine or osteopathy," are a required service.  42 C.F.R § 440.50(a)(1), (2).

41.    "[E]ach service must be sufficient in amount, duration or scope to reasonably achieve its purpose."  42 C.F.R. § 440.230(b).

42.    The "Medicaid agency may not arbitrarily deny or reduce the amount or scope of a required service under sections 440.210 and 440.220 to an otherwise eligible recipient solely because of the diagnosis, type of illness or condition."  42 C.F.R. § 440.230(c).

43.    42 U.S.C. § 1396a(a)(43) requires participating states to include in their State Medicaid Plan a provision for the Early, Periodic Screening, Diagnosis and Treatment ("EPSDT") of all Medicaid eligible children under the age of twenty-one.

44.    The federal requirements for EPSDT are specifically detailed and require states to provide "[s]uch other necessary health care, diagnostic services, treatment, and other measures to correct or to ameliorate defects and physical and mental illnesses and conditions discovered by the screening services, whether or not such services are covered under the State plan." 42 U.S.C. § 1396d(r)(5).

45.   The State of New York participates in the federal Medicaid program, including the EPSDT provisions.

46.   New York's EPSDT program is operated under the name "Child/Teen Health Program" ("C/THP") and is codified at New York's C/THP set forth in 18 NYCRR §§ 508 – 508.12.

47.   Minor class member children are Medicaid eligible individuals under age twenty-one who are eligible for EPSDT services set forth under the federal Medicaid Act, 42 U.S.C. § 1396a(a)(43) and 42 U.S.C. § 1396d(r) and New York's C/THP set forth in 18 NYCRR §§ 508 – 508.12.

48.   18 NYCRR § 508.1 defines C/THP as "… a program established and administered by local social services districts which is directed toward assisting eligible persons to receive ongoing primary and preventive health care in order to discover any physical and mental problems and to provide treatment to correct or ameliorate such problems or chronic conditions …"

49.   18 NYCRR § 508.8 defines C/THP's Provision of care and services: "The periodicity schedule contained in this section and the contents of the C/THP examination generally follow those recommended by the Committee on Standards of Child Health of the American Academy of Pediatrics.  Appropriate modifications in the content of the examination can be made according to the attending physician's medical judgment, consistent with the needs of the individual child and current recommended standards of medical practice."

50.    Minor class members have all been diagnosed with a gender dysphoria formerly known as gender identity disorder.

51.    Defendant's adoption of the amended 505.2(*l*) is contrary to the State's obligation to provide medically necessary services to children that correct or ameliorate conditions under the federal Medicaid requirements of EPSDT.

52.    Section 1557 of the ACA, 42 U.S.C. § 18116, provides, in relevant part that:

> [A]n individual shall not, on the ground prohibited under . . . title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.) . . . be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments). The enforcement mechanisms provided for and available under … title IX … shall apply for purposes of violations of this subsection.

ACA § 1557(a), 42 U.S.C. § 18116(a).  The ground prohibited under Title IX, Education Amendments of 1972, is sex and states:  "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]" 20 U.S.C. § 1681(a).  Thus, the ACA prohibits health care programs receiving federal assistance from discriminating on the basis of sex.  The Director of HHS's Office for Civil Rights (the "OCR"), Leon Rodriguez, has confirmed that this protection includes gender, gender identity, and failure to conform to the sex and gender stereotypes associated with one's anatomical sex.  A letter from Mr. Rodriguez to the National Center for Lesbian Rights dated July 12, 2012 states: "We agree that Section 1557's sex discrimination prohibition extends to claims of discrimination

based on gender identity or failure to conform to stereotypical notions of masculinity or femininity[.]"

### NEW YORK STATE STATUTORY AND REGULATORY SCHEME

53.  New York State has opted to participate in the federal Medicaid program.  N.Y. Soc. Serv. Law § 363-a.

54.  The Medicaid program is administered in New York in accordance with Sections 363-369 of the New York Social Services Law, and the regulations promulgated thereunder. N.Y. Soc. Serv. Law §§ 363-369; 18 N.Y.C.R.R. §§ 358, 360, 505, et seq.

55.  Effective October 1, 1996, the DOH assumed responsibility, formerly held by the New York State Department of Social Services ("NYSDSS"), for administering New York's Medicaid Program.  All regulations of NYSDSS with respect to the Medicaid program continued, in full force and effect, as regulations of the DOH.  N.Y. Soc. Serv. Law § 363-a(1); 1996 N.Y. Session Law, c. 474, § 242.

56.  New York Social Services Law § 365-a establishes the coverage and adequacy of medical assistance under the New York State plan for Medicaid.  N.Y. Soc. Serv. Law § 365-a.

57.  New York Social Services Law §§ 363 and 364(2)(e) mandate a "comprehensive program of medical assistance for needy persons . . . to operate in a manner which will assure a uniform high standard of medical assistance throughout the state," in such a way "that the quality of medical care and services is in the best interests of the recipients."  N.Y. Soc. Serv. Law §§ 363, 364(2)(e).

58.    Pursuant to § 365-a(2) of the New York Social Services Law, "medical assistance" is defined as "payment of part or all of the cost of care, services and supplies which are necessary to prevent, diagnose, correct or cure conditions in the person that cause acute suffering, endanger life, result in illness or infirmity, interfere with his capacity for normal activity, or threaten some significant handicap. . . ."  N.Y. Soc. Serv. Law § 365-a(2).

59.    Medical assistance is also defined to include "surgical benefits for certain surgical procedures which meet standards for surgical intervention, as established by the state commissioner of health on the basis of medically indicated risk factors, and medically necessary surgery where delay in surgical intervention would substantially increase the medical risk associated with such surgical intervention," N.Y. Soc. Serv. Law § 365-a(5)(b), and "surgical benefits for other deferrable surgical procedures specified by the state commissioner of health, based on the likelihood that deferral of such procedures for six months or more may jeopardize life or essential function, or cause severe pain; provided, however, such deferrable surgical procedures shall be included in the case of in-patient surgery only when a second written opinion is obtained from a physician, or as otherwise prescribed, in accordance with regulations established by the state commissioner of health, that such surgery should not be deferred,"  N.Y. Soc. Serv. Law § 365-a(5)(c).

60.    18 N.Y.C.R.R. § 505.2 sets forth eligibility for and the extent of physicians' services provided under the New York State Medicaid plan.

**Private Insurer Mandates**

61.    On December 11, 2014, the New York State Department of Financial Services issued Insurance Circular Letter No. 7 (the "Circular"), which concluded, based on both New

York and federal law, that private issuers of health insurance policies in New York that "include[] coverage for mental health conditions may not exclude coverage for the diagnosis and treatment of gender dysphoria." The statutes and regulations discussed in the Circular demonstrate a clear legislative intent at both the state and federal level to safeguard for transgender individuals the same level of insurance coverage that is provided to the non-transgender population.

62.   The Circular notes that New York Insurance Regulation 62, 11 N.Y.C.R.R. § 52, "prohibits an insurer from limiting coverage by type of illness, treatment, or medical condition."

63.   The Circular further states that Timothy's Law, N.Y. Ins. Law §§ 3221(l)(5), 4303(g)–(h), "requires an issuer delivering or issuing a group or school blanket policy in New York that provides coverage for inpatient hospital care or for physician services to provide coverage for the diagnosis and treatment of gender dysphoria." The statute requires such an issuer to provide coverage for the diagnosis and treatment of "mental, nervous, or emotional disorders or ailments," as such language is defined under the Empire Plan, N.Y. Civ. Serv. Law art. 11. The Empire Plan "defines mental health care to include medically necessary care for a condition that has been classified as a mental disorder in the current American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders [the 'DSM-V']." The DSM-V recognizes a diagnosis of gender dysphoria.

64.   Per 45 C.F.R. § 146.136, which interprets the federal Mental Health Parity and Addiction Equality Act of 2008, issuers that provide both medical/surgical and mental health or substance use disorder benefits must not limit coverage for treatment procedures purely

based on a diagnosis of gender dysphoria.  The regulation prohibits such issuers from applying

any limits to their mental health or substance use disorder benefits that are not applied to

substantially all of their medical/surgical benefits for the same treatment.  Such issuers must

identify and define the mental health conditions that are covered under their policies

consistently with "generally recognized independent standards of current medical practice,"

which the Circular states are encompassed by the DSM-V.

### Adoption of 505.2(*l*)

65.    On July 16, 1997, the DOH published a Notice of Proposed Rule Making which

proposed amending 18 N.Y.C.R.R. § 505.2 to include Section 505.2(*l*) (the "Notice of

Proposed Rulemaking").  At that time, Section 505.2(*l*) provided:

> Gender reassignment.  Payment is not available for care, services,
> drugs, or supplies rendered for the purpose of gender reassignment
> (also known as transsexual surgery) or any care, services, drugs, or
> supplies intended to promote such treatment.

66.    Despite acknowledging that promulgation of the proposed rule would only give

rise to "minimal savings" because "the particular treatments and procedures involved in gender

reassignment are also used to treat other medical conditions,"  the DOH adopted the regulation

nevertheless, claiming that gender reassignment treatment "has not been shown to be a safe and

effective treatment over the long-term."

67.    In response to the Notice of Proposed Rule Making, the DOH did not receive any

submissions in support of the proposed rule.  However, the DOH did receive comments in

opposition to the proposed rule from two physicians, Dr. Walter J. Meyer III and Dr. Heino

F.L. Meyer-Bahlburg, each of whom were specialists with more than twenty years of

experience in the treatment of persons with GD/GID.  The DOH acknowledged receipt of the

comments it had received from Dr. Meyer and Dr. Meyer-Bahlburg in the Notice of Adoption,

which was published on March 25, 1998.

68.   Dr. Meyer-Bahlburg noted that the contention that sex reassignment treatment

"has not been shown to be a safe and effective treatment over the long-term" was "not in

agreement with the empirical data as documented in numerous follow-up studies of parties

after sex reassignment in the U.S. and other countries."  For Medicaid-dependent patients with

GD/GID, Dr. Meyer-Bahlburg said, enactment of the rule would cause "unnecessary

suffering."  Dr. Meyer observed that the "appropriate, effective and safe treatment for

[transgender] patients includes living in the role of the desired gender, hormonal treatment to

match that gender, and surgical correction of the genitalia."  Dr. Meyer urged the DOH to

reject the proposed rule, noting that it would be "inhuman" to deny these patients appropriate

treatment, and that enactment would be based on prejudice against the persons who would

receive this care.

**Amendment of 505.2(*l*)**

69.   As a result of the filing of this Action, the DOH drafted an Amendment to Section

505.2(*l*) (the "Amendment").  Notice of the Proposed Amendment was published in the New

York State Register on Dec. 17, 2014.

70.   On February 24, 2015, Defendant issued a notice which stated, "I HEREBY

ADOPT the attached amendment of section 505.2(*l*) of Title 18 . . . to be effective upon

publication of a Notice of Adoption in the New York State Register."  As adopted, the

amendment did not differ from the proposed amendment published on December 17, 2014.

71.    The Amendment became effective on March 11, 2015, upon its publication in the New York State Register that same day.

72.    The Notice of Adoption published in the New York State Register on March 11, 2015, states: "***Action taken:*** Amendment of section 505.2(*l*) of Title 18 NYCRR."  (Emphasis in original).

73.    As amended, Section 505.2(*l*) provides, in part:

> (l) Gender dysphoria treatment. As provided in this subdivision, payment is available for medically necessary hormone therapy and/or gender reassignment surgery for the treatment of gender dysphoria.
>
> (2) Hormone therapy, whether or not in preparation for gender reassignment surgery, may be covered for individuals 18 years of age or older.
>
> (3) Gender reassignment surgery may be covered for an individual who is 18 years of age or older, or 21 years of age or older if the surgery will result in sterilization, . . .

74.    The exclusion in Section 505.2(*l*) of coverage for medically necessary hormone therapy for individuals under the age of eighteen lacks an adequate basis in medical or scientific fact and is thus unreasonable.

75.    The exclusion in Section 505.2(*l*) of coverage for medically necessary gender reassignment surgery for individuals under the age of twenty-one when the surgery results in sterilization lacks an adequate basis in medical or scientific fact and is thus unreasonable.

76.    The exclusion in Section 505.2(*l*) of coverage for medically necessary gender reassignment surgery for individuals under the age of eighteen lacks an adequate basis in medical or scientific fact and is thus unreasonable.

77.   As amended, Section 505.2(*l*) further provides:

(4) Payment will not be made for the following services and procedures: . . .

 (v) cosmetic surgery, services, and procedures, including but not limited to:

> (a)  abdominoplasty, blepharoplasty, neck tightening, or removal of redundant skin;
> (b)  breast augmentation;
> (c)  breast, brow, face, or forehead lifts;
> (d)  calf, cheek, chin, nose, or pectoral implants;
> (e)  collagen injections;
> (f)  drugs to promote hair growth or loss;
> (g)  electrolysis, unless required for vaginoplasty;
> (h)  facial bone reconstruction, reduction, or sculpturing, including jaw shortening and rhinoplasty;
> (i)  hair transplantation;
> (j)  lip reduction;
> (k)  liposuction;
> (l)  thyroid chondroplasty; and
> (m)  voice therapy, voice lessons, or voice modification surgery.

(5) For purposes of this subdivision, cosmetic surgery, services, and procedures refers to anything solely directed at improving an individual's appearance.

78.   The exclusion by Section 505.2(*l*) of so-called "cosmetic surgery, services, and procedures," despite the medical necessity of these procedures for many GD/GID patients, lacks an adequate basis in medical or scientific fact and is thus unreasonable.  Furthermore, the definition in Section 505.2(*l*) of "cosmetic" as "anything solely directed at improving an individual's appearance" reveals a fundamental misunderstanding of the treatment of GD/GID and the importance of such procedures to the treatment and well-being of transgender individuals and is thus unreasonable.

79.   Upon information and belief, DOH received public comment from ninety-one commenters regarding the language of the proposed amendment to Section 505.2(*l*), before the amendment was adopted.

## CONSTITUTIONAL PROVISIONS

80.   Article Six, Clause 2 of the United States Constitution provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof, and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the contrary notwithstanding."  U.S. Const. art. VI, Clause 2.

81.   Article 1, Section 11 of the New York State Constitution provides that "[n]o person shall be denied the equal protection of the laws of this state or any subdivision thereof." N.Y. Const. art. I, § 11.

## FACTS

82.   GD/GID is consistently recognized as "an identifiable, severe and incapacitating disease."  D. Harish & B. Sharma, Medical Advances in Transsexualism and the Legal Implications, 24 Am. J. Forensic Med. & Pathology, 100, 101 (2003).

83.   GID is defined in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision ("DSM-IV-TR") as a condition characterized by "a strong and persistent cross-gender identification" with "persistent discomfort about one's assigned sex" unrelated to either a "perceived cultural advantage[] of being the other sex" or "a concurrent physical intersex condition," which results in "clinically

significant distress or impairment in social, occupational or other important areas of functioning."  DSM-IV-TR, §§ 302.06, 302.85.

84.    In May 2013, the American Psychiatric Association released the latest version of its Diagnostic and Statistical Manual of Mental Disorders ("DSM-V").  The diagnosis of GID was changed to GD, which is defined as follows:

> A.    A marked incongruence between one's experienced/expressed gender and assigned gender, of at least 6 months' duration, as manifested by at least two of the following:
> (i) A marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics (or in young adolescents, the anticipated secondary sex characteristics).
> (ii) A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender (or in young adolescents, a desire to prevent the development of the anticipated secondary sex characteristics).
> (iii) A strong desire for the primary and/or secondary sex characteristics of the other gender.
> (iv) A strong desire to be of the other gender (or some alternative gender different from one's assigned gender).
> (v) A strong desire to be treated as the other gender (or some alternative gender different from one's assigned gender).
> (vi) A strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender different from one's assigned gender).
> B.    The condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning.

DSM-V, §§ 302.06, 302.85.

85.    Sex reassignment has been endorsed by the country's leading medical organizations as safe and effective treatment for GD/GID.

86.   For example, the American Medical Association has recognized that "an established body of medical research demonstrates the effectiveness and medical necessity of mental health care, hormone therapy and sex reassignment surgery as forms of therapeutic treatment for many people diagnosed with GD and GID" and opposes "categorical exclusions," such as Section 505.2(*1*), "of coverage for treatment of gender identity disorder when prescribed by a physician."

87.   Similarly, the American Psychological Association "recognizes the efficacy, benefit and medical necessity of gender transition treatments," and has called upon "public and private insurers to cover these medically necessary treatments."

88.   The American Psychiatric Association likewise "recognizes that appropriately evaluated transgender and gender-variant individuals can benefit greatly from medical and surgical gender transition treatments," advocates for "removal of barriers to care and supports both public and private health insurance coverage for gender transition treatment," and "opposes categorical exclusions of coverage for such medically necessary treatment when prescribed by a physician."

89.   According to the World Professional Association for Transgender Health ("WPATH"), which is an international interdisciplinary professional association founded in 1979 and devoted to the understanding and treatment of individuals with gender identity disorders, "sex (gender) reassignment, properly indicated and performed . . . has proven to be beneficial and effective in the treatment of individuals with transsexualism, gender identity disorder and/or gender dysphoria."

90.    In its Medical Necessity Statement, WPATH has noted that the "medical procedures attendant to sex reassignment are not 'cosmetic' or 'elective' or for the mere convenience of the patient.  These reconstructive procedures are not optional in any meaningful sense, but are understood to be medically necessary for the treatment of the diagnosed condition."  Nor are they "experimental:  decades of both clinical research and medical research show that they are essential to achieving well-being for the transsexual patient."

91.    In addition, numerous respected clinics around the United States provide medical services for people diagnosed with GD/GID who are under the age of eighteen. The Children's Hospital of Boston, and the Children's Hospital Los Angeles are two such examples.

92.    The federal Medicare program allows for beneficiaries to apply for transition-related medical care. On May 30, 2014, the Appeals Board for HHS issued a decision declaring that Medicare's blanket exclusion on gender-confirming surgeries was not valid.  The Appeals Board ordered CMS to implement its decision within thirty days and "to apply any resulting policy changes to claims or service requests made by Medicare beneficiaries[.]"

**Plaintiff Cruz**

93.    Angie Cruz is a categorically needy Medicaid recipient residing in Bronx County, New York.  Ms. Cruz is fifty years old and has been in almost continuous receipt of Medicaid benefits since she was a child.

94.    Ms. Cruz supports herself with Supplemental Security Income ("SSI") and public benefits and food stamps from New York City's Human Resources Administration ("HRA").

95.   Ms. Cruz was assigned male at birth, but has identified as a woman since she was

ten years old.  Most of Ms. Cruz's family has recognized that she was a woman since she was

young.  Her father was very accepting of her self-identification as female, although it took her

mother considerably longer.  Her two brothers and sister consider her a second sister and are

very supportive.  Since Ms. Cruz was young, most of her family members have addressed her

as a woman and have used the pronoun "she" to describe her.

96.   Ms. Cruz started taking hormones as a teenager in order to help align her physical

appearance with her female gender identity.  She started taking prescribed hormones in pill

form on and off from the age of seventeen, after being evaluated by a psychiatrist to make sure

she understood the risks and consequences of hormone therapy.  Since then she has gotten her

hormones either from doctors and pharmacies or from the street.

97.   Ms. Cruz has lived openly as a woman since she was in her early twenties.  She

was first officially diagnosed with GID in 2004.  Since 2005, Ms. Cruz's prescribed hormone

therapy requires her to take estrogen injections every other week.

98.   Angie Cruz's hormone therapy has created positive physical bodily change,

resulting in a more feminine body.  Her skin became softer, facial and body hair growth

stopped, and her facial features became more feminine.  She has felt much more comfortable

and confident because of the positive body changes.

99.   Ms. Cruz stopped receiving hormone therapy in 2004 due to health problems.

She developed severe pneumonia, resulting in the collapse of her lungs.  She started taking a

blood thinner, and was forced to go off hormones.  She remained off hormones for eighteen

months before going back on hormones in 2005.  Since then, Ms. Cruz went off Medicaid and

hormones for short periods of time on several other occasions.

100.  In 2012, Ms. Cruz legally changed her name, and was able to obtain identification

documents bearing the name Angie Milan Cruz.  However, some of Ms. Cruz's documents,

such as her New York State identification card and Medicaid card, still bear a "male" gender

marker because she was unable to change the designation.

101.  Although supported by much of her family, Ms. Cruz struggles as a result of

having a physical body that does not match her gender identity.  Although most people she

meets address Ms. Cruz as a woman, she describes herself as having lived for a long time in

secrecy.

102.  Ms. Cruz needs breast augmentation surgery and vaginoplasty in order to

complete her gender transition.  She sees the next phase of her transition as a step-by-step

process, and would like to begin with breast augmentation.

103.  Ms. Cruz feels that without breast augmentation and vaginoplasty, her gender

transition will not be complete.  She feels that having breast augmentation and vaginoplasty

will reduce the social isolation and stress she experiences as a result of her gender dysphoria.

104.  Breast augmentation and vaginoplasty are medically necessary treatments for Ms.

Cruz's gender dysphoria.

105.  Upon information and belief, Medicaid will not pay for breast augmentation

surgery because it is deemed "cosmetic" under Section 505.2(*l*).

106.  Ms. Cruz feels great emotional pain because Medicaid will not cover her breast implants.  It is devastating for Ms. Cruz to know she will not have any access to the desired surgeries.  Ms. Cruz's self-confidence, mental stability, and physical comfort suffer due to the mismatch of her body with her gender identity.

107.  Ms. Cruz and individuals similarly situated need gender reassignment treatment, including breast augmentation and other procedures excluded by Section 505.2(*l*), in order to achieve the capacity to live a life without terrible suffering.  Ms. Cruz experiences acute interference with her capacity for normal activity and a normal social life as result of Defendant's refusal to provide medical assistance coverage of her gender reassignment treatment.

108.  Ms. Cruz describes it as impossible to find and maintain a relationship. Whenever she meets a potential male partner she has to come out as transgender.  Ms. Cruz has experienced many relationship problems and loss of relationships because of the mismatch of her physical body and her female gender.

109.  Defendant provides medical assistance coverage for the same surgical procedures and other treatments indicated by Ms. Cruz's physicians as medically necessary to treat her GD/GID to Medicaid recipients, who are similarly situated to Ms. Cruz, suffering from medical conditions other than GD/GID.  See, e.g., 18 N.Y.C.R.R. § 533.5.

110.  Defendant's promulgation and enforcement of the coverage exclusions set forth in Section 505.2(*l*) does not serve any compelling, important or legitimate State interest.  To the contrary, as set forth above, there is no scientific support for the notion that gender reassignment treatment—including procedures classified as "cosmetic" by Section 505.2(*l*)—is

experimental, unsafe, or ineffective, which were the stated reasons for the enactment of Section 505.2(*l*).

**Plaintiff I.H.**

111.  I.H. is a categorically needy Medicaid recipient residing in Manhattan, New York. She has been a recipient of Medicaid benefits for most of the past twenty-five years.

112.  I.H. supports herself with Supplemental Security Income ("SSI"), benefits from New York City's HIV/AIDS Services Administration ("HASA"), and public benefits and food stamps from New York City's Human Resources Administration ("HRA").

113.  I.H. was assigned male at birth, but has identified as a woman since she was about twelve years old.  I.H. was first assessed by a psychiatrist due to her gender non-conformity on or around 1974, when she was approximately six years old.  She was later diagnosed with GD/GID.

114.  I.H. has been living full-time as a woman for over twenty-five years, including conforming her physical appearance with her female gender.  She began taking feminizing hormones in 1984 at the approximate age of fourteen.  I.H. was not supervised by a doctor when she started taking hormones.  She first received her hormones from her grandmother when she was young, and later purchased them from pharmacies or from other transgender women.  During this time, I.H. did not receive hormones from doctors as she was unsure how to obtain them and did not have appropriate personal documentation, such as a birth certificate, for her to access health care.

115.  I.H. developed serious health problems around the age of twenty-six as a result of her unsupervised hormone usage.  For example, she had a minor heart attack when she was eighteen, followed by a major stroke when she was twenty-six.  Her unsupervised hormone use also caused damage to her genitals.  I.H. stopped taking hormones when she was approximately twenty-six years old because of these health complications.  I.H. ceased taking hormones at that time based on doctors' recommendations, as they told her she had harmful levels of hormones in her system.

116.  I.H. tried to live without hormones so as not to do any further damage to her health.  Around the age of forty, I.H. started to feel that with age, she was getting stiffer and losing her femininity.  She started taking hormones again, this time under a doctor's care.  At first she had to pay $100 for her hormones every month by herself, because Medicaid did not cover the hormone therapy.

117.  Since 2010, I.H. has been taking feminizing hormones under the supervision of her physicians at Callen-Lorde Community Health Center.  She takes an oral form of estradiol.  Medicaid repeatedly denied insurance coverage for I.H.'s hormone therapy.  Only after I.H. changed her gender marker with HASA from male to female four years ago did Medicaid start covering her hormone therapy.

118.  Hormone therapy has made it possible for I.H. to appear as a woman.  The feminizing hormones have helped her to develop her breasts and other feminine characteristics.

119.  I.H. has suffered from severe pain in her genitals for more than fifteen years.  She has been in constant treatment for her pain.  Three years ago I.H. had her testicles removed through a bilateral orchiectomy, due to ascension (rising) of the testes into her abdominal

cavity from prolonged feminizing hormone use.  This surgery was covered by Medicaid because it was not related to I.H.'s GD/GID treatment.

120.  I.H. still suffers from pain in her genitals despite the surgical intervention and other treatments.  Due to complications from her orchiectomy, I.H. was diagnosed with a thrombosis in her penis and suffers from priapism.  Priapism is a condition where blood accumulation in the penis results in extended erections.  These are severe illnesses that limit I.H.'s ability to leave the house and have forced I.H. to go to the hospital or emergency room on numerous occasions.

121.  To resolve her priapism and thrombosis, I.H.'s doctor recommends full gender-confirming surgery, including a penectomy procedure, which involves removal of the penis.  Upon information and belief, the complete removal of I.H.'s penis through penectomy would be covered by Medicaid because it is not related to I.H.'s treatment for GD/GID.  However, if I.H.'s penis is completely removed through a penectomy, her penis tissue could not be used for a later vaginoplasty, the surgical construction of a vagina.

122.  I.H. requires a vaginoplasty with full penectomy in order to complete her treatment for gender dysphoria.

123.  In a vaginoplasty with penectomy, only parts of the penis are removed and parts of the penis are used for the construction of the vagina.  Upon information and belief, if I.H. could directly obtain a vaginoplasty, she would be able to address the pain and inflammation in her genitals and complete sex reassignment at the same time.

124.  DOH's refusal to cover I.H.'s vaginoplasty put I.H. in a devastating situation. She had to endure the pain in her genitals until she can obtain a vaginoplasty.  A penectomy without vaginoplasty would make it challenging or impossible for her to obtain vaginoplasty at a later point, because vaginoplasty typically requires the use of existing tissue.

125.  I.H. also needs breast reconstruction to affirm her female gender identity and repair damage from previous breast augmentation.

126.  At the age of seventeen, I.H. had surgery, performed by a surgeon in private practice, to place silicone implants in her chest.  She paid for the surgery herself.  She was not on Medicaid at that time.  The surgeon used cheap material, and the silicone implants ruptured three years later due to heat exposure.  I.H. was twenty years old when the implants ruptured. Now, twenty-five years later, she still has many toxic silicone particles in her chest from the rupture.  Loose silicone is linked to infections, disfigurement, respiratory distress, chronic pain, fatigue, cramping, stroke, pulmonary embolism, toxic shock, neuropathy, and heart failure, among other severe health conditions, and may cause death if untreated.

127.  I.H. obtained two surgeries in which silicone particles were removed.  The doctors have not been able to remove all silicone particles.  I.H. herself paid for two previous surgeries in which silicone particles were removed from her body.  She obtained the first surgery at age twenty-four.  She was not on Medicaid at that time and paid $10,000.  At age thirty-two she had a second surgery which cost $13,000.  Medicaid did not cover the surgery. I.H. needs further surgeries to remove the silicone particles and to reconstruct her breasts.

128.   Upon information and belief, Medicaid will not cover all of the costs of I.H.'s treatment to the extent it is deemed "cosmetic."  I.H. is currently low-income and is not able to cover the costs for that treatment herself.

129.   The denial of coverage for breast reconstruction deprives I.H. of surgeries that are essential for her mental and physical health.

130.   I.H.'s self confidence, mental stability and physical comfort suffer due to the mismatch of her genitals with her gender identity.  She carries the mental diagnoses of severe bipolar disorder, post-traumatic stress disorder, anxiety with panic, and insomnia.  I.H.'s doctor has concluded that these diagnoses are directly related to her GD/GID.  Because I.H. cannot obtain sex reassignment surgery and live as a woman with female genitals, her depression becomes so severe that she can be bed-bound for extended periods of time.

131.   At the age of seventeen, I.H. was attacked badly by seven people when they found out she was transgender.  This traumatic experience contributes to I.H.'s post-traumatic stress disorder.  I.H. continues to be afraid that she will be attacked in public if she is perceived as transgender.  Therefore it is crucial for her safety to outwardly appear as a non-transgender woman.  This is only possible through hormone therapy and surgeries.

132.   Without the surgeries, I.H. will remain in a status that is extremely dangerous for her physical and mental health.  The thrombosis in her penis and priapism are serious illnesses that require urgent surgery.  Two urologists have urged I.H. to obtain surgery as soon as possible.

133.   The silicone particles that indurated after I.H.'s silicone implants burst cause constant pain in I.H.'s breasts, and she remains at risk of toxic shock and other side effects.

134.   I.H. and individuals similarly situated need gender reassignment treatment, including surgery, in order to achieve the capacity to live a life without terrible suffering.  I.H. experiences acute interference with her capacity for normal activity as result of Defendant's refusal to provide medical assistance coverage of her gender reassignment treatment.

135.   Breast reconstruction with removal of silicone are medically necessary for I.H.'s treatment of GD/GID and other health conditions, which are directly related to her being denied care.  I.H.'s significant depression often manifests in her disengaging in treatment for her HIV, a behavior referred to as passive suicidality.

136.   Defendant provides medical assistance coverage for the same surgical procedures and other treatments indicated by I.H.'s physicians as medically necessary to treat her GD/GID to Medicaid recipients, who are similarly situated to I.H. and suffering from medical conditions other than GD/GID.  See, e.g., 18 N.Y.C.R.R. § 533.5 (construction of an artificial vagina, orchiectomy, amputation of penis, mastectomy and hysterectomy).

137.   Defendant's promulgation and enforcement of the blanket coverage exclusion set forth in Section 505.2(1) does not serve any compelling, important or legitimate State interest. To the contrary, as set forth above, there is no scientific support for the notion that gender reassignment treatment is experimental, unsafe or ineffective, which were the stated reasons for the enactment of Section 505.2(1) and for Defendant's refusal, upon statutorily-mandated review, to repeal, alter or modify Section 505.2(1) thereafter.

**Plaintiff Kpaka**

138.  Ar'es Kpaka is a categorically needy Medicaid recipient residing in Harlem, New York.  Ms. Kpaka is twenty-three years old and has been in continuous receipt of Medicaid benefits since she was twenty-one years old.

139.  Ms. Kpaka has identified as a woman since she was three years old.  Most of Ms. Kpaka's family were not aware that she identified as a woman until she was eleven years old.  Her mother and her three brothers (with whom she was living) refused to accept her identity, although her father (with whom she was not living, and later learned of her gender identity) was very supportive.  Therefore, Ms. Kpaka hid her gender identity from her mother and brothers through high school, which was very difficult for her.  When Ms. Kpaka was twenty-one years old, she was forced to move out of her mother's home and was homeless for a few months.

140.  Around the age of twenty-one, Ms. Kpaka was diagnosed with GD/GID by the medical professionals at the Apicha Community Center.  She started taking prescribed hormones in order to help align her physical appearance with her female gender identity.

141.  Ms. Kpaka has been seeing a therapist for the past year and a half and currently sees a medical doctor and nurse practitioner for her treatment at Apicha Community Center.

142.  In or around May 2013, Ms. Kpaka struggled with depression related to issues surrounding her gender identity and started taking prescribed medication for her depression.  Although she stopped taking the medication in November 2014, she continues to suffer from bouts of depression.

143.  Ms. Kpaka continues to feel pain and struggles because she is in need of gender-affirming procedures and surgeries in order to treat her GD/GID.  She needs facial feminizing surgery (FFS), chondrolarngoplasty (commonly referred to as a "tracheal shave"), body sculpting procedures, and breast augmentation in order to move on to the next phase in her gender transition.

144.  Facial feminizing surgery, a tracheal shave, body sculpting procedures, and breast augmentation are medically necessary treatments for Ms. Kpaka's GD/GID.

145.  Upon information and belief, Medicaid will not pay for the above-referenced procedures and treatments because they are deemed "cosmetic" under Section 505.2(*l*).

146.  Ms. Kpaka suffers emotional pain because Medicaid will not cover these surgeries, although they are medically necessary for her to conform to her gender identity and eventually complete her gender transition.

147.  Ms. Kpaka and individuals similarly situated need gender reassignment treatment, including breast augmentation and other procedures excluded by Section 505.2(*l*), in order to achieve the capacity to live a life without terrible suffering.

148.  Defendant provides medical assistance coverage for the same surgical procedures and other treatments indicated by Ms. Kpaka's physicians as medically necessary to treat her GD/GID to Medicaid recipients, who are similarly situated to Ms. Kpaka, suffering from medical conditions other than GD/GID.  See, e.g., 18 N.Y.C.R.R. § 533.5.

149.  Defendant's promulgation and enforcement of the coverage exclusions set forth in Section 505.2(*l*) do not serve any compelling, important or legitimate State interest.  To the

contrary, as set forth above, there is no scientific support for the notion that gender reassignment treatment – including procedures classified as "cosmetic" by Section 505.2(*l*) – is experimental, unsafe or ineffective, which were the stated reasons for the enactment of Section 505.2(*l*).

**Plaintiff Christie**

150.  Riya Christie is a categorically needy Medicaid recipient residing in a homeless shelter in Brooklyn, New York.  She is twenty-three years old and has been a recipient of Medicaid benefits since 2014.

151.  Ms. Christie was assigned male at birth.  She was born and lived in Jamaica until the age of twenty-one.

152.  As a child, Ms. Christie experienced violence because of her gender expression. She struggled with severe depression and suicidality.

153.  In March 2012, Ms. Christie moved to the United States.  When she moved to New York, Ms. Christie met transgender women for the first time and she began to identify and live as a transgender woman at the age of twenty-one.

154.  Because her gender expression would have made it unsafe for her to return to Jamaica, Ms. Christie filed for asylum.  She was granted asylum in May 2014.

155.  Ms. Christie has been homeless since the age of twenty-one.

156.  In June 2013, Ms. Christie legally changed her name to Riya Mercedes Christie. She was able to obtain identification documents, including her Medicaid card, that reflected her correct name and gender.

157.  In 2013, Ms. Christie was diagnosed with GD and began hormone replacement therapy through a program that provides free health care for young, low-income transgender New Yorkers.  She will age out of this program this year.

158.  Ms. Christie requested an orchiectomy from her Medicaid managed care plan. The request was denied on March 4, 2014.

159.  In addition to an orchiectomy, Ms. Christie needs vaginoplasty, breast augmentation, a tracheal shave, electrolysis, and facial feminizing surgery.

160.  Breast augmentation, tracheal shave, electrolysis, and facial feminizing surgery are excluded services under Section 505.2(*l*).

161.  Ms. Christie requires these above-referenced procedures to conform her body to her gender identity.  Without these procedures, she experiences great pain and anxiety.

162.  Defendant provides medical assistance coverage for the same surgical procedures medically necessary to treat her GD/GID to Medicaid recipients, who are similarly situated to Ms. Christie, suffering from medical conditions other than GD/GID.  See, e.g., 18 N.Y.C.R.R. § 533.5.

163.  Defendant's promulgation and enforcement of the coverage exclusions set forth in Section 505.2(*l*) do not serve any compelling, important or legitimate State interest.  To the contrary, as set forth above, there is no scientific support for the notion that gender reassignment treatment – including procedures classified as "cosmetic" by Section 505.2(*l*) – is experimental, unsafe or ineffective, which were the stated reasons for the enactment of Section 505.2(*l*).

**Plaintiff M.B.**

164.  M.B. is a categorically needy Medicaid recipient residing in Chenago County, New York.  M.B. is 14 years old and has been a recipient of Medicaid benefits for approximately the past eight months.

165.  M.B. lives in the care of her mother and natural guardian, A.B., who brings this claim on her behalf.

166.  M.B. has received regular therapy from a clinical psychologist since 2008.  She currently attends weekly therapy sessions.

167.  M.B. was assigned male at birth.  In June 2015, M.B. told her mother that she identified as a girl.  A.B. is accepting and supportive of her transition.

168.  Although she goes by a name that corresponds to the initials M.B., she has not yet legally changed her name from her birth name, which corresponds to the initials J.B.

169.  Since coming out as a girl, M.B. feels more comfortable in her skin.  She has fared better at school, both academically and socially.

170.  In 2015, M.B. was diagnosed with gender dysphoria.

171.  After coming out, M.B. saw a pediatrician who recommended she begin a regimen of pubertal suppressants.  These medications are prescribed once patients reach a particular stage of puberty, called Tanner Stage 2, to delay puberty and alleviate the distress associated with developing undesired sex characteristics and an outward appearance contrary to one's gender identity.  Pubertal suppressants are used until a patient reaches an appropriate stage to receive cross-sex hormones, if necessary. Pubertal suppressants are safe and effective,

and have been shown to lower the risks of depression, suicide, school failure, and substance abuse associated with untreated gender dysphoria in youth.

172.  In November 2015, M.B. began receiving medical care from a licensed physician with extensive experience providing care to transgender and gender-nonconforming youth, who confirmed her diagnosis of gender dysphoria.  That physician also recommended that M.B. begin a regimen of pubertal suppressants.

173.  Pubertal suppressants are medically necessary to treat M.B.'s gender dysphoria.

174.  In or around December 2015, M.B. applied for and was denied Medicaid coverage of pubertal suppressants by her managed care plan.

175.  Defendant provides medical assistance coverage for the same medications prescribed by M.B.'s physicians as medically necessary to treat her gender dysphoria, *i.e.*, pubertal suppressants, to Medicaid recipients who are similarly situated to M.B. but suffer from medical conditions other than GD/GID, including precocious puberty and endometriosis.

176.  The use of pubertal suppressants to treat people with GD who are under the age of 18 is generally accepted within the medical community to be safe and effective.

**Plaintiff S.V.**

177.  S.V. is a categorically needy Medicaid recipient residing in Ulster County, New York.  S.V. is 13 years old and has been a recipient of Medicaid benefits since birth.

178.  S.V. lives in the care of her grandmother and legal guardian, N.V., who brings this claim on her behalf.

179.  S.V. was assigned male at birth, but identifies as a girl.  S.V.'s grandmother is accepting and supportive of S.V.'s gender identity.

180.  Last year, as a seventh-grader, S.V. came out at school as transgender.  After that, S.V. was bullied at school.  After enduring several weeks of bullying, S.V. refused to go to school.  She then spent six weeks receiving psychological treatment at a hospital, where she was prescribed anti-depressants.

181.  In 2015, S.V. was diagnosed with gender dysphoria.

182.  In the Spring of 2015, S.V. began receiving therapy from a psychotherapist who specializes in treating children and adolescents with gender dysphoria and who discussed the possibility of S.V.'s using pubertal suppressants with N.V.

183.  In October 2015, S.V. began receiving medical care from a licensed physician with extensive experience providing care to transgender and gender-nonconforming youth, who confirmed S.V.'s diagnosis of gender dysphoria.  That physician prescribed a regimen of pubertal suppressants for S.V.

184.  Pubertal suppressants are medically necessary to treat S.V.'s gender dysphoria.

185.  In October 2015, S.V. applied for and was denied Medicaid coverage of pubertal suppressants by her managed care plan.

186.  Defendant provides medical assistance coverage for the same medications prescribed by S.V.'s physicians as medically necessary to treat her gender dysphoria, *i.e.*,

pubertal suppressants, to Medicaid recipients who are similarly situated to S.V. but suffer from medical conditions other than GD/GID, including precocious puberty and endometriosis.

187.  The use of pubertal suppressants to treat people with GD who are under the age of 18 is generally accepted within the medical community to be safe and effective.

## FIRST CLAIM FOR RELIEF

188.  Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 187 above.

189.  Section 505.2(*l*) violates 42 U.S.C. § 1396a(a)(10)(A) and its implementing regulation 42 C.F.R. § 440.210, which are enforceable by Plaintiffs pursuant to 42 U.S.C. § 1983.

190.  Section 505.2(*l*) conflicts with 42 U.S.C. § 1396a(a)(10)(A) and its implementing regulation 42 C.F.R. § 440.210 and is thus preempted by the Supremacy Clause of the U.S. Constitution, art. VI.

## SECOND CLAIM FOR RELIEF

191.  Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 190 above.

192.  Section 505.2(*l*) violates Medicaid's comparability requirement, 42 U.S.C. § 1396a(a)(10)(B) and its implementing regulation 42 C.F.R. § 440.240(b), enforceable by Plaintiffs pursuant to 42 U.S.C. § 1983.

193.   Section 505.2(*l*) conflicts with Medicaid's comparability requirement, 42 U.S.C. § 1396a(a)(10)(B) and its implementing regulation 42 C.F.R. § 440.240(b), and is thus preempted by the Supremacy Clause of the U.S. Constitution, art. VI.

### THIRD CLAIM FOR RELIEF

194.  Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 193 above.

195.  Section 505.2(*l*) arbitrarily denies and/or reduces the amount, duration, or scope of a required service solely on account of diagnosis, which conflicts with 42 U.S.C. § 1396a(a)(17), 42 U.S.C. § 1396a(a)(10)(B)(i) and their implementing regulation 42 C.F.R. § 440.230(c), and is thus preempted by the Supremacy Clause of the U.S. Constitution, art. VI.

### FOURTH CLAIM FOR RELIEF

196.  Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 195 above.

197.  Defendant has violated and is violating Plaintiffs' rights under Section 11 of Article I of the Equal Protection Clause of the New York State Constitution by denying care, services, drugs and/or supplies to Plaintiffs to treat their GD/GID while providing the same care, services, drugs and/or supplies to categorically needy Medicaid recipients suffering from illnesses other than GD/GID without justification.  N.Y. Const. art. I, § 11.

198.  As a result of the promulgation and enforcement of Section 505.2(*l*), Medicaid provides coverage for non-experimental, medically necessary care, services, drugs and/or supplies to Medicaid-eligible people in New York except transgendered people.  Section

505.2(*l*) therefore unlawfully discriminates on the basis of sex (including gender, gender identity and failure to conform to the sex and gender stereotypes associated with one's anatomical sex), identity as a transgender person, sexual orientation, and/or disability, and its enforcement denies Plaintiffs the equal protection of the laws.

199.  Defendant's actions in promulgating and enforcing Section 505.2(*l*) were undertaken purposefully and intentionally, and bear no substantial or rational relationship to any compelling, important or legitimate government interest.

## FIFTH CLAIM FOR RELIEF

200.  Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 199 above.

201.  Section 505.2(*l*) excludes Plaintiffs from participation in, deny Plaintiffs the benefits of, and/or subject Plaintiffs to discrimination under the New York State Medicaid Program, a health program receiving federal financial assistance, on the basis of sex (including gender, gender identity, and failure to conform to the sex and gender stereotypes associated with anatomical sex) and disability.  Section 505.2(*l*) therefore violates Section 1557 of the ACA, 42 U.S.C. § 18116, which is enforceable under 42 U.S.C. § 1983.

## SIXTH CLAIM FOR RELIEF

202.  Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 201 above.

203.  Section 505.2(*l*) violates 42 U.S.C. § 1396a(a)(10) and its implementing

regulations by failing to provide medical assistance guaranteed to all Medicaid-eligible

individuals under the age of twenty-one, which is enforceable under 42 U.S.C. § 1983.

## PRAYER FOR RELIEF

204.  WHEREFORE, Plaintiffs respectfully request that this Court:

(a)   Issue a permanent injunction pursuant to 42 U.S.C. § 1983 and otherwise, including but not limited to the Court's inherent power:

   i.   ordering Defendant Zucker to provide Plaintiffs with medical assistance coverage for all care, services, drugs and supplies prescribed by Plaintiffs' physicians as medically necessary for the purpose of gender reassignment to treat Plaintiffs' GD/GID;

   ii.   enjoining Defendant Zucker from denying medical assistance coverage to Medicaid-eligible recipients who have been diagnosed with GD/GID for expenses associated with medically necessary treatment of their GD/GID (including physician-prescribed care, services, drugs and supplies);

   iii.   ordering Defendant Zucker to repeal 18 N.Y.C.R.R. § 505.2(*l*); and

   iv.   ordering Defendant Zucker to issue an Informational Letter ("INF") informing local social services districts that 18 N.Y.C.R.R. § 505.2(*l*) is no longer in effect;

(b)   Enter a declaratory judgment declaring that:

   i.   18 N.Y.C.R.R. § 505.2(*l*) is preempted by the Supremacy Clause of the United States Constitution, art. VI., because it is inconsistent with the Medicaid Act;

   ii.   18 N.Y.C.R.R. § 505.2(*l*) violates the Medicaid Act which is enforceable pursuant to 42 U.S.C. § 1983;

   iii   18 N.Y.C.R.R. § 505.2(*l*) violates Article 1, Section 11 of the New York State Constitution by denying care, services, drugs and/or supplies necessary to treat Medicaid-eligible patients diagnosed with GD/GID;

   iv.   18 N.Y.C.R.R. § 505.2(*l*) violates Section 1557 of the Patient Protection and Affordable Care Act, 42 U.S.C. § 18116, by

denying care, services, drugs and/or supplies necessary to treat
Medicaid-eligible patients diagnosed with GD/GID;

    (c)    Award Plaintiffs costs and disbursements, including reasonable attorneys'
fees, pursuant to 42 U.S.C. § 1988; and

    (d)    Award Plaintiffs such other and further relief as the Court may deem just
and proper.

Dated:  April 22, 2016
New York, New York

Respectfully submitted,

WILLKIE FARR & GALLAGHER LLP
By: /s/ Mary Eaton, Esq.
Mary Eaton, Esq.
Wesley Powell, Esq.
Norman Ostrove, Esq.
Arthur Biller, Esq.
Christopher McNamara, Esq.
L. Lars Hulsebus, Esq.
787 Seventh Avenue
New York, N.Y. 10019
Tel: (212) 728-8000
Fax: (212) 728-8111
meaton@willkie.com

THE LEGAL AID SOCIETY
Seymour W. James, Jr., Esq.
Adriene Holder, Esq.
Judith Goldiner, Esq.
Kimberly Forte, Esq.
Belkys Garcia, Esq.
Sumani Lanka, Esq.
199 Water Street
New York, N.Y. 10038
Tel: (212) 577-3300
Fax: (212) 509-8761

SYLVIA RIVERA LAW PROJECT
Mik Kinkead, Esq.
147 West 24th Street, 5th Floor
New York, N.Y. 10001
Tel: (212) 337-8550
Fax: (212) 337-1972

*Attorneys for Plaintiffs*