UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ x
ANGIE CRUZ, I.H., AR'ES KPAKA, and      :
RIVA CHRISTIE, on behalf of             :
themselves and all others similarly     :
situated,                               :
                                        :
                 Plaintiffs,            :
                                        :         14-cv-4456 (JSR)
          -v-                           :
                                        :         OPINION AND ORDER
HOWARD ZUCKER, as Commissioner of the   :
Department of Health [of the State of   :
New York],                              :
                                        :
                 Defendant.             :
------------------------------------ x
JED S. RAKOFF, U.S.D.J.

     Plaintiffs claim that New York wrongly denies Medicaid

coverage for treatment of gender dysphoria in two material

respects. First, they challenge N.Y. Comp. Codes R. & Regs. tit.

18, § 505.2(l), which provides coverage for gender reassignment

surgery and hormone therapy but excludes coverage for individuals

under eighteen (the "Age Exclusion").[1] Second, plaintiffs also

claim that § 505.2(l) wrongfully imposes a blanket ban on

coverage of cosmetic procedures related to gender dysphoria,

including medically necessary cosmetic procedures (the "Cosmetic

Exclusion").

     The details of this case are discussed in greater detail in

---

[1] § 505.2(l) previously excluded coverage of gender reassignment
surgery for individuals under twenty-one if it resulted in
sterilization. However, effective April 27, 2016, § 505.2(l) was
amended to establish a minimum age of 18 for gender reassignment
surgery, even when the surgery would result in sterilization. See
Notice of Adoption dated April 12, 2016, 2016 N.Y. Reg. 407920.
Plaintiffs' claims against the earlier prohibition on surgeries
resulting in sterilization for individuals under 21 are therefore
dismissed as moot.

Cruz v. Zucker, 116 F. Supp. 3d 334, 337-41 (S.D.N.Y. 2015), familiarity with which is here presumed. The Court now has four motions before it. First, defendant asks the Court to reconsider its decision on his motion to dismiss. Specifically, he wants the Court to revisit its conclusion that § 505.2(l) imposes a blanket ban on cosmetic procedures. Second, the defendant asks the Court to decertify the plaintiff class. Finally, both parties move for summary judgment. For the following reasons, the Court denies defendant's motions except for parts of his motion for summary judgment, and grants plaintiffs' motion for summary judgment in part.

First, defendant moves for reconsideration of this Court's decision on his motion to dismiss. Specifically, defendant argues that § 505.2(l) does allow cosmetic procedures when they are medically necessary. He bases his argument on guidance released by the New York Department of Health ("DOH") in June 2015 (the "June Guidance"). See New York Department of Health Medicaid Program, Medicaid Update Vol. 31 No. 6 (June 2015). The June Guidance explicitly supersedes earlier DOH guidance, published in March 2015, (the "March Guidance") which stated that "payment will not be made for [a list of cosmetic surgeries that can be used to treat gender dysphoria.]" See New York Department of Health Medicaid Program, Medicaid Update Vol. 31 No. 3 (March 2015). Although the June Guidance still states that "[p]ayment

2

will not be made for any procedures that are performed solely for
the purpose of improving an individual's appearance," it
implicitly allows coverage of some cosmetic procedures when
"justification of medical necessity is provided and prior
authorization is received." New York Department of Health
Medicaid Program, Medicaid Update Vol. 31 No. 6 at 7 (June 2015).
Specifically, the June Guidance recasts the March Guidance's list
of prohibited cosmetic surgeries as "procedures [that] will be
presumed to be performed solely for the purpose of improving
appearance and will not be covered, unless justification of
medical necessity is provided and prior authorization is
received." Id. Defendants argue that the June Guidance should
effectively end plaintiffs' facial attack on the Cosmetic
Exclusion because, if the June Guidance were a proper
interpretation of § 505.2(l), it would show that § 505.2(l)
allows coverage for medically necessary cosmetic surgeries.

Defendants also argue that the June Guidance affects the
Court's consideration of the ripeness of plaintiffs' claims. "A
claim is not ripe for adjudication if it rests upon contingent
future events that may not occur as anticipated," such as the
denial of coverage for medically necessary cosmetic surgeries.
Texas v. United States, 523 U.S. 296, 300 (1998) (internal
quotation marks omitted). However, the Second Circuit does not
require "a futile gesture as a prerequisite for adjudication in

3

federal court." Desiderio v. Nat'l Ass'n of Sec. Dealers, Inc.,

191 F.3d 198, 202 (2d Cir. 1999) (quoting Williams v. Lambert, 46

F.3d 1275, 1280 (2d Cir. 1995)). Although plaintiffs did not

plead that they had requested and been denied cosmetic surgeries,

the Court held that their claims were nonetheless ripe because

the plain language of § 505.2(l) bars coverage of cosmetic

surgeries and so requests for such surgeries pursuant to §

505.2(l) would be futile. In reaching this conclusion the Court

relied, in part, on the March Guidance. See Opinion dated July 29

at 28, ECF No. 52. But, according to the June Guidance,

plaintiffs' request for cosmetic surgeries under § 505.2(l) would

not necessarily be futile, and defendants' ripeness arguments

would rest on a stronger foundation.

     In response to these various points, plaintiffs first argue

that the Court should not take the June Guidance into account

because it was released after the Court made its decision denying

defendant's motion to dismiss. However, there is no rule

requiring that, on a motion for reconsideration, the Court must

limit itself to facts or evidence existing at the time of its

initial decision. "[T]he major grounds justifying reconsideration

are 'an intervening change of controlling law, the availability

of new evidence, or the need to correct a clear error or prevent

manifest injustice.'" Virgin Atl. Airways, Ltd. v. Nat'l

Mediation Bd., 956 F.2d 1245, 1255 (2d Cir. 1992) (quoting 18 C.

Wright, A. Miller & E. Cooper, Federal Practice & Procedure §
4478 at 790). The Court will therefore consider the June Guidance
to ensure that its past decision was not clear error or manifest
injustice.

The June Guidance is significant because, in many
circumstances, a court is bound to give deference to an agency's
interpretation of its own ambiguous regulation. See Barnhart v.
Walton, 535 U.S. 212, 221 (2002) (upholding deference to agency
interpretation of regulations even when agency recently enacted
the regulations in response to litigation); Auer v. Robbins, 519
U.S. 452, 461-63 (1997) (deferring to agency interpretation
submitted in amicus brief). Defendant argues that the Court
should defer to the June Guidance as the authoritative
interpretation of § 505.2(l) because both were promulgated by
DOH.

However, deference to an agency's interpretation of its own
regulation is not always warranted. For one thing, "Auer
deference is warranted only when the language of the regulation
is ambiguous." Christensen v. Harris Cty., 529 U.S. 576, 588
(2000). Moreover, "[d]eference is undoubtedly inappropriate . . .
when the agency's interpretation is plainly erroneous or
inconsistent with the regulation." Christopher v. SmithKline
Beecham Corp., 132 S. Ct. 2156, 2166 (2012) (internal quotation
marks omitted). The Second Circuit has explained that an

interpretation is "'plainly erroneous' . . . where the plain language of the regulation itself or some other indication of the agency's intent at the time of promulgation compels a different result." Florez ex rel. Wallace v. Callahan, 156 F.3d 438, 442 (2d Cir. 1998).

Here, the Court will give no deference to the June Guidance because the plain language of § 505.2(l) unambiguously forecloses its interpretation. The Court already held as much in its earlier decision on defendant's motion to dismiss. See Opinion dated July 29, 2015, at 28, ECF No. 28 ("Section 505.2(l), by its plain terms, excludes coverage for the procedures deemed 'cosmetic.'"). However, because the Court did cite the March Guidance in its earlier analysis, it now holds that the March Guidance was not essential to its decision, for which the text of § 505.2(l) provides a sufficient foundation.

Section 505.2(l) consists of five relevant subsections. Subsections (1), (2), and (3) provide coverage for medically necessary hormone therapy and gender reassignment surgery for Medicaid recipients over 18. 18 N.Y.C.R.R. § 505.2(l)(1)-(3). Subsection (4) specifically excludes a list of services and procedures from coverage, including "cosmetic surgery, services, and procedures" and provides a non-exhaustive list of explicitly excluded cosmetic procedures. 18 N.Y.C.R.R. § 505.2(l)(4)(v). Subsection (5) defines "cosmetic surgery, services, and

6

procedures" to mean "anything solely directed at improving an individual's appearance." 18 N.Y.C.R.R. § 505.2(l)(5). Defendant argues that Subsection (5) should be construed not as an elaboration of the items excluded by (4), but as an allowance for provision of coverage for cosmetic procedures that would otherwise be excluded outright by (4). See Memorandum of Law in Support of Defendant's Motion to Dismiss the Amended Class Action Complaint at 22-23, ECF No. 30. However, no provision of § 505.2(l) states that coverage will be provided for cosmetic procedures of any kind. Defendant's argument would be on surer footing – and § 505.2(l) would be at least ambiguous – if § 505.2(l) contained a catch-all provision establishing coverage for all medically necessary treatments of gender dysphoria. It does not. Instead, § 505.2(l) carefully provides for only two treatments for gender dysphoria, hormone therapy and gender reassignment surgery, and states outright that "[p]ayment will not be made for . . . breast augmentation, . . . electrolysis, . . . [or] facial bone reconstruction, reduction, or sculpturing" – procedures plaintiffs allege they need. § 505.2(l)(4). This unambiguous language renders the June Guidance clearly erroneous and undeserving of deference.[2] Because § 505.2(l) categorically

---

[2] Because the unambiguous language of § 505.2(l) is a sufficient basis to deny defendant's motion for reconsideration, the Court need not reach plaintiffs' other arguments against giving deference to the June Guidance, including the inconsistency

bars coverage for cosmetic surgeries, plaintiffs need not be required to attempt to gain approval for these surgeries under § 505.2(l). Their facial challenge to the regulation is ripe without such futile gestures.

It is of no moment that two named plaintiffs, Kpaka and Christie, have received prior approval of Medicaid coverage for cosmetic surgeries under the June Guidance. See Declaration of Ronald J. Bass in Support of Defendant's May 11, 2016, Letter, Exs. 1-7, ECF No. 122. Plaintiffs' claims are directed solely at § 505.2(l), and, as defendant himself has argued, the implementation of the June Guidance is irrelevant to their suit. See Declaration of Zoey S. Chenitz dated Aug. 17, 2015 ¶¶ 3, 7, ECF No. 59 (explaining that plaintiff's pre-enforcement facial challenge has nothing to do with how § 505.2(l) has been "operationalized" and that defendant's present motion for reconsideration turns on the purely legal question of the interpretation of § 505.2(l)). The questions of whether plaintiffs have benefited from defendant's publication of guidance that contradicts a duly promulgated regulation and under what authority he undertook that publication are not before the Court. Plaintiffs do not share defendant's apparent ability to

---

between the March and June Guidances, material from § 505.2(l)'s promulgation suggesting DOH intended a blanket ban on cosmetic procedures, and the convenience of the June Guidance as a litigating position. See Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion for Reconsideration at 11-13,

disregard duly promulgated regulations and allege that any valid application of the plain language of § 505.2(l) would stop them from receiving coverage for medically necessary cosmetic surgeries. Because these allegations continue to state a valid claim for relief, the Court denies defendant's motion for reconsideration of his motion to dismiss.[3]

Second, the Court denies defendant's motion to decertify the plaintiff class. On August 22, 2014, before § 505.2(l) was amended to provide coverage of some medically necessary treatments for gender dysphoria, the parties entered a Provisional Stipulation and Order of Class Certification, certifying a class consisting of:

> All New York State Medicaid recipients who have been diagnosed with Gender Identity Disorder or Gender Dysphoria, and whose expenses associated with medically necessary Gender Identity Disorder- or Gender Dysphoria-related treatment are not reimbursable by Medicaid pursuant to 18 N.Y.C.R.R. § 505.2(l).

---

ECF No. 92.

[3] Relatedly, defendant argues that plaintiffs' Cosmetic Exclusion claims have been mooted by DOH's issuance of a Notice of Proposed Rule Making ("NPRM") amending § 505.2(l) to track the language of the June Guidance. Compare New York Department of Health Notice of Proposed Rule Making dated April 26, 2016 with New York Department of Health Medicaid Program, Medicaid Update Vol. 31 No. 6 (June 2015). The NPRM does not moot plaintiffs' claims because it is not a final rule and is not binding. In addition, under N.Y. APA Law § 202, DOH must respond to public comments on the NPRM and undertake other procedural steps before the NPRM is finalized. The Court cannot base its decision on a document subject to change. The Court also declines to stay the case until the NPRM is finalized. The present motions have been pending for months and, while the Court has entertained several rounds of supplemental briefing, delaying its decision any further would be unfair to the parties and the public.

Stipulation and Order dated August 22, 2014, ECF No. 23.
Defendant now argues that this class does not meet the
requirements of 23(a) or 23(b)(2). First, defendant argues that a
single class containing members challenging solely the Cosmetic
Exclusion and members challenging solely the Age Exclusion cannot
satisfy the typicality requirement of Rule 23(a)(3). Typicality
"is satisfied when each class member's claim arises from the same
course of events, and each class member makes similar legal
arguments to prove the defendant's liability." Marisol A. v.
Giuliani, 126 F.3d 372, 376 (2d Cir. 1997) (internal quotation
marks omitted). Defendant argues that the claims of class members
challenging solely the Cosmetic Exclusion do not arise from the
same course of events as those challenging the Age Exclusion
because gender dysphoria works differently in children and
adolescents than in adults. The World Professional Association
for Transgender Health Standards of Care ("WPATH Standards of
Care")[4] state that "[t]here are a number of differences in the

---

[4] The Court puts significant weight on the WPATH Standards of
Care. Plaintiffs' expert Dr. Nicholas Gorton stated in his expert
report that

> there are many local standards of care, but the most
> widely recognized and utilized international standard
> for treating transgender people is the Standards of
> Care of the World Professional Association for
> Transgender Health (WPATH SOC), which provides
> practical clinical guidance for health care providers
> treating transgender patients. WPATH SOC has been
> internationally recognized by much of the developed

10

phenomenology, developmental course, and treatment approaches for gender dysphoria in children, adolescents, and adults." Declaration of John Gasior dated Aug. 28, 2015, Ex. 14 ("WPATH Standards of Care") at 10, ECF No. 83. Defendant also points out that any class member older than eighteen will not be directly affected by any legal judgment pertaining to the Age Exclusion.

Plaintiffs respond that defendant has overstated the typicality requirement. They also rely on Marisol A. but point out that the Second Circuit affirmed class certification in that case, even though the district court "conceptualiz[ed] the common legal and factual questions at [a] high level of abstraction." Marisol A., 126 F.3d at 377. Marisol A. involved a class of essentially all children who were in the custody of or should have been in the custody of New York City's child welfare system. Although "no single plaintiff [was] affected by each and every legal violation alleged in the complaint, and . . . no single specific legal claim . . . affect[ed] every member of the class," the Second Circuit recognized that the plaintiffs' "injuries derive[d] from a unitary course of conduct by a single system."

---

western nations for decades and is more recently being adopted by insurers in the U.S.

Expert Report of Nicholas Gorton, MD, DABEM, Declaration of Christopher J. McNamara dated August 28, 2015, 38, ECF No. 74. Defendant does not meaningfully attack the authority of the WPATH Standards of Care and indeed relies in part on them.

Id. at 377. Plaintiffs contend that the reasoning of Marisol A. calls for class certification in this case.

The Court reads Marisol A. a third way. Plaintiffs are correct that a faithful application of Marisol A. allows class certification here. However, in Marisol A., the Second Circuit also directed the district court to create subclasses under Fed. R. Civ. P. 23(c)(4). The Second Circuit suggested that the district court "divide the . . . class based on the commonality of the [plaintiffs'] particular circumstances, the type of harm the plaintiffs allegedly have suffered, and the particular systemic failures which the plaintiffs assert have occurred." Id. at 379. The Court concludes that this is also the best approach in the present case. Defendant is correct that the claims of class members solely challenging the Cosmetic Exclusion – i.e. any class member over the age of eighteen – are typical of the claims of members challenging solely the Age Exclusion only at a "high level of abstraction," with the claims of each group implicating different legal and factual questions. Marisol A., 126 F.3d at 377. For instance, DOH's publication of the June Guidance raised legal questions specific to members challenging the Cosmetic Exclusion (discussed above) but also resolved key factual questions pertinent to that group's claims (discussed below). Meanwhile, the factual questions surrounding the claims of class members challenging the Age Exclusion remain unresolved.

These differences are not fatal to the certification of the overall class, but they do suggest a natural division into two subclasses: the first consisting of all class members aged eighteen and older (the "Cosmetic Subclass") and the second consisting of all class members younger than eighteen (the "Age Subclass").

Defendant objects that the creation of subclasses is inappropriate here because the Age Subclass would lack an adequate class representative. To be an adequate class representative, a named plaintiff must, at the very least, be a member of the class. See Bailey v. Patterson, 369 U.S. 31, 32-33 (1962). Three of the named plaintiffs, Angie Cruz, Ar'es Kpaka, and Riya Christie, are over the age of 18. Therefore, they are not members of the Age Subclass and cannot serve as class representatives for it. However, with the Court's permission, plaintiffs filed a Second Amended Complaint ("SAC") adding two new named plaintiffs, A.B. as parent and natural guardian of M.B. and N.V. as legal guardian of S.V. See SAC ¶¶ 164-87, ECF No. 114; Order dated April 1, 2016, ECF No. 113. M.B. is a fourteen-year-old, categorically needy Medicaid recipient with gender dysphoria; she allegedly applied for and was denied Medicaid coverage of pubertal suppressants,[5] which two physicians

---

[5] "Pubertal suppressants" are hormones that can delay the onset of puberty until further medical decisions are made, thereby sparing adolescents with gender dysphoria the anguish of going

recommended she begin taking. See SAC ¶¶ 164-76. S.V. is a
thirteen-year-old, categorically needy Medicaid recipient with
gender dysphoria; she allegedly applied for and was denied
Medicaid coverage of pubertal suppressants, which a physician
prescribed for her. See SAC ¶¶ 177-87. Plaintiffs submitted a
Declaration from a physician treating M.B. and S.V., attesting to
their medical need for pubertal suppressants and that she
prescribed pubertal suppressants to each of them. See Declaration
of Dr. Carolyn Wolf-Gould dated April 21, 2016, ECF No. 115. A.B.
as parent and natural guardian of M.B. and N.V. as legal guardian
of S.V. are adequate class representatives of the Age Subclass.

Defendant makes one more argument based on the differences
between the Cosmetic Subclass and the Age Subclass, under Rule
23(b)(2). Rule 23(b)(2) requires that "the party opposing the
class has acted or refused to act on grounds that apply generally
to the class, so that final injunctive relief or corresponding
declaratory relief is appropriate respecting the class as a
whole." Defendant argues that the Court could award final relief
with respect to the Cosmetic Exclusion, but not the Age
Exclusion, or vice versa. Defendant is correct that the differing
legal and factual questions implicated by the Cosmetic and Age
Exclusion make this a possibility. However, the creation of

---

through puberty in the wrong gender. Expert Report of Johanna
Olson, M.D., Declaration of Christopher J. McNamara Ex. 27 ¶ 16,
ECF No. 94.

subclasses cures this defect and is a more appropriate course than decertification. See Marisol A. v. Giuliani, 126 F.3d 372, 378 (2d Cir. 1997). Accordingly, the Court certifies the Cosmetic Subclass and the Age Subclass.

Defendant raises one additional argument against both subclasses under Rule 23(b)(2). Defendant invokes a line of Second Circuit cases approving denials of class certification when defendants are public officials. See, e.g., Berger v. Heckler, 771 F.2d 1556, 1566-67 (2d Cir. 1985). This doctrine first took definite shape in Galvan v. Levine, 490 F.2d 1255, 1261 (2d Cir. 1973) (Friendly, J.), where the Second Circuit explained that in such cases "what is important . . . is that the judgment run to the benefit not only of the named plaintiffs but of all others similarly situated." However, in Galvan, "[t]he State ha[d] made clear that it [understood] the [court's] judgment to bind it with respect to all claimants; indeed even before entry of the judgment, it withdrew the challenged policy even more fully than the court ultimately directed and stated it did not intend to reinstate the policy." Id. at 1261. Defendant has not taken such steps here. Moreover, the Galvan doctrine has generally been applied to denials of class certification in the first instance. See, e.g., Berger v. Heckler, 771 F.2d 1556, 1566-67 (2d Cir. 1985). A doctrine that rests on a public official's acceptance of the applicability of a judgment to a

15

broad group does not apply when the public official has moved to
decertify an existing class and thereby attacks the broad
applicability of a judgment. Accordingly, defendant's 23(b)(2)
argument fails.

Defendant also raises several arguments directed either at
the Cosmetic Subclass or the Age Subclass. To begin with,
defendant argues that the Cosmetic Subclass fails the commonality
requirement of Rule 23(a)(2). Under Rule 23(a)(2), there must be
"questions of law or fact common to the class." In particular,
plaintiffs' "claims must depend upon a common contention . . . of
such a nature that it is capable of classwide resolution — which
means that determination of its truth or falsity will resolve an
issue that is central to the validity of each one of the claims
in one stroke." Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541,
2551 (2011). Defendant argues that the Cosmetic Subclass runs
afoul of Dukes because each class member's individual medical
circumstances will determine whether specific treatments are
medically necessary and available under § 505.2(l). This argument
would have more force if plaintiffs were challenging the
implementation of a regulation that allowed any coverage of
cosmetic procedures, in line with the June Guidance. However,
plaintiffs have brought a facial challenge against a regulation
that unequivocally bans all cosmetic procedures. See supra.
Section 505.2(l)'s ban is the "glue" holding together plaintiffs'

16

claims as required by Dukes: if the ban violates the federal law, each of the claims brought by members of the Cosmetic Subclass will be resolved "in one stroke." Dukes, 131 S. Ct. at 2551, 2552.

Further, defendant argues that named plaintiffs Cruz and Kpaka fail the typicality requirement of Rule 23(a)(3) because they have failed to show that the cosmetic treatments they seek are medically necessary for them. Typicality does "require[] that the claims of the class representatives be typical of those of the class." Marisol A. v. Giuliani, 126 F.3d 372, 376 (2d Cir. 1997). However, Cruz and Kpaka have adequately demonstrated medical necessity for purposes of class certification. See In re IPO Sec. Litig., 471 F.3d 24, 41 (2d Cir. 2006) ("[T]he district judge must receive enough evidence, by affidavits, documents, or testimony, to be satisfied that each Rule 23 requirement has been met."). Cruz submitted a declaration stating that her doctor has determined that breast augmentation is medically necessary for her. See Declaration of Angie Cruz dated Sept. 8, 2015 ¶ 10, ECF No. 96. Defendants do not point to any evidence contradicting Cruz's declaration, apart from an absence of documents in Cruz's medical records that state the medical necessity of cosmetic surgeries. See Declaration of John Gasior dated Aug. 28, 2015 Ex. 1, ECF No. 83. In light of Cruz's declaration, the Court cannot rely on an absence of unspecified documents in Cruz's medical

records – which otherwise confirm that Cruz was diagnosed with gender identity disorder – to conclude that cosmetic treatments are not medically necessary for her. Cruz's claims are sufficiently typical for her to serve as class representative.

Defendant also points out that Kpaka's medical records do not contain documents specifically certifying that cosmetic procedures are necessary for her. See Declaration of John Gasior dated Aug. 28, 2015 Ex. 2, ECF No. 83. However, he does not dispute that Kpaka has received prior approval for coverage of breast augmentation and facial feminizing surgeries. See Reply Memorandum of Law in Further Support of Defendant's Motion for Summary Judgment at 6, ECF No. 98. Under the terms of the June Guidance, Kpaka could only have received prior approval if the surgeries were medically necessary. See New York Department of Health Medicaid Program, Medicaid Update Vol. 31 No. 6 (June 2015). Given this uncontested evidence of medical necessity, the Court concludes that Kpaka's claim are sufficiently typical for her to serve as class representative.

It should be noted that defendant does not challenge the medical necessity of cosmetic procedures for Christie. Accordingly, even if (contrary to fact) Cruz and Kpaka had failed to demonstrate the typicality of their claims, the appropriate response would be the dismissal of Cruz and Kpaka as class

18

representatives, rather than the decertification of the entire
class.

Further still, defendant argues that Cruz and Kpaka fail the
adequacy requirement of Rule 23(a)(4). "Rule 23(a)(4) requires
that plaintiffs demonstrate that class counsel is qualified,
experienced, and generally able to conduct the litigation.
Plaintiffs must also demonstrate that there is no conflict of
interest between the named plaintiffs and other members of the
plaintiff class." Marisol A. v. Giuliani, 126 F.3d 372, 378 (2d
Cir. 1997) (citation and internal quotation marks omitted).
Defendant claims that his typicality arguments also apply to the
adequacy requirement. See Memorandum of Law in Support of
Defendant's Motion to Decertify the Plaintiff Class at 12-13, ECF
No. 80. But lack of medical necessity would not bear on the
adequacy of plaintiffs' counsel nor on any conflict of interest
between Cruz, Kpaka, and other Cosmetic Subclass members.
Plaintiffs' counsel has repeatedly demonstrated it is qualified,
experienced, and able to conduct this litigation, and the Court
sees no conflict of interest between Cruz, Kpaka, and other
Cosmetic Subclass members. Defendant's adequacy arguments fail.

Additionally, defendant raises an argument against the
Cosmetic Subclass under Rule 23(b)(2). Defendant argues that he
has not acted on grounds that apply to the entire Cosmetic
Subclass and, instead, any denials of coverage to class members

are the result of individual factors. Defendant's argument on this point proceeds similarly to his commonality arguments and meets the same fate: because § 505.2(*l*) categorically bans coverage for cosmetic surgeries, defendant has acted on grounds that apply to the entire Cosmetic Subclass. Injunctive relief dissolving § 505.2(*l*)'s ban would resolve all claims of the members of the Cosmetic Subclass. Accordingly, the Cosmetic Subclass satisfies Rule 23(b)(2).

Finally, defendant raises an argument directed at the Age Subclass. After plaintiffs filed the SAC, the Court received supplemental briefing from the parties regarding the addition of the two new named plaintiffs. In his supplemental briefing, defendant objects that A.B. as parent and natural guardian of M.B. and N.V. as legal guardian of S.V. lack class standing. "[A] plaintiff has class standing if he plausibly alleges (1) that he 'personally has suffered some actual . . . injury as a result of the putatively illegal conduct of the defendant,' and (2) that such conduct implicates 'the same set of concerns' as the conduct alleged to have caused injury to other members of the putative class by the same defendants." NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co., 693 F.3d 145, 162 (2d Cir. 2012) (citations omitted). Defendant does not dispute that the new named plaintiffs satisfy the first prong but argues that they fail the second prong because they have demonstrated only a medical need

for pubertal suppressants, while the claims of Age Subclass members are also based on bans on coverage for gender reassignment surgery and cross-sex hormone therapies. However, the conduct of defendant that caused the new named plaintiffs' injuries, namely the denial of Medicaid coverage for prescribed pubertal suppressants, was his enforcement of § 505.2(*l*)'s complete ban on any coverage of treatments for individuals under 18. This conduct does not merely implicate the same set of concerns as the conduct underlying the other Age Subclass members' claims, it is in fact the same. All members of the Age Subclass have allegedly been injured by defendant's enforcement of § 505.2(*l*)'s ban on under-18 coverage. As such, the new named plaintiffs have class standing to assert the claims of the Age Subclass.

Based on the foregoing analysis, the Court denies defendant's motion to decertify the plaintiff class.

Third, the Court denies in part defendant's motion for summary judgment on standing grounds. Article III standing requires an "injury in fact," "a causal connection between the injury and the conduct complained of," and redressability, such that "the injury will be redressed by a favorable decision." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (internal quotation marks omitted). To satisfy these requirements at the summary judgment stage, a plaintiff "must 'set forth' by

affidavit or other evidence 'specific facts,' which for purposes
of the summary judgment motion will be taken to be true." Id.
(citation omitted).

Defendant claims that named plaintiffs Cruz, Kpaka, and
Christie lack standing. First, defendant argues that Christie's
claims are either unripe or moot. Defendant's ripeness arguments
are directed at Christie's claim for electrolysis procedures, for
which she has demonstrated medical necessity, but which she has
not applied for and been denied coverage. See Declaration of John
Gasior dated Aug. 28, 2015 Ex. 3 at CRUZ00002625-26, ECF No. 83
(documenting Christie's medical need for electrolysis and facial
feminizing surgery). The Second Circuit does not require "a
futile gesture as a prerequisite for adjudication in federal
court." Desiderio v. Nat'l Ass'n of Secs. Dealers, Inc., 191 F.3d
198, 202 (2d Cir. 1999). Because § 505.2(l) bans coverage of
electrolysis, Christie does not need to go through the futile
process of applying for and being denied coverage.

The fact that Christie has received approval for other
procedures banned by § 505.2(l), ostensibly pursuant to the June
Guidance, has no bearing on whether her attempts to receive
coverage for electrolysis would be futile. This is because the
plain language of § 505.2(l) bars coverage of these procedures
and the Court is bound to apply the language of a duly
promulgated regulation as opposed to non-binding guidance that

defendant can change at his discretion. Compare New York
Department of Health Medicaid Program, Medicaid Update Vol. 31
No. 3 (March 2015) (no coverage for electrolysis) with New York
Department of Health Medicaid Program, Medicaid Update Vol. 31
No. 6 at 7 (June 2015) (coverage for medically necessary
electrolysis). Whatever murky largesse may have motivated the
June Guidance and approval of Christie's other procedures cannot
be relied upon to defeat the futility of opposing the plain
language of a regulation. Christie has standing to bring her
claims even without denials in hand.

Defendant also argues that Christie's other claims are moot
because she has received prior approval for coverage of
mammoplasty and facial feminization surgeries. See Declaration of
Ronald J. Bass in Support of Defendant's May 11, 2016, Letter,
Exs. 1-4, ECF No. 122. These approvals were ostensibly granted
pursuant to the June Guidance. With respect to the procedures for
which Christie has won approval, the Court applies "the 'well
settled' rule that a defendant's voluntary cessation of a
challenged practice does not deprive a federal court of its power
to determine the legality of the practice." Ne Fla. Chapter of
Associated Gen. Contractors of Am. v. City of Jacksonville, 508
U.S. 656, 662 (1993) (internal quotation marks omitted). In the
context of a challenged statute on appeal, the Supreme Court has
explained that repeal of an unconstitutional statute does not

23

moot a plaintiff's claim because a repeal "would not preclude [the promulgating body] from reenacting precisely the same provision if the District Court's judgment were vacated." City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283, 289 (1982). In the same way, without a judgment in this case there is nothing to stop defendant from revoking the June Guidance and denying coverage of all cosmetic procedures. Indeed, because § 505.2(1) is a duly promulgated regulation while the June Guidance is non-binding guidance, the June Guidance need not even be revoked – defendant could simply begin to enforce his own regulation again. Medicaid recipients should not be forced to suffer through a cloud of uncertainty when requesting medically necessary procedures and hope that defendant will continue to defy his own regulation. Christie's claim is not moot, and she has standing.

Defendant also argues that Kpaka lacks standing because she has failed to show that any cosmetic procedures are medically necessary for her. This is an odd argument for defendant to make because he simultaneously argues that Kpaka's claims are moot because she has received prior approval for mammoplasty and facial feminization surgeries. Compare Reply Memorandum of Law in Further Support of Defendant's Motion for Summary Judgment at 4, ECF No. 98 with Reply Memorandum of Law in Further Support of Defendant's Motion for Summary Judgment at 6, ECF No. 98. Ostensibly, Kpaka could only have received prior approval if,

24

under the terms of the June Guidance, she had provided

"justification of medical necessity." New York Department of

Health Medicaid Program, Medicaid Update Vol. 31 No. 6 (June

2015). With respect to Kpaka, then, it appears defendant has

taken three contradictory positions at once: under § 505.2(*l*)'s

ban on coverage of cosmetic procedures, Kpaka's medical necessity

is irrelevant; under defendant's standing argument, Kpaka's

medical necessity has not been established; and, under

defendant's mootness argument, Kpaka's medical necessity was

established and addressed. The undisputed facts are consistent

only with defendant's third argument, on mootness, see Memorandum

of Law in Opposition to Defendant's Motion for Summary Judgment

at 8 n.4, ECF No. 95; Reply Memorandum of Law in Further Support

of Defendant's Motion for Summary Judgment at 6, ECF No. 98, but

defendant's mootness argument fails for the reasons explained

above: defendant cannot short-circuit a plaintiff's standing by

gratuitously approving some medically necessary procedures in

contravention of the plain language of his own regulation. There

is no factual dispute that Kpaka has standing and, as a legal

matter, her claims are not moot.

Further, defendant argues that Cruz lacks standing because

she has failed to document that a mammoplasty is medically

necessary for her. Cruz's medical records do not contain any

document stating that a mammoplasty is medically necessary, nor

has she received prior approval for a mammoplasty. See

Declaration of John Gasior dated Aug. 28, 2015, Ex. 1, ECF No.

83. Instead, Cruz has submitted a declaration stating that her

doctor "has determined breast augmentation to be medically

necessary for [Cruz]." Declaration of Angie Cruz dated Sept. 8,

2015, ¶ 10, ECF No. 96. Although the Court could rely on this

declaration for purposes of class certification, on a motion for

summary judgment the Court cannot consider material that would

not be admissible under the Federal Rules of Evidence. Fed. R.

Civ. P. 56(c)(2). Cruz's declaration that her doctor determined

breast augmentation was medically necessary for her is

inadmissible hearsay because it offers her doctor's statement for

its truth. See Fed. R. Evid. 801, 802. Cruz cannot testify

directly to the medical necessity of breast augmentation surgery

because she is not a medical expert. See Fed. R. Evid. 701.

Accordingly, plaintiffs' have not raised a triable question of

fact as to whether breast augmentation surgery is medically

necessary for Cruz: apart from the diagnoses of gender identity

disorder that are present in Cruz's medical records, admissible

evidence of medical necessity is lacking.

Plaintiffs argue that this lack of evidence is irrelevant

because they can establish standing without demonstrating medical

necessity. Specifically, they argue that because they have raised

a facial challenge to § 505.2(l), named plaintiffs need not show

medical necessity. Plaintiffs claim they are situated similarly to plaintiffs challenging racial quotas in public contracting and racial-based admissions policies; the Supreme Court has held that such plaintiffs need not show that they would have been awarded contracts or gained admission in absence of the challenged policies. See Ne Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, 508 U.S. 656, 666 (1993); Regents of Univ. of Cali. v. Bakke, 438 U.S. 265, 280 n.14 (1978). But this overextends plaintiffs' valid defense to defendant's ripeness argument. Although Cruz does not need to go through the futile process of opposing § 505.2(1)'s plain language in an attempt to redress her alleged injury, if she does not establish that some cosmetic surgeries are medically necessary for her, she has no definite injury in the first place. Thus, Cruz is differently situated from the plaintiffs in Northeastern Florida Chapter and Bakke, who had established they were members of a group that had suffered a denial of equal treatment. Plaintiffs have not alleged, nor have they produced any evidence indicating, that cosmetic surgeries are medically necessary for every person with gender dysphoria. Accordingly, not every individual with gender dysphoria is injured by § 505.2(1). In the absence of admissible evidence of the medical necessity of mammoplasty procedures for Cruz, she has not demonstrated she is a member of the group harmed by § 505.2(1). Accordingly, the Court dismisses Cruz's

claim on standing grounds, but otherwise denies defendant's
motion for summary judgment on standing grounds.

Fifth, on plaintiffs' first claim, for violations of 42
U.S.C. § 1396a(a)(10)(A) (Medicaid's "Availability Provision"),
the Court denies defendant's motion for summary judgment and
grants plaintiffs' motion with respect to the Cosmetic Exclusion,
but grants defendant's motion in part and denies plaintiffs'
motion with respect to the Age Exclusion. The Availability
Provision requires that a state Medicaid plan "must provide . . .
for making medical assistance available [to all categorically
needy individuals], including at least" certain enumerated types
of care and services, including inpatient hospital services and
physicians' services. 42 U.S.C. §§ 1396a(a)(10)(A), 1396d(a). The
statute does not clearly delimit the exact extent of the services
it requires, although its implementing regulations provide some
more detail. See, e.g., 42 C.F.R. § 440.210 (requiring provision
of certain services, including those "defined in [42] C.F.R. §§
440.10 through § 440.50, 440.70"). For instance, 42 C.F.R. §
440.50(a) defines "physicians' services" as "services furnished
by a physician . . . [w]ithin the scope of practice of medicine
or osteopathy as defined by State law; and . . . [b]y or under
the personal supervision of an individual licensed under State
law to practice medicine or osteopathy." More broadly, "[e]ach
service must be sufficient in amount, duration, and scope to

reasonably achieve its purpose." 42 C.F.R. § 440.230(b). Although "[t]he [Medicaid] agency may place appropriate limits on a service based on criteria such as medical necessity or on utilization control procedures," it "may not arbitrarily deny or reduce the amount, duration, or scope of a required service . . . solely because of the diagnosis, type of illness, or condition." 42 C.F.R. § 440.230(c), (d).

The Supreme Court has implied, but not held, that the Medicaid Act requires states to provide medically necessary care, see Beal v. Doe, 432 U.S. 438, 444 (1977) ("[S]erious statutory questions might be presented if a state Medicaid plan excluded necessary medical treatment from its coverage."); and several circuits have held that medical necessity is the appropriate standard to determine the scope of services required by the Medicaid Act, see, e.g., Hern v. Beye, 57 F.3d 906, 911 (10th Cir. 1995); Dexter v. Kirschner, 984 F.2d 979, 983 (9th Cir. 1992); Pinneke v. Preisser, 623 F.2d 546, 549 (8th Cir. 1980). The Second Circuit previously rejected this approach as "baseless and unworkable," but the Supreme Court vacated its judgment in light of guidance issued by the Health Care Financing Administration. DeSario v. Thomas, 139 F.3d 80, 96 (2d Cir. 1998), vacated sub nom. Slekis v. Thomas, 525 U.S. 1098 (1999). Although vacated, however, DeSario is still a useful guide. The Second Circuit there held that "the state must extend coverage

through reasonable standards with . . . the 'general aim of assuring that individuals will receive necessary medical care' and each category of service must be sufficient in amount, duration, and scope to adequately (although not fully) meet the needs of the Medicaid population of the state." Id. at 96 (quoting Alexander v. Choate, 469 U.S. 287, 303 (1985)). It seems that DeSario must be correct that coverage of every single medically necessary treatment is not automatically required by the Availability Provision. After all, a Medicaid "agency may place appropriate limits on a service based on criteria such as medical necessity or on utilization control procedures." 42 C.F.R. § 440.230(d) (emphasis added). Proper utilization control procedures, as distinct from medical necessity, may limit the provision of services. See, e.g., Pharm. Research and Mfrs. of America v. Walsh, 538 U.S. 644 (2003) (plurality opinion) (upholding prior authorization processes). But any limiting criteria other than medical necessity must ultimately serve the broader aim of "assuring that individuals will receive necessary medical care." Alexander v. Choate, 469 U.S. 287, 303 (1985).

Against the background of this somewhat fractured legal regime, plaintiffs ask the Court to adopt a rule that a state may not place an outright ban on medically necessary treatments for a particular diagnosis. See Hern v. Beye, 57 F.3d 906, 911 (10th Cir. 1995) ("[A] state law that categorically denies coverage for

30

a specific, medically necessary procedure except in those rare instances when the patient's life is at stake is not a 'reasonable standard [ ] . . . consistent with the objectives of [the Act],' but instead contravenes the purposes of Title XIX." (citation omitted) (quoting 42 U.S.C. § 1396a(a)(17))); White v. Beal, 555 F.2d 1146, 1151 (3d Cir. 1977). Defendant does not meaningfully oppose this rule, preferring instead to argue that § 505.2(l) does not impose any outright bans and that the June Guidance's prior authorization requirements are acceptable limitations on coverage.

The Court therefore adopts this "never-say-never" rule. The Availability Provision and its implementing regulations do allow a state to say "only sometimes" and to limit coverage of specific treatments when the state has good reasons for doing so – reasons that ultimately uphold the provision of necessary medical care to needy individuals. But a state cannot say "never" when it comes to medically necessary treatments, because there are no such reasons justifying categorical bans on medically necessary treatment. A categorical ban on medically necessary treatment for a specific diagnosis would not "adequately . . . meet the needs of the Medicaid population of the state." DeSario v. Thomas, 139 F.3d 80, 96 (2d Cir. 1998).

With respect to the Cosmetic Exclusion, there are no genuine factual disputes material to the determination that defendant has

enacted a categorical ban on medically necessary treatments for a
specific diagnosis. Specifically, "[d]efendant does not contest
that presumptively cosmetic procedures listed in § 505.2(*l*) may
be medically necessary for some patients diagnosed with GD."
Defendants Response and Counter-Statement to Plaintiffs'
Statement of Material Facts Pursuant to Local Rule 56.1 ¶ 138,
ECF No. 87. Moreover, by publishing the June Guidance and
approving cosmetic procedures for Christie and Kpaka, defendant
has demonstrated that cosmetic procedures can be medically
necessary for individuals with gender dysphoria. See New York
Department of Health Medicaid Program, Medicaid Update Vol. 31
No. 6 (June 2015); Declaration of Ronald J. Bass in Support of
Defendant's May 11, 2016, Letter, Exs. 1-7, ECF No. 122;
Declaration of John Gasior dated Aug. 28, 2015, Ex. 3 at
CRUZ00002625-26, ECF No. 83. As discussed above, § 505.2(*l*)
enacts a categorical ban on coverage for cosmetic procedures. See
supra. As such, plaintiffs prevail on their § 1983 claim that §
505.2(*l*) violates the Availability Provision.[6] Accordingly, the
Court grants plaintiffs' motion and denies defendant's motion for

---

[6] Plaintiffs also argue that the June Guidance's restrictions on
eligibility for breast augmentation surgery violate the
Availability Provision. See Memorandum of Law in Support of
Plaintiffs' Motion for Summary Judgment at 6-7, ECF No. 76.
However, the June Guidance – and therefore this issue – is not
presently before the Court. § 505.2(*l*)(4)(v)(b) states
unequivocally that "[p]ayment will not be made for . . . breast
augmentation."

summary judgment on plaintiffs' Availability Provision claim with
respect to the Cosmetic Exclusion.

     With respect to the Age Exclusion, the Court denies
plaintiffs' motion for summary judgment on their Availability
Provision claims and grants defendant's motion in part. To begin
with, part of defendant's motion must be granted as a matter of
law. Plaintiffs seek treatments of two kinds: surgeries and
hormone therapies, including pubertal suppressants and cross-sex
hormone therapies. There is no dispute that § 505.2(*l*)
categorically bans coverage for all of these treatments for
individuals younger than 18. See § 505.2(*l*)(2)-(3). However,
under 42 U.S.C. § 1396r-8(d)(1)(B)(i) (the "Compendia
Requirement"), "[a] State may exclude or otherwise restrict
coverage of a covered outpatient drug if . . . the prescribed use
is not for a medically accepted indication," defined as any use
approved by the FDA or included in the Medicaid Compendia.[7] See
42 U.S.C. § 1396r-8(k)(6). There is no dispute that the hormone
therapies sought by plaintiffs are neither approved by the Food
and Drug Administration ("FDA") nor listed in the Medicaid
Compendia for the purpose of treating gender dysphoria in minors.
See Plaintiff's Opposition to Defendant's Local Rule 56.1

---

[7] The "Medicaid Compendia" are drug information databases,
consisting of the "(I) American Hospital Formulary Service Drug
Information; (II) [the] United States Pharmacopeia-Drug
Information (and its successor publications), and (III) the
DRUGDEX Information System". 42 U.S.C. § 1396r-8(g)(1)(B)(i).

Statement of Material Facts ¶ 67, ECF No. 93. As such, for purposes of plaintiffs' Availability Provision claims, the Compendia Requirement allows defendant to exclude coverage of them.

Plaintiffs argue that the Compendia Requirement does not apply to the hormone therapies they seek because they are not "covered outpatient drugs." In particular, plaintiffs argue that, to the extent hormone therapies are provided in the context of a physician visit, they are not covered outpatient drugs because, under 42 U.S.C. § 1396r-8(k)(3),

> [t]he term 'covered outpatient drug' does not include any drug . . . provided as part of, or as incident to and in the same setting as, any of the following (and for which payment may be made under this subchapter as part of payment for the following and not as direct reimbursement for the drug): (A) Inpatient hospital services . . . (D) physicians' services. (E) Outpatient hospital services.

§ 1396r-8(k)(3) continues on to state that "[s]uch term also does not include . . . a drug . . . used for a medical indication which is not a medically accepted indication." Thus, plaintiffs' argument regarding the context of when the hormone therapies are provided is unnecessary because the Medicaid Act explicitly excludes "off-label" hormone therapies from the definition of "covered outpatient drugs."

Although plaintiffs' argument does highlight the inartful drafting of the Medicaid Act – if the term "covered outpatient

drug" does not include a drug used for a non-medically accepted indication, how can the Compendia exclude or restrict coverage of a covered outpatient drug's use for a non-medically accepted indication? - nonetheless, reading the statute as a whole, the Court concludes that the definition of "covered outpatient drug" reinforces the Compendia Requirement because "[r]eimbursement under Medicaid is, in most circumstances, available only for 'covered outpatient drugs.'" United States ex rel. Franklin v. Parke-Davis, Div. of Warner-Lambert Co., 147 F. Supp. 2d 39, 44-45 (D. Mass. 2001). In short, defendant may exclude coverage of the hormone therapies under either the Compendia Requirement of § 1396r-8(d)(1)(B)(i) or the definition of covered outpatient drugs of § 1396r-8(k)(3). As such, the Court grants defendant's motion for summary judgment on plaintiffs' Availability Provision claims with respect to hormone therapies and dismisses these claims.

Genuine disputes of material fact prevent the Court from granting either party's motion for summary judgment on plaintiffs' Availability Provision claims with respect to surgeries. In particular, the medical necessity of surgeries as treatments for gender in individuals under 18 is genuinely disputed. Before discussing this factual dispute, however, the Court must resolve a preliminary matter: the parties dispute what facts are relevant to a determination of medical necessity. Plaintiffs argue that physicians "have 'primary responsibility'

to determine what treatment patients should receive." Reply
Memorandum of Law in Further Support of Plaintiffs' Motion for
Summary Judgment at 3 n.3, ECF No. 104. Defendant claims that
DeSario v. Thomas, 139 F.3d 80 (2d Cir. 1998), "[took] issue with
the view that a Medicaid beneficiary's physician 'deserves almost
complete deference in determining medical necessity'" and that
"prevailing medical knowledge and scientific evidence" should
control. Defendant's Memorandum of Law in Opposition to
Plaintiffs' Motion for Summary Judgment at 6, 7, ECF No. 86
(quoting DeSario, 139 F.3d at 95). Defendant also frames the
inquiry not as a determination of whether a treatment is
medically necessary but instead as a question of whether the
state's determination of medical necessity is reasonable. Id.

    The differences between the parties' positions are
artificial. Although the medical community is not a monolith,
individual physicians, as members of a self-regulating
professional community, are expected to adhere to standards of
"prevailing medical knowledge and scientific evidence." Put
another way, "prevailing medical knowledge" is largely defined by
the practice of individual physicians. As such, testimony of
individual physicians as well as any other evidence of prevailing
medical knowledge is relevant to a court's determination of
medical necessity. Moreover, because of the way New York has
defined "medical necessity" and because it has enacted a

categorical ban on the treatments at issue, there is no
difference between determining the medical necessity of a
treatment and evaluating the reasonableness of the state's
determination of whether a treatment is medically necessary. See
N.Y. Comp. Codes R. & Regs. tit. 18, § 500.1(b) ("The department
will limit the amount, duration and scope of medical assistance
authorized to be provided . . . to medical care, services and
supplies which are medically necessary and appropriate,
consistent with quality care and generally accepted professional
standards."); Declaration of Constance Donohue dated Sept. 11,
2015, ¶ 10, ECF No. 88 (stating that the DOH adopted the Age
Exclusion on the basis of § 500.1(b)). As an administrative
matter, the state makes "determinations" of medical necessity,
consistent with its power under the Medicaid regulations to
"place[s] appropriate limits on a service based on criteria such
as medical necessity." 42 C.F.R. § 440.230(d). But when the state
makes such determinations, it is simply synthesizing an
administrative rule based on the accumulated knowledge of the
medical community. The Department of Health cannot assemble
evidence from the medical community but then, on its own, alter
some of the substantive results. See, e.g., N.Y. Comp. Codes R. &
Regs. tit. 18, § 513.6(e). The grounds for finding a treatment
medically necessary or for finding the state's determination of
lack of necessity unreasonable will be therefore be same: the

37

testimony of physicians and evidence of prevailing medical and
scientific knowledge.

DeSario is not to the contrary. DeSario did not actually
"take issue" with the unremarkable notion that physicians should
be the primary arbiters of medical necessity. Instead, it pointed
out that, if the Medicaid Act did obligate states to cover every
last medically necessary treatment, such that an individual
physician could legally obligate the state to cover a treatment
simply by writing a prescription, then states would be severely
limited in their efforts to control costs. See DeSario, 139 F.3d
at 95-96 (observing that the only cost control measures available
to states in such a scenario would be to cut back on any optional
services). The Second Circuit's solution in DeSario was not to
take determinations of medical necessity out of the hands of
medical professionals, where they rightfully belong. Instead, as
discussed above, the Second Circuit held that the Medicaid Act
does not obligate states to cover all medically necessary
treatments: proper utilization control procedures can be used to
control costs, if they ultimately "assur[e] that individuals will
receive necessary medical care." Alexander v. Choate, 469 U.S.
287, 303 (1985).

Plaintiffs have produced two reports from expert witnesses
testifying that the same treatments that are effective for adults
with gender dysphoria can be effective and medically necessary

38

for minors with gender dysphoria. See Expert Report of Johanna Olson, M.D., Declaration of Christopher J. McNamara dated Sept. Aug. 28, 2015, Ex. 27 ¶¶ 14-22, ECF No. 74; Expert Report of Nicholas Gorton, MD, DABEM, Declaration of Christopher J. McNamara dated Aug. 28, 2015, Ex. 38 at 15-17, ECF No. 74. Indeed, one expert concludes that "treatment of youth is more effective in many ways than treatment of transgender adults" because gender dysphoria is exacerbated over time by repeated traumas and because puberty causes significant physical changes that can be difficult to reverse or mask later in life. Id. at 16.

Defendant claims that the medical community has not yet reached a consensus on the safety and efficacy of the treatment of gender dysphoria in minors. He primarily relies on the testimony of one expert witness, John W. Williams, M.D., and a fact witness, a representative of DOH. However, Dr. Williams did not address the safety or efficacy of treatments for gender dysphoria for minors in his expert report. Instead, Dr. Williams drew conclusions regarding the quality of two literature reviews submitted by defendant, one compiled by a private health consultancy, Hayes, Inc., (the "Hayes report") and the other compiled by the Oregon Health & Science University Center for Evidence-based Policy (the "OHSU report"). In particular, Dr. Williams stated that "[b]ased on my experience in working with

and/or utilizing research reports from OHSU and Hayes . . . I am confident that these reports represent scientifically valid work." Expert Report of John W. Williams Jr, MD, MHSc, Second Declaration of Zoey S. Chenitz in Further Support of Defendant's Motion for Summary Judgment Ex. A at 5, ECF No. 112.

The Hayes report and the OHSU report, as well as the studies cited therein, are inadmissible hearsay. Defendant has not offered the authors of the reports or any of the underlying studies they cite as witnesses. Defendant also has not offered any expert witnesses who reasonably relied on the reports within the meaning of Fed. R. Evid. 703 or 803(18)(A). Dr. Williams did not rely on the contents of the reports; he evaluated their methodology. The reports are also not admissible as learned treatises under Fed. R. Evid. 803(18)(B). No expert has established the reports as reliable authority. Indeed, because Dr. Williams is not an expert on treatments of gender dysphoria, he cannot competently testify about the authority of the reports. Defendant's Response and Counter-Statement to Plaintiffs' Statement of Material Facts Pursuant to Local Rule 56.1 ¶ 150, ECF No. 87. Moreover, defendant has offered no reasonable basis for the Court to take judicial notice of the reports' authority. For instance, they have not been peer-reviewed by the wider medical community. Accordingly, the Court excludes the Hayes and OHSU reports as inadmissible hearsay and concludes that Dr.

Williams' report has no bearing on the question of the medical
necessity of specific treatments of gender dysphoria in minors.

Apart from Dr. Williams, defendant primarily relies on the
testimony of a representative of the DOH, Constance Donohue.[8] She
affirms that, in deciding that no treatments for gender dysphoria
in minors were medically necessary, the DOH relied on the WPATH
Standards of Care, the Hayes report, the OHSU report, "studies
and journal articles related to [the] topic," and guidelines
prepared by the Endocrine Society. See Declaration of Constance
Donohue dated Sept. 11, 2015, ¶ 9, ECF No. 88. As explained
above, the Hayes report and the OHSU report are inadmissible
hearsay. Defendant has not produced any of the "studies and
journal articles related to [the] topic" and, on the present
record, they would also be inadmissible hearsay. Defendant's own

_____

[8] After full briefing on the present motions, defendant also
submitted a proposed decision memorandum issued by the Centers
for Medicare & Medicaid Services ("CMS"). The memorandum proposes
to maintain the status quo regarding Medicare coverage of gender-
reassignment surgeries, namely, that CMS will not issue a
National Coverage Determination and instead leave coverage
determinations to local Medicare Administrative Contractors on an
individual claim basis. It bases this proposal on the conclusion
that there is insufficient evidence to determine whether coverage
of gender reassignment surgery by Medicare would be beneficial
and asks for further studies to be conducted on the issue. This
document is of little relevance to the present inquiry and the
Court gives it little weight. The proposed decision memorandum is
not a binding document and is primarily a literature review of
studies that are inadmissible hearsay. Most importantly, it
focuses on Medicare recipients, i.e. individuals 65 years and
older, a necessarily significantly different population than
members of the Age Subclass.

30(b)(6) testimony concerning the contents of these absent studies is inadmissible hearsay.

That leaves the WPATH Standards of Care and the guidelines prepared by the Endocrine Society, each of which raise a genuine dispute over whether surgeries are medically necessary treatments for minors with gender dysphoria. Both sides, as well as plaintiffs' experts, rely on these texts, and the Court concludes they are sufficiently authoritative to allow their admissibility under Fed. R. Evid. 803(18). See Expert Report of Jack Drescher, M.D., P.C., Declaration of Christopher J. McNamara dated Aug. 28, 2015, Ex. 22 at 11, ECF No. 74; Expert Report of Johanna Olson, M.D., Declaration of Christopher J. McNamara dated Aug. 28, 2015, Ex. 27 ¶¶ 17, 22, 25, ECF No. 74; Expert Report of Nicholas Gorton, MD, DABEM, Declaration of Christopher J. McNamara dated Aug. 28, 2015, Ex. 38 at 3, ECF No. 74. As a general matter, the WPATH Standards of Care encourage treatment of minors with gender dysphoria and even warn of the consequences of delaying treatment. See WPATH Standards of Care at 21. However, the WPATH Standards of Care state that

> [g]enital surgery should not be carried out until [] patients reach the legal age of majority to give consent for medical procedures in a given country [18, under N.Y. Public Health Law § 2504.1] . . . . The age threshold should be seen as a minimum criterion and not an indication in and of itself for active intervention.

Id. at 21. The WPATH Standards of Care do state that "[c]hest surgery in FtM patients could be carried out earlier." Id. The

Endocrine Society guidelines state that "[w]e suggest deferring surgery until the individual is at least 18 years old." Declaration of John Gasior dated Aug. 28, 2015 Ex. 15 at 4 ¶ 2.6, ECF No. 83. These materials create a genuine dispute of material fact that must be resolved at trial: what surgeries are medically necessary treatments for minors with gender dysphoria? As such, the Court denies both parties' motion for summary judgment on plaintiffs' Availability Provision claims against the Age Exclusion with respect to surgeries.

Sixth, on plaintiffs' second claim, for violations of 42 U.S.C. § 1396a(a)(10)(B) (Medicaid's "Comparability Provision"), the Court denies defendant's motion for summary judgment with respect to the Cosmetic Exclusion, grants plaintiffs' motion with respect to the Cosmetic Exclusion, and grants defendant's motion in part and denies plaintiffs' motion with respect to the Age Exclusion. The Comparability Provision requires that "the medical assistance made available to any [categorically needy] individual . . . shall not be less in amount, duration, or scope than the medical assistance made available to any other such [categorically needy] individual." 42 U.S.C. § 1396a(a)(10)(B)(i). The Second Circuit has explained that "[the Comparability Provision] prohibits discrimination among individuals with the same medical needs stemming from different

43

medical conditions." <u>Davis v. Shah</u>, 821 F.3d 231, 258 (2d Cir. 2016).

With respect to the Cosmetic Exclusion, there is no genuine dispute that DOH covers the cosmetic surgeries excluded by § 505.2(*l*) for individuals with diagnoses other than gender dysphoria. Defendant claims that there is a dispute over which cosmetic surgeries are covered for other diagnoses. However, defendant's position is belied by his own admissions that New York's Medicaid program covers breast reconstruction, facial feminizing surgery, chondrolaryngoplasty, electrolysis, and body-sculpting procedures. <u>See</u> Defendant's Responses to Plaintiffs' First Set of Requests for Admission, Declaration of Christopher J. McNamara dated Aug. 28, 2015, Ex. 4 at 14-15, ECF No. 74. In addition, defendant does not contest that the New York State Medicaid Program Physician Procedure Code, 2015 Version, (the "Physician's Manual") which contains billing instructions for physicians regarding treatments covered by Medicaid, contains billing instructions, including billing codes, for essentially all the cosmetic procedures. <u>See</u> Defendant's Response and Counter-Statement to Plaintiffs' Statement of Material Facts Pursuant to Local Rule 56.1 ¶¶ 154, 155, ECF No. 87. The one item barred by the Cosmetic Exclusion which is not addressed in some form by defendant's admissions, the Physician's Manual, or both is "drugs to promote hair growth or loss," barred by §

44

505.2(l)(4)(v)(f). Neither side presents evidence particularly
addressed to this item. Moreover, as discussed above, there is no
dispute that the cosmetic procedures and services barred by the
Cosmetic Exclusion can be medically necessary. Defendant's
Response and Counter-Statement to Plaintiffs' Statement of
Material Facts Pursuant to Local Rule 56.1 ¶ 138, ECF No. 87.
Accordingly, the Court grants plaintiffs' motion for summary
judgment on their Comparability Provision claims with respect to
the Cosmetic Exclusion, except with respect to drugs promoting
hair growth or loss, and denies the corresponding part of
defendant's motion.

        With respect to the Age Exclusion, there is no dispute that
the cosmetic and gender reassignment surgeries sought by
plaintiffs are covered by New York's Medicaid program. See supra
(discussing coverage of cosmetic procedures); Defendant's
Response and Counter-Statement to Plaintiffs' Statement of
Material Facts Pursuant to Local Rule 56.1 ¶ 188, ECF No. 87
(defendant admitting that New York provides Medicaid coverage of
the components of gender reassignment surgeries). However, this
is not the end of the Comparability Provision inquiry. The Second
Circuit has stated that "[the Comparability Provision] prohibits
discrimination among individuals with the same medical needs
stemming from different medical conditions." Davis v. Shah, 821
F.3d 231, 258 (2d Cir. 2016) (emphasis added). Thus, the

Comparability Provision incorporates a medical necessity requirement. Otherwise, any categorically needy individual, regardless of medical need for a procedure, could seek coverage of a procedure provided to other categorically needy recipients under the Comparability Provision. As discussed above, it is disputed whether the surgeries sought by the Age Subclass members are medically necessary for individuals under 18. This question must be resolved at trial with respect to plaintiffs' Comparability Provision claims as well as their Availability Provision claims. Accordingly, the Court denies both parties' motions for summary judgment on plaintiffs' Comparability Provision claims with respect to surgeries.

With respect to hormone therapies, defendant argues that the Compendia Requirement blocks plaintiffs' Comparability Provision claims. Plaintiffs respond that the Compendia Requirement does not apply to their Comparability Provision claims because defendant provides hormone therapies to other categorically needy individuals with gender dysphoria, even though all uses of hormones to treat gender dysphoria lack FDA support. See Defendant's Response and Counter-Statement to Plaintiffs' Statement of Material Facts Pursuant to Local Rule 56.1 ¶ 226, ECF No. 87.

Plaintiffs' argument points to a tension within the Medicaid Act between the Compendia Requirement (and § 1396r-8(k)(3)'s

46

definition of a "covered outpatient drug") and the Comparability
Provision. The Supreme Court has identified as "one of the most
basic interpretive canons, that '[a] statute should be construed
so that effect is given to all its provisions, so that no part
will be inoperative or superfluous, void or insignificant.'"
Corley v. United States, 556 U.S. 303, 314 (2009) (internal
quotation marks omitted) (alteration in original). In this case,
defendant's reading of the Medicaid Act would render the
Comparability Provision inoperative. Accordingly, the Court
adopts a reading that gives both the Compendia Requirement and
the Comparability Provision force: although defendant may, under
the Compendia Requirement, exclude coverage of uses of hormone
therapies without FDA or Compendia support to all categorically
individuals with gender dysphoria, nonetheless, if defendant does
cover unapproved uses of hormone therapies for some categorically
needy individuals with gender dysphoria, under the Comparability
Provision, he must then cover unapproved uses of hormone
therapies for all categorically needy individuals with gender
dysphoria. Essentially, the provisions work together to present
defendant with an "all-or-nothing" choice: he can either cover
hormone therapies for gender dysphoria or not, but he cannot
cover them selectively.

Defendant argues that, as a factual matter, he has chosen
not to cover unapproved hormone therapies at all. He claims that

DOH has a policy in place to deny coverage of all drug uses not
covered in the Medicaid Compendia. See Declaration of Norman P.
Ostrove dated Sept. 18, 2015, Ex. 66, ECF No. 103. Plaintiffs
respond that defendant fabricated this policy for purposes of the
present litigation and, to the extent it was a bona fide policy,
it has been selectively enforced, such that New York does cover
drug uses that lack FDA or Compendia support in some
circumstances. See id. (showing a prominent "DRAFT" watermark on
defendant's policy); 30(b)(6) Deposition of Constance Donohue,
Declaration of Christopher J. McNamara dated Aug. 28, 2015, Ex.
19 at 142:15-23, 162:22-163:3. Because the Court has conflicting
evidence before it, the provenance of defendant's policy and
whether it has been consistently enforced cannot be resolved on
summary judgment and must be dealt with at trial. Relatedly, the
Court notes that § 505.2(*l*) states that "payment is available for
medically necessary hormone therapy . . . for the treatment of
gender dysphoria . . . for individuals 18 years of age or older."
Although plaintiffs have offered uncontroverted expert testimony
that no uses of hormone therapy to treat gender dysphoria (for
adults or minors) have been approved by the FDA, see Deposition
of Johanna Olson, M.D., Declaration of Christopher J. McNamara
dated Aug. 28, 2015, Ex. 50 at 214:18-21, ECF No. 74, the Court
cannot discern from the present record whether hormone therapies
for adults are listed in the Medicaid Compendia. If they are not,

48

the language of § 505.2(l) approving hormone therapy for adults
would fly in the face of defendant's alleged policy limited
coverage to uses with Compendia support. However, the question of
whether hormone therapies for adults with gender dysphoria are
listed in the Medicaid Compendia must be resolved at trial. In
addition, if the Compendia Requirement does not defeat
plaintiffs' Comparability Provision claims against the Age
Exclusion, the parties need also address at trial which types of
hormone therapies defendant has covered for adults. In
particular, it is not clear from the present record if pubertal
suppressants for individuals 18 years or older have been or ever
would be covered under § 505.2(l).[9] Depending on the resolution
of this factual question, it is possible that plaintiffs'
Comparability Provision claims would only survive the Compendia
Requirement with respect to cross-sex hormones and not with
respect to pubertal suppressants.

Even assuming that the Compendia Requirement is not a bar to
plaintiffs' Comparability Provision claims for hormone therapies
for minors – i.e. that the factual disputes discussed above are
resolved in plaintiffs' favor – to prevail on their Comparability
Provision claims, plaintiffs would still need to show that
pubertal suppressants and cross-sex hormones are medically

---

[9] Pubertal suppressants are typically administered when individual
reaches Tanner Stage II, the second of five stages of puberty.

necessary for minors. See Davis v. Shah, 821 F.3d 231, 258 (2d Cir. 2016). Plaintiffs' experts report that the use of cross-sex hormones and pubertal suppressants for minors with gender dysphoria is safe, effective, and medically necessary. See Expert Report of Johanna Olson, M.D., Declaration of Christopher J. McNamara dated Sept. Aug. 28, 2015, Ex. 27 ¶¶ 15-20, ECF No. 74; Expert Report of Nicholas Gorton, MD, DABEM, Declaration of Christopher J. McNamara dated Aug. 28, 2015, Ex. 38 at 16-18, ECF No. 74. Defendant claims that hormone therapies for minors with gender dysphoria are experimental and that there is no medical consensus that they are safe and effective. However, as discussed above in the context of the factual dispute over surgeries for minors with gender dysphoria, much of what defendant has offered in support of his position is inadmissible hearsay and defendant's sole expert witness did not opine on the efficacy of treatments for individuals with gender dysphoria. The non-hearsay WPATH Standards of Care and Endocrine Society guidelines endorse the use of hormone therapies to treat gender dysphoria in minors. See WPATH SOC at 18-20; Declaration of John Gasior dated Aug. 28, 2015, Ex. 15 at 11-17, ECF No. 83. Nonetheless, the Court concludes that there is a genuine factual dispute over the safety and efficacy of hormone therapies for minors with gender dysphoria because of the lack of FDA or Medicaid Compendia

---

Deposition of Johanna Olson, M.D., Declaration of Christopher J.

approval. The lack of regulatory approval means that this issue must be resolved at trial. Accordingly, the Court denies both parties' motions for summary judgment on plaintiffs' Comparability Provision claims. The trial must resolve the following two questions with respect to these claims: first, what treatments, including surgeries or hormone therapies, are medically necessary for the treatment of gender dysphoria in minors? Second, does DOH have a bona fide policy to exclude coverage of drug uses not listed in the Medicaid Compendia, and to what extent has this policy been applied consistently in the context of the provision of hormone therapies to treat individuals with gender dysphoria?

Seventh, on plaintiffs' fifth claim,[10] for violations of § 1557 of the Affordable Care Act ("ACA"), 42 U.S.C. § 18116, the Court denies defendant's motion for summary judgment in part and grants it in part. § 1557 of the ACA incorporates the standards of, among other statutes, Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, and § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. See 42 U.S.C. § 18116. Title IX forbids discrimination on the basis of sex. 20 U.S.C. § 1681. Section 504 prohibits discrimination on the basis of disability. 29 U.S.C. §

---

McNamara dated Aug. 28, 2015, Ex. 50 at 190:22-191:3, ECF No. 74.
[10] The Court previously dismissed plaintiffs' third and fourth claims. See Order dated June 29, 2015, ECF No. 46. Plaintiffs did not move for summary judgment on their fifth claim.

794. Plaintiffs claim that § 505.2(*l*) discriminates against them

on the basis of sex and disability.

The Court grants defendant's motion for summary judgment

with respect to plaintiffs' disability discrimination claims.

Section 504 states that

> [n]o otherwise qualified individual with a disability
> in the United States, as defined in section 705(20) of
> this title, shall, solely by reason of her or his
> disability, be excluded from the participation in, be
> denied the benefits of, or be subjected to
> discrimination under any program or activity receiving
> Federal financial assistance.

29 U.S.C. § 794. Section 705(20)(F) states that "[f]or the

purposes of section[] . . . 794 of this title, the term

'individual with a disability' does not include an individual on

the basis of . . . gender identity disorders not resulting from

physical impairments." 29 U.S.C. § 705(20)(F). Even if this

carveout did not apply here, 29 U.S.C. § 705(20)(B) incorporates

the definition of "disability" given in 42 U.S.C. § 12102: "a

physical or mental impairment that substantially limits one or

more major life activities of such individual" with "major life

activities includ[ing], but . . . not limited to, caring for

oneself, performing manual tasks, seeing, hearing, eating,

sleeping, walking, standing, lifting, bending, speaking,

breathing, learning, reading, concentrating, thinking,

communicating, and working." Defendant argues that plaintiffs

have failed to produce any significant evidence that all

individuals with gender dysphoria are limited in the performance of major life activities, such that gender dysphoria can be identified as a disability. See, e.g., Deposition of Johanna Olson, M.D., Declaration of John Gasior dated Aug. 28, 2015, Ex. 12 at 109:3-110:6 ("I think that gender dysphoria can be disabling. I don't know that I would call it a disability."), ECF No. 83. Plaintiffs do not oppose defendant's arguments. See Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment at 23-25, ECF No. 95. Accordingly, the Court grants defendant's motion for summary judgment and dismisses plaintiffs' disability discrimination claim.

The Court denies, however, defendant's motion for summary judgment with respect to plaintiffs' sex discrimination claim. Defendant originally argued that plaintiffs' sex discrimination claim failed because gender dysphoria was not a proxy for sex within the meaning of the ACA, § 505.2(*l*) did not treat individuals with gender dysphoria differently from other individuals, and Title IX, as incorporated into the ACA, does not allow disparate impact claims. However, on May 18, 2016, the Department of Health and Human Services ("HHS") promulgated regulations explaining that the ACA's ban on discrimination "on the basis of sex" includes discrimination on the basis of "gender identity." Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31376, 31467 (May 18, 2016). The regulation defines

"gender identity" as "an individual's internal sense of gender" and states that "[a] transgender individual is an individual whose gender identity is different from the sex assigned to that person at birth." Id. It sets forth the following rules:

> [a] covered entity [defined as an entity that operates a health program or activity, any part of which receives Federal financial assistance] shall not, in providing or administering health-related insurance or other health-related coverage . . . (4) Have or implement a categorical coverage exclusion or limitation for all health services related to gender transition; or (5) Otherwise deny or limit coverage, deny or limit coverage of a claim, or impose additional cost sharing or other limitations or restrictions on coverage, for specific health services related to gender transition if such denial, limitation, or restriction results in discrimination against a transgender individual.

Id. at 31472. The supplementary information published with the rule stated that "[the Office of Civil Rights] interprets Section 1557 as authorizing a private right of action for claims of disparate impact discrimination on the basis of any of the criteria enumerated in the legislation." Id. at 31440.

After publication of this regulation, the Court received supplemental briefing from the parties. In his supplemental briefing, defendant argued that § 505.2(l) does not run afoul of the ACA or the recent HHS regulation because it does not implement a categorical exclusion on treatments of gender dysphoria and allows coverage of medically necessary procedures. As explained above, § 505.2(l) does categorically ban medically necessary treatments for gender dysphoria. Accordingly, the Court

54

denies defendant's motion for summary judgment on plaintiffs' sex
discrimination claim.

Eighth, on plaintiffs' sixth claim, for violations of 42
U.S.C. §§ 1396a(a)(43), 1396d(r) (Medicaid's "EPSDT Provision"),
the Court denies both parties' motions for summary judgment. The
EPSDT Provision requires states to "provid[e] or arrang[e] for
the provision of [early and periodic screening, diagnostic, and
treatment services, described at § 1396d(r)] in all cases where
they are requested" for Medicaid recipients under 21 and
"arrang[e] for . . . corrective treatment the need for which is
disclosed by such child health screening services." 42 U.S.C. §
1396(a)(43)(B)-(C). Section 1396d(r) defines early and periodic
screening, diagnostic, and treatment ("EPSDT") services to
include a range of screening services, as well as "necessary
health care, diagnostic services, treatment, and [other medical
assistance] to correct or ameliorate defects and physical and
mental illnesses and conditions discovered by the screening
services, whether or not such services are covered under the
State plan." 42 U.S.C. § 1396d(r). The parties agree that the
EPSDT Provision requires states to provide all medically
necessary care to Medicaid recipients under 21, although states
may elect not to cover experimental treatments. Memorandum of Law
in Support of Defendant's Motion for Summary Judgment at 17-18,

ECF No. 82; Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment at 19-21, ECF No. 76.

As discussed above, there is a genuine dispute over whether the surgeries sought by plaintiffs are medically necessary and not experimental. Accordingly, the Court denies both parties' motions for summary judgment on plaintiffs' EPSDT Provision claims with respect to surgeries.

With respect to the hormone therapies sought by plaintiffs, defendant argues that the Compendia Requirement bars plaintiffs' EPSDT claims because there is no FDA or Compendia support for hormone therapies as treatments for gender dysphoria in minors. However, the Compendia Requirement does not extend to the EPDST Provision. The Compendia Requirement states that "[a] State may exclude or otherwise restrict coverage of a covered outpatient drug if . . . the prescribed use is not for a medically accepted indication." 42 U.S.C. § 1396r-8(d)(1)(B)(i). However, the EPDST Provision defines EPSDT services, which states are required to provide, to include "necessary health care, diagnostic services, treatment, and [other medical assistance] to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services, whether or not such services are covered under the State plan." 42 U.S.C. § 1396d(r)(5) (emphasis added). Accordingly, the coverage carveout offered by the Compendia Requirement does not lessen a state's

burden under the EPSDT Provision to provide all medically necessary care.

Because they survive the Compendia Requirement in full, plaintiffs' EPSD Provision claims directly present the factual questions that are only contingently presented by plaintiffs' Comparability Provision claims, namely, whether hormone therapies are medically necessary to treat gender dysphoria in minors. As discussed above, because of the lack of regulatory approvals, there are genuine disputes over whether hormone therapies, both cross-sex hormones and pubertal suppressants, are safe, effective, and medically necessary for minors with gender dysphoria. Accordingly, the Court denies both parties' motions for summary judgment on plaintiffs' ESPDT claims. The question to be resolved at trial on the EPDST Provision claims is also presented by plaintiffs' other claims, namely, what treatments, including surgeries or hormone therapies, are medically necessary for the treatment of gender dysphoria in minors?

In sum, for the foregoing reasons, the Court denies defendant's motion for reconsideration, denies defendant's motion to decertify the plaintiff class, denies defendant's motion for summary judgment in part and grants it in part, and denies plaintiffs' motion for summary judgment in part and grants it in part. This case will proceed to trial to determine (1) what treatments are medically necessary for individuals under 18 with

gender dysphoria and (2) to what extent DOH has consistently followed a bona fide policy of limiting coverage of drug uses to those listed in the Medicaid Compendia in the context of treatments for gender dysphoria. The parties are directed to jointly telephone Chambers by no later than July 8, 2016, to schedule a trial date.

The Clerk of Court is directed to close documents numbered 77, 79, and 81 on the docket of this case.

SO ORDERED.

Dated: New York, New York
       July 5, 2016                          JED S. RAKOFF, U.S.D.J.

58